THE CAYUGA INDIAN NATION OF
NEW YORK, et al., Plaintiffs,

and

The Seneca–Cayuga Tribe of Oklahoma
and the United States of America,
Plaintiff–Intervenors,

v.

George E. PATAKI, as Governor
of the State of New York,
et. al., Defendants.

No. 80–CV–930, 80–CV–960.

United States District Court,
N.D. New York.

Oct. 2, 2001.

Rubinbaum LLP, Attorneys for Plaintiffs Cayuga Indian Nation of New York, New York, NY, Martin R. Gold, Esq., Raymond J. Heslin, Esq., Of Counsel.

Mariscal Weeks McIntryre & Friedlander, Attorneys for Plaintiff–Intervenors The Seneca–Cayuga Tribe of Oklahoma, Phoenix, AZ, Glenn M. Feldman, Esq., Brian Mueller, Esq., Of Counsel.

Hank Meshorer, Esq., Special Litigation Counsel, U.S. Department of Justice, Environment & Natural Division, Attorney for Plaintiff–Invenor United States, Special Litigation Section, Washington, D.C., Roger R. Martella, Jr., Asst. Section Chief Indian Resources Section, Of Counsel.

Hon. Eliot Spitzer, Attorney General of the State of New York, Attorney for State Defendants, Albany, NY, David B. Roberts, Howard L. Zwickel, Christopher Hall, John Pickett, Assistant Attorneys General, Of Counsel.

Huber Lawrence & Abell, Attorneys for Def. New York State Electric & Gas Corporation, New York, NY, Theodore F. Duver, Esq., Of Counsel.

Goodwin Procter & Hoar, Attorneys for Miller Brewing and Def. Class, Boston, Mass., Anthony M. Feeherry, Esq., Of Counsel.

Harris Beach & Wilcox, Attorneys for Def. Counties, Rochester, NY, Brian Laudadio, Esq., Of Counsel.

## MEMORANDUM–DECISION AND ORDER

MCCURN, Senior District Judge.

### Table of Contents

Introduction ............................................. 271

Background ............................................. 272
 I. Pre–Trial Motions ............................. 272
 II. Jury Instructions ............................. 273
 III. Verdict ............................. 273

Discussion ............................................. 275
 I. Verdict ............................. 275
 II. Pre–Judgment Interest ............................. 284
 A. Wickham Analysis ............................. 286
 1. Full Compensation ............................. 286

 2. Nature of Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .288
 3. "Other General Principles" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .291
 4. Fairness of Relative Equities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .293
 a. Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .297

Historical Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .300
 I. Pre–Revolutionary War . . . . . . . . . . . . . . . . .· . . . . . . . . . . . . . . . . . . . . .304
 II. American Revolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .305
 A. Wyoming Valley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .305
 B. Sullivan–Clinton Campaign . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .306
 C. Articles of Confederation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .309
 D. Cayuga Factions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .309
 E. 1784 Fort Stanwix Treaties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .310
 F. Livingston Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .312
 G. 1789 Treaty at Albany . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .314
 H. Nonintercourse Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .321
 I. Richardson Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .322
 J. 1793 State Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .324
 1. Aftermath of the 1793 Statute . . . . . . . . . . . . . . . . . . . . . . . . . .327
 K. 1794 Federal Treaty of Canandaigua . . . . . . . . . . . . . . . . . . . . . . .328
 L. New York State's 1795 Act and the Council of Revision . . . . . . . . . . . . . . . . .330
 M. 1795 Treaty of Cayuga Ferry . . . . . . . . . . . . . . . . . . . . . . . . . . . . .· . . .331
 1. State's Awareness of Nonintercourse Act . . . . . . . . . . . . . . . . . . . . . . .332
 a. Pre–1795 Awareness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .332
 b. 1795 Awareness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .334
 2. Negotiation Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .340
 3. Commissioners' Conflicts of Interests . . . . . . . . . . . . . . . . . . . . . . . . .343
 4. Sale of Former Cayuga Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . .346
 5. Adequacy of Consideration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .347
 N. 1807 Treaty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .351
 O. 1807 Onward . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .353
 1. "Bad Faith" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .355
 2. Delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .356

Economic Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .358

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .366

### *Introduction*

On January 18, 2000, the court commenced with jury selection in this historic land claim litigation. The court's resolution of the liability issues,[1] left only one issue for the jury's consideration—the amount of compensation, if any, to which the tribal plaintiffs, the Cayuga Indian Nation of New York and the Seneca–Cayuga Tribe of Oklahoma ("the Cayuga"),[2] were

**1.** *See Cayuga Indian Nation of New York v. Cuomo*, 730 F.Supp. 485 (N.D.N.Y.1990) (*"Cayuga IV "*)(granting Cayuga's motion for partial summary judgment, and declaring that its 1795 and 1807 Treaties with the State were invalid under the Nonintercourse Act because the Federal Government never ratified those conveyances); *Cayuga Indian Nation of New York v. Cuomo*, 758 F.Supp. 107 (N.D.N.Y.1991) (because the Cayuga obtained recognized title in the subject land through the 1794 Treaty of Canandaigua, defendants' abandonment defense was insufficient to defeat the Cayuga's claims to that land); and *Cayuga Indian Nation of New York v. Cuomo*, 771 F.Supp. 19 (N.D.N.Y.1991) (defense of laches unavailable).

**2.** Nearly two years after the commencement of this action, the United States of America ("the U.S.") intervened as a plaintiff in this action "on its own behalf and to enforce the restrictions on alienation found in 25 U.S.C. § 177 [the Nonintercourse Act]" for the tribal plaintiffs. *See* U.S. Complaint in Intervention at 2, ¶ 4. Hereinafter, the U.S. and the Cayuga

entitled for the loss of their tribal lands over two centuries ago. Nineteen days, six witnesses, whose testimony comprises the nearly 3,000 page trial transcript, and approximately 130 exhibits later, on February 17, 2000, the jury rendered its verdict. It found the State of New York ("the State")[3] liable to the Cayuga in the total amount of $36,911,672.62. Those damages were divided into two categories: (1) $1,911,672.62 for the fair rental value of the Cayuga's former homeland for 204 years; and (2) an additional $35,000,000.00 in damages for future loss use and possession of that same land.

## Background

No less than twenty years of litigation preceded that jury verdict. Assuming familiarity with the protracted and at times convoluted history of this action, the court will not repeat that entire history herein. To place the issue of prejudgment interest which now dominates this litigation in context, however, an overview of some of this court's rulings in recent years, especially as to remedies, is in order.

### I. Pre–Trial Motions

Faced with several motions *in limine* seeking to "severely limit the remedies available to the Cayugas[,]" in *Cayuga Indian Nation of New York v. Pataki*, No. 80–CV–930, 80–CV–960, 1999 WL 224615, at *1 (N.D.N.Y. April 15, 1999) ("*Cayuga VIII* "), the issue of prejudgment interest first arose. Holding that federal rather

than state law governs the issue of the availability of prejudgment interest, this court recognized its "*sweeping discretion* to decide whether to award prejudgment interest . . . , as well as [its] *considerable latitude* in establishing both the rate of interest and the accrual date." *Id.* at *17 (emphasis added). Ultimately, the court declined to decide whether the Cayuga were entitled to recover prejudgment interest because at that time the record was not sufficiently developed.

The court also was operating in a "legal vacuum" because the parties had not addressed the factors which the Second Circuit in *Wickham Contracting v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 955 F.2d 831 (2d Cir.1992), had identified as relevant in deciding "whether to award prejudgment interest[.]" *See id.* at *19 and *21. After reciting the *Wickham* factors, the court stressed that an award of prejudgment interest was *not* a foregone conclusion. *Id.* at *16.

With a date for jury selection looming, the parties sought further clarification on a variety of issues including, yet again, prejudgment interest. The court held that it would not receive proof of present day value during Phase I. In a final round of motions *in limine* made in anticipation of Phase I, the U.S. sought, *inter alia*, to have the court "reserv[e] to [itself] all issues of law and equity, leaving only fact issues as to the amount of damages for the jury[.]" *Cayuga Indian Nation of New York v. Pataki*, 79 F.Supp.2d 78, 86

---

plaintiffs will be collectively referred to as "plaintiffs," unless it is necessary to distinguish between the two.

**3.** To avoid "a morass of complicated and lengthy litigation which could easily extend well into the next century[,]" if the court allowed the Cayuga to proceed against all of the defendants, including the approximately 7,000 individual landowners, it granted the

U.S.' motion "to proceed to trial first against the State[.]" *See Cayuga Indian Nation of New York v. Pataki*, 79 F.Supp.2d 66, 76 (N.D.N.Y.1999) ("*Cayuga XI* "). Hence, the State was the lone defendant in the jury trial or what has come to be known as "Phase I" of this litigation, and it continued to be the only defendant in "Phase II" of this litigation, the non-jury trial.

(N.D.N.Y.1999) ("*Cayuga XII*"). Adopting this approach, the court held that equitable issues such as laches would "be reserved to [it], and if necessary, the same may be the subject of post-trial motions and/or additional post-trial proceedings before the court, without a jury." *Id.* at 92.

## II. Jury Instructions

At various points during Phase I the court instructed the jury in conformity with the pre-trial rulings outlined above. Among other things, in its preliminary instructions the court briefly explained the respective roles of the jury and the court, *i.e.,* the court decides legal issues and the jury decides fact issues. Consistent with those different roles, the court further explained that the trial would occur in two phases. In Phase I the jury's task was to resolve the issue of the amount of damages, if any, to which the Cayuga would be entitled. The court then explained that there would be another proceeding after the jury trial where the Court would resolve certain equitable issues, such as interest.

At the close of the proof the court reiterated these points, explaining that "interest on the amount of any damages you may award, conversion to present day value of any past damages you may award," and "a possible reduction in any damages you may award to the plaintiffs due to their alleged failure to timely commence this action, that is, laches[,]" are all equitable issues outside the province of the jury. *See* Transcript ("Tr.") at 2748–49. Thus, the jury was unequivocally advised, not once, but twice that it should not concern itself with equitable issues such as interest. Consistent with the foregoing, the jury was explicitly instructed that it "should [not] . . . calculate an amount to compensate the plaintiffs for the fact that they did not have the use of the money

between when the injury occurred and the present." *Id.* at 2773–74. That particular charge concluded by advising the jury: "It has previously been decided that the Court will determine whether an award of same will or will not be made in connection with the amount you determine as damages." *Id.* at 2774. The jury was further instructed that it *"should not make any adjustment for* the effect of *inflation or* the *loss of use* of the *money.*" *Id.* at 2773 (emphasis added). Presupposing that it would award damages in dollars for the year the injury was sustained, the jury also was instructed that it "should not, . . . attempt to convert the value of the dollar at the time of the injury for which you have determined damages to an equivalent value in current dollars[.]" *Id.* Further, insofar as calculating lost rent, the jury was instructed, "you must determine . . . the loss of the value of the use of the lands of the Cayugas for each of the 204 years they were wrongfully detained or prevented from the use of the land." *Id.* at 2768–69.

## III. Verdict

The verdict form was fairly lengthy, but the jury only had to answer two discrete questions. The first was:

> What amounts, if any, do you find that plaintiffs have been damaged for loss of use and possession of the claim area from July 27, 1795 to date as measured by a fair rental value without improvements but with infrastructure in place, less credit, if any, to the State for payments made to plaintiffs?

Gov. exh. 21 at 1, ¶ 1 (footnote omitted). The verdict form also required the jury to indicate for each year from July 27, 1795, through "2000 to date," the following: the "amount" of such loss; the "credit to the State[;]" and the "net amount." *See id.* at 1. For the first designated time period, from July 27, 1795 to the end of that year,

the jury found that the Cayuga had sustained losses in the amount of $7,148.69. *See id.* For every full year thereafter through 1999, the jury found that the Cayuga had sustained losses in the amount of $17,156.86 per year. For the year 2000, to the verdict date, February 17, 2000, the jury found that the Cayuga had sustained losses in the amount of $2,859.48. *See id.* at 10.

In accordance with a stipulation between the Cayuga and the State, the jury then credited the State for its annuity payments to the Cayuga for the years 1795 through 1999. After finding total rental losses in the amount of $3,510,007.61, and payments by the State totaling $1,598, 334.99, the jury concluded that the Cayuga were entitled to $1,911,672.62 for the fair rent value of the claim area over the 204 years. *See id.*

After polling the jury, the court advised the parties that it would not enter a final judgment at that time because of the outstanding issues which needed to be resolved in Phase II. The parties were given the opportunity within sixty days of the verdict to file any motions in relation thereto, but no such motions were filed.

Anticipating Phase II, among other things, the parties filed their respective economists' reports. On May 17, 2000, after reviewing the same, those reports revealed an "enormous disparity[ ]" as to the amount of prejudgment interest to which the Cayuga may be entitled, and the court was forced "to conclude that it [could not] properly assess the availability of prejudgment interest in the first instance without some context, beyond the mathematical calculations found in th[ose] ... reports." *Cayuga Indian Nation of New York v. Pataki,* Nos. 80–CV–930, 80–CV–960, 2000 WL 654963, at \*3 (N.D.N.Y. May 17, 2000), *amended on other grounds,* 2000 WL 687901 (N.D.N.Y. May 22, 2000). Therefore, the court agreed to allow the parties' witnesses to testify as to certain "equitable factors[.]" *See id.* The court went on to list several such factors, but it did not mention allowing any witness to testify as to what the jury actually intended when it rendered its verdict. In the end though, the court was extremely generous in terms of the proof which it permitted during Phase II, reasoning:

> Because the stakes are simply too high, the experts' views too antithetical, and the equities on all sides too important to disregard, ... the only way to proceed at this juncture is to make every effort to insure that all parties to this litigation have an equal opportunity to present their respective versions of history, and how those versions impact the remaining issues of prejudgment interest and laches.

*Id.* at \*4.

The Phase II trial was lengthy and the court's task in analyzing the extensive proof adduced therein was an arduous one, to say the least. Under the best of circumstances analysis of the Phase II proof would have been difficult. But the court's task was unnecessarily complicated by the fact that *all* of the parties frequently either cited to a document which did not support their contention, or equally disconcerting, would take a quote out of context. All too often this selective quoting meant that when the court consulted a source document or the transcript, the assertion was not actually supported therein.[4]

---

4. The parties are equally guilty of this practice. To give but a few examples, the U.S. declares that "[t]he Cayuga minority protested the treaty vehemently, and again accused New York of having defrauded them at the Treaty of Albany in 1789." United States' Revised Post–Trial Memorandum of Law ("U.S.Post–Tr.Memo.") at 26. It then cites

Moreover, when the court read such a quote in context the meaning was often times very different than that ascribed to it by the quoting party. The court is fully aware that lawyers have an obligation to represent their clients "zealously[,]" *see* N.Y. code of Professional Responsibility Canon 7, reprinted in N.Y. JUD. LAW APP. (McKinney Supp.2001); but there are limits to such zealousness and a lawyer does not do his or her client any great service by engaging in such tactics which distract from a party's otherwise valid legal arguments and undermine a lawyer's credibility to a certain extent.

### Discussion

The issues the parties raise in connection with Phase II are legion. The first and in some ways perhaps most important issue pertains to the meaning of the jury verdict itself.

### I. Verdict

More than four months *after* the jury rendered its verdict and more than four months *after* the jury's discharge, the State raised for the first time the possibility of an inconsistent verdict. In its June 30, 2000, memorandum of law submitted prior to Phase II the State did not employ

the phrase "inconsistent verdict." Its economist Richard S. Grossman did not shy away from that concept in his report, unequivocally stating that the "verdict presents the Court with an inconsistency[.]" *See* St. exh. 721 at 10, ¶ 26. In the State's view this alleged inconsistency arises because in Phase I the jury, colloquially speaking, impermissibly compared apples and oranges. *See* Pre–Tr. Memo at 74.

This supposedly impermissible comparison occurred, Grossman believes, because the jury did not distinguish between current and constant dollars as he defines and employs those terms. In Grossman's report he wrote that from an economic standpoint there are "two types of dollars: 'current dollars,' which are merely the dollars of a particular year *in that year*, and 'constant dollars,' which are sums that are expressed in the dollars of one particular year (called the base year)." St. exh. 721 at 7, ¶ 18 (emphasis in original). When "compar[ing] quantities of dollars from different years," Grossman declared that "[i]t is not possible to make an *economically* meaningful comparison between sums denominated in dollars of different years." *Id.* at 8, ¶ 20 (emphasis added). Grossman therefore asserted "it makes *no economic*

---

page 2995 of Dr. Whiteley's testimony to support that assertion. Support for the U.S.' proposition cannot be found anywhere on that page however. In another example, the State compounded its misstatement by inaccurately stating the opposition's position. The State asserts that according to the Cayuga "[b]oth the 1789 and 1795 treaties, ..., were negotiated in bad faith because they were not conducted with the full council of chiefs of the Iroquois confederacy." State of New York Defendants' Phase II Post–Hearing Reply Memorandum ("St.Reply") at 10 (emphasis added). The State then goes on to cite to the Cayuga's and U.S.' memorandum respectively. When those cites are consulted, however, they pertain only to the 1789 Treaty and not to the 1795 Treaty.

Equally troubling, and adding to the court's burden, was the parties' tendency to at times cite to an entire exhibit without referring to a page number. This practice is bothersome enough when the documents are relatively short, such as when the State cited to four speeches from the 1795 Treaty negotiations without including specific references, *see* State of New York Defendants' Phase II Hearing Memorandum ("St.Pre–Tr.Memo.") at 10; but when the cite is to a voluminous exhibit such as the two volume "Proceedings of the Commissioners of Indian Affairs," compiled by historian, Franklin Hough, this practice is inexcusable. *See* St. exh. 35.

*sense* to add or to subtract sums denominated in dollars of different years[;]" yet that is precisely what the jury did Grossman concludes. *Id.* (emphasis added). Such calculations are in Grossman's view "completely unacceptable from an economic perspective[.]" *Id.* That type of calculation is "troublesome" suggests Grossman because, for example, when subtracting 1999 and year 2000 dollars, those dollars "differ in value by 3 percent[.]" *Id.* Accordingly, a meaningful comparison of dollars in different years can only be had, Grossman contends, when those dollars are "denominated in the constant dollars of any given year." *See id.*

Grossman posits that the jury disregarded these general economic precepts by crediting the State with payments to the Cayuga through the years in "current dollars," while at the same time using "constant dollars," as he defines that term, in determining the amount of lost rent in any given year. *See id.* at 9, ¶¶ 22 and 23. To support his theory as to how the jury calculated lost rent damages, Grossman made two assumptions. First, because "the 'credit to state' column . . . corresponds exactly to the amounts actually paid by the [State] to the plaintiffs in each year of the 204–year period[,]" Grossman believes that "the figures stated in this column are clearly expressed in the dollars of the years in which they were paid, i.e., current dollars." *Id.* at ¶ 22.

Second, in determining the amount due the Cayuga each year for lost rent, Grossman hypothesizes that the jury used "constant" year 2000 dollars. To support this hypothesis, Grossman observes that the jury "award[ed] [a total of] $3.5 million divided up into 204 equal payments (since $3.5 million divided by 204 equals $17,156.86 exactly)." *Id.* at ¶ 23. Further, Grossman observes that the $3.5 million in lost rent damages, as found by the jury is

(not coincidentally in Grossman's view), equivalent to exactly ten percent of the $35 million which the jury awarded the Cayuga for future loss of use and possession of the claim area. Given what Grossman deems to be this obvious correlation between the total rental value damages and the current fair market value of the land, and the fact that rents are identical in each year from 1795 to 2000, he concludes that "it is . . . clear that the jury expressed the lost rents in current dollars." *Id.*

Grossman also relies upon the court's instruction to the jury not to adjust the award or "attempt to convert the value of a dollar at the time of the injury[ ]" *see* Tr. at 2773, to support his conclusion "that the jury's verdict in the 'amount' column is expressed in dollars of the year 2000." *See* St. exh. 721 at 9, ¶ 23. Additionally, Grossman opines that the dollars in the "amount" column cannot be expressed in current dollars because prices have not stayed constant over the past 204 years. *See id.* at 9, ¶ 24. Finally, Grossman believes in part that because the jury was instructed not to make adjustments for inflation, it "gave its verdict in the dollars it . . . knows best: constant 2000 dollars." *See id.* at 10, ¶ 25.

In light of the foregoing, instead of accepting the verdict on its face, the State maintains that the court should "adjust[ ]" the verdict "by either converting the annual rent to historical damages for each year *or* by converting the State payments to present-day dollars." State Defendants' Memorandum of Law in Support of their Request to Examine the Economic Witnesses on the Jury's Award for Fair Market Rental Value of the Claim Area at 2 (emphasis added); *see also* St. Post–Tr. Memo. at 70. The State argues that adjusting the jury verdict in this way is entirely proper because where, as the State believes occurred here, "the verdict

is not clear on its face, it is appropriate to look at how the verdict was constructed[.]" Tr. at 6116. Once the court makes such an adjustment or conversion, the State wants the court to recalculate the jury verdict using those adjusted figures. The State contends that this process, as opposed to the process outlined by Grossman, which the State suspects the jury employed, will "yield a meaningful total net rental figure" from which the court can then compute prejudgment interest. *See id.*

In contrast to the State's approach, which requires interpreting the jury verdict, both the Cayuga's and the U.S.' respective economists, while arriving at different conclusions as to the amount of prejudgment interest, accept the verdict "at face value." *See* Cayugas' Post–Trial Memorandum ("Cay.Post–Tr.Memo.") at 22. Dr. Berkman, the U.S.' economist, acknowledged that his calculations were based upon "the numbers presented on the jury verdict form[.]" *See* Tr. at 6053–54. The Cayuga's economist, Dr. Temin, similarly testified that in terms of yearly rent payments, he "started from the jury verdict form[.]" *See id.* at 5809. Thus Drs. Temin and Berkman assumed, in conformity with the charge, that the jury expressed *both* the State's credit payments and the fair rental value "in *dollars* of the *particu-*

*lar year* in which they were incurred." U.S. Post–Tr. Memo. at 60 (emphasis added). Any other reading of the verdict amounts to improper "second-guessing" of the jury's intent, according to the Cayuga. *See* Cay. Post–Trial Memo. at 20. Finally, characterizing Grossman's suggested "adjustments" to the verdict as "tampering" with the same, the Cayuga are taking the position that there is no need, and indeed it would be improper for the court to make the adjustments which the State is urging because such adjustments would "lead[ ] to a complete nullification of the jury's award[.]" Cayugas' Post–Trial Reply Memorandum ("Cay.Reply") at 8 (citations omitted); *see also* U.S. Post–Trial Memo. at 65.

■ Given these conflicting views as to the meaning of the jury verdict, the first issue which this court must consider is whether it is proper, in hindsight, to reexamine the verdict in an effort to ascertain how the jury arrived at the final damage figure for 204 years of lost rent. More specifically, in calculating prejudgment interest, should the court, as the State urges, "adjust" the dollar amounts as found by the jury, or should it simply make any prejudgment interest calculation it deems proper using the dollar figure, unadjusted, found on the verdict form.[5]

---

5. Somewhat surprisingly, the Cayuga are not questioning the timing of the State's argument that the verdict is inconsistent. If the court ultimately agrees with the State, finding that the verdict is inconsistent, the ramifications are tremendous, including the possibility of a retrial. In terms of both judicial economy and upholding the sanctity of jury verdicts generally, retrials are disfavored. That is especially so in a case of this magnitude where the trial was relatively lengthy and hardfought. *See Grant v. Westinghouse Elec. Corp.,* 877 F.Supp. 806, 815 (E.D.N.Y.1995). Given the enormity of the task which a retrial would involve here, and given the fact that the State did not even hint at the possibility of

an inconsistent verdict until four months after the discharge of the jury, the court cannot ignore the timing of the State's argument in this regard.

Generally "if trial counsel fails to object to any asserted inconsistencies and does not move for resubmission of the inconsistent verdict *before* the jury is discharged, the party's right to seek a new trial is waived." *James v. Tilghman,* 194 F.R.D. 408, 413 (D.Conn.1999) (quoting *Manes v. Metro–North Commuter R.R.,* 801 F.Supp. 954, 959 (D.Conn.1992), *aff'd without published opinion,* 990 F.2d 622 (2d Cir.1993)) (emphasis added by *Manes* court). The purpose of waiver is easy to see; it "promote[s] the efficiency of trials by allow-

ing the original deliberating body to reconcile inconsistencies without the need for a new presentation of evidence to a different body." *Wright v. Wilburn*, 194 F.R.D. 54, 59 (N.D.N.Y.2000) (internal quotation marks and citations omitted). Otherwise, especially where counsel is fully aware of the claimed inconsistency when the jury renders its verdict, the jury's work-product is "unfairly scuttled[.]" *In re Wedtech Corp.*, 196 B.R. 274, 278 (Bankr.S.D.N.Y.1996) (internal quotation marks and citations omitted).

Instead of taking a hard-line approach to waiver, the Second Circuit in *Denny v. Ford Motor Co.*, 42 F.3d 106, 111 (2d Cir.1994), adopted a "case-by-case" approach to evaluating whether a party has waived its right to challenge a verdict as inconsistent. While the Second Circuit does "take a guarded approach to the *per se* application of the waiver rule, acknowledging that a party's failure to make a timely objection carries some weight in [a] court's analysis of the waiver issue[,]" at the same time it recognizes "that a court may not completely abdicate its responsibility to resolve inconsistencies in jury verdicts." *Tilghman*, 194 F.R.D. at 413 (internal quotation marks and citations omitted); *see also Trinidad v. American Airlines, Inc.*, No. 93 Civ. 4430 SAS, 1997 WL 79819, at *2 (S.D.N.Y. Feb.25, 1997) ("[A]lthough this Circuit has rejected a *per se* waiver rule, waiver can and should be applied in appropriate cases.")

Adopting a "contextual approach" to waiver, *see Manes*, 801 F.Supp. at 959, the Second Circuit in *Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48 (2d Cir.1992), found that the defendant manufacturer waived its challenge to the jury verdict as inconsistent where it made that challenge for the first time in a post-trial motion, and where it failed to raise that inconsistency before the jury's discharge. *Id.* at 54. In a similar vein, in *Tilghman*, 194 F.R.D. at 412, the court deemed the plaintiff to have waived his argument that the verdict form's answers were inconsistent where he did not object to that form after the verdict. *See id.* at 413. Nor did that plaintiff ask for reconsideration of the jury's verdict, or move for a new trial on that basis. *See id.; see also Castle v. Leach Co.*, 4 F.Supp.2d 128, 130 (N.D.N.Y.1998) (in products liability and negligence case, plaintiff waived right to seek a new trial based upon an asserted inconsistent verdict where she did not object to the verdict sheet at the charge conference, nor to the jury's answers; and she did not move for

resubmission to the jury to resolve the alleged inconsistency); *Blissett v. P.K. Deputy Eisensmidt, D.S.S.*, 940 F.Supp. 449 (N.D.N.Y. 1996) (McCurn, J.) (defendant correction officers waived right to object to verdict as inconsistent based upon a finding of a constitutional violation, but no finding of battery, where despite several opportunities, they failed to object to the same before the jury's discharge). By the same token, however, in *Denny* itself the Second Circuit held that the defendant manufacturer did *not* waive its objection to submitting to the jury the issues of strict products liability and breach of implied warranty where the defendant had timely objected to such submission in that it was made before the jury was instructed on the claims, arguing that it could lead to inconsistent results. *See* 42 F.3d at 111. The Second Circuit also noted that resubmission to the jury would have amounted to no more than renewal of the party's earlier objection. *See id.* Thus, in essence, whether or not a party is deemed to have waived its right to object to a verdict as inconsistent depends largely upon the timing of that objection.

In accordance with the waiver principles developed within this Circuit, here, in all likelihood, the State *did* waive its right to object to the jury's verdict as inconsistent. First of all, the State did not raise the specter of an inconsistent verdict prior to the jury's discharge, thus preventing the court from resubmitting the case to the jury for further deliberations to clarify and/or perhaps correct this perceived inconsistency. The State also did not object to the jury's answers immediately after it the verdict, even though the jurors were individually polled, giving the State additional time in which to contemplate the jury's verdict. Due to the State's silence, the court was never made aware of this claimed inconsistency prior to discharging the panel.

The jury has long since been discharged and along with that the possibility of reconciling the jury's verdict has also disappeared. Furthermore, if this alleged inconsistency is as readily transparent as the State seems to believe, it is difficult to imagine why the State did not immediately notify the court of same and seek to have the verdict resubmitted to that jury which had attentively sat through several weeks of often tedious testimony. *See Trinidad*, 1997 WL 79819, at *2 ("[I]f the alleged inconsistency is as blatant as plaintiff suggests, plaintiff cannot ... claim that the inconsistency was unnoticeable at the time of

To support its argument that the court should "look behind" the jury verdict, the State relies heavily upon *Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371 (2d Cir. 2000). According to the State, *Sharkey* stands for the proposition "that where the verdict is not clear on its face, it is appropriate to look at how the verdict was constructed[.]" Tr. at 6116. It is also "appropriate" under *Sharkey*, argues the State, for the court to consider evidence regarding the jury's intent in rendering its verdict. *See id.* at 6117.

In *Sharkey*, a case brought pursuant to the Age Discrimination in Employment Act ("ADEA"), the plaintiff argued "that because he did not include lost pension benefits in his calculations of damages ... or attempt to quantify his lost benefits ..., the jury must not have included them it its award[;]" hence the district court erred in denying an award of prejudgment interest and pension benefits. *Sharkey*, 214 F.3d at 375. The defendant countered that because the evidence included references to pension benefits offered to plaintiff's colleagues, when the jury awarded plaintiff "damages for [his] *total* financial losses[,]" it included the value of his lost pension benefits in the verdict. *See id.* (emphasis in original) (internal quotation marks omitted). The defendant also pointed to the fact that the jury had been instructed that plaintiff was entitled to recover his "economic loss[;]" and that he "was entitled to recover lost salary and benefits, including ... fringe benefits." *Id.* Finally, the defendant noted that the jury was also instructed that it "may award [plaintiff] an amount equal to the salary and benefits he would have received ... less the amount of salary and benefits he received after he left the employ of the defendants, including severance payments, *pension benefits* and amounts from other employers ...." *Id.* (emphasis in original) (internal quotation marks omitted).

Given the ambiguous state of the record as to whether the jury included the value of lost pension benefits in its verdict for " 'total financial losses[,]' " the Second Circuit concluded that it was impossible to definitively say whether the jury included the value of such benefits in making its award. *See id.* Therefore, the Court instructed the district court on remand to "make a determination whether the jury's award included the value of lost pension benefits." *Id.*

On remand the Second Circuit also instructed the district court "to apportion the jury's award[ ]" to determine what part was attributable "to stock rights and options and the value of lost pension benefits[.]" *Id.* Such apportionment was necessary according to the Second Circuit because an award of "prejudgment interest

---

the verdict and therefore that plaintiff was justified in his delay."). In short, the State had a number of opportunities to object to the jury verdict form, as well as the instructions, on the basis that possibly an inconsistent verdict would result: (1) during the charge conference, which commenced on a Thursday, and continued over to the following Monday, giving the State ample time to study the proposed verdict form and the charge with an eye toward possible inconsistencies; (2) after the court's instructions, but before the jury began deliberations; (3) and again after the jury returned its verdict. The State was silent at each of those critical junctures. In fact, the court ventures to say that this alleged inconsistency did not become evident to the State except with the advantage of hindsight when its retained economist analyzed the verdict and the process which the jury supposedly undertook in arriving at same. Having said all that, the court need not definitively hold that the State has waived its right to object to the verdict as inconsistent because, for the reasons set forth above, the court is not persuaded that an inconsistency exists here. Consequently, there is no danger in the present case of the court abdicating its responsibilities to reconcile a claimed inconsistent verdict.

may be inappropriate on the portion attributable to the value of lost pension benefits, if any." *Id.*

*Sharkey* does not mandate the conclusion that this court should, after-the-fact, in effect rewrite the jury verdict here. There is a fundamental distinction between *Sharkey* and the present case—a distinction which the State conveniently disregards. In *Sharkey* the district court's task on remand was to ascertain the scope of the jury's award and to apportion it. Here, the State is asking the court to engage in a far different task—a task which would, as will be seen, result in usurping the jury's function. In the present case it is not simply a matter, as it was in *Sharkey*, of ascertaining the scope of the jury's award and then apportioning it. Rather, analyzing the verdict in the manner which the State is advocating would require this court to examine the Phase I evidence in its entirety, as well as the jury instructions, and then speculate as to how the jury derived damages for fair rental value. The analysis which the State proffers through Grossman would also require the court to improperly assume that the jury disregarded the court's instructions. Plainly such an analysis goes far beyond any contemplated by the *Sharkey* Court.

Of equal if not more import is that in *Sharkey* the possibility of an inconsistent verdict was never raised; but the State is raising that possibility now. Therefore, this court's obligations differ significantly from those of the district court in *Sharkey*. Because the State is claiming that the verdict is potentially inconsistent, this court has an obligation to harmonize the verdict where possible—an obligation which did not arise in *Sharkey*. In short, given the obvious differences between *Sharkey* and the present case, the court declines to rely upon the latter as justification for, as the State insists, ascertaining

"how the verdict was constructed[.]" *See* Tr. at 6116.

In addition to *Sharkey*, to support its assertion that the court should scrutinize this verdict and adjust it in the manner which Dr. Grossman is urging, the State cites to *Malarkey v. Texaco, Inc.*, 983 F.2d 1204 (2d Cir.1993). Claiming that the district court's award of equitable relief, in the form of ordering plaintiff's promotion upon her reinstatement, "went far beyond making [her] whole, as mandated by the ADEA[,]" on appeal the defendant employer sought, *inter alia,* to set aside that relief for an abuse of discretion. *See id.* at 1214. The Second Circuit in *Malarkey* did observe that the district court had "*surmised* [that] the jury awarded plaintiff $65,000 by comparing her salary to that of ... [another employee who was given the secretarial position to which plaintiff claim[ed] she was entitled]." *Id.* (emphasis added).

Relying upon the just quoted language from *Malarkey,* the State urges this court to "surmise" that the jury calculated its award in the manner which Dr. Grossman posits. The court will not do that because *Malarkey* presents an entirely different situation than does the present case. In exercising its "broad" discretion to fashion relief under the ADEA by ordering plaintiff's promotion, the district court in *Malarkey* was drawing what the Second Circuit implicitly found to be a "logical extension" of the jury's award "express ... findings[.]" *See id.* In sharp contrast with what the State is asking this court to do, the district court in *Malarkey* did not adjust or rewrite the jury's factual findings; nor did it supplant those jury findings with its own—both of which would happen if this court were to adopt the State's argument. Analyzing the verdict as the State's economist suggests would require more than a "logical

extension" of the jury's verdict. It would require this court to completely transform the Phase I verdict, so much so that it would result in substantially altering if not completely reversing that verdict. Clearly, such a readjustment of the jury's factual findings is not what the Second Circuit had in mind in *Malarkey* when it implicitly approved of the fact that the district court had surmised how the jury arrived at a back pay award. Because *Malarkey* is readily distinguishable from the present case, it does not advance the State's argument in any way. Accordingly, *Malarkey* does not, as the State contends, support this court reexamining and ultimately readjusting the jury's verdict as to fair rental value. In sum, the State has not brought to the court's attention any legal authority to support its argument that the court should essentially re-write the jury's findings as to lost rent damages.

This omission by the State is all the more glaring given the plethora of case law set forth below pertaining to the sanctity of a jury's verdict and a court's duty to reconcile a purportedly inconsistent verdict. Typically that case law centers on situations where courts are confronted with potentially inconsistent verdicts in the context of either a motion for a new trial or a motion for judgment as a matter of law. Although the State is *not* seeking a new trial, those cases are instructive at this juncture nonetheless, particularly in the absence of any case law directly on point.

 In this Circuit " '[w]hen confronted with a potentially inconsistent jury verdict, the court must 'adopt a view of the case, if there is one, that resolves any seeming inconsistency.' '" *Densberger v. United Technologies Corporation*, 125 F.Supp.2d 585, 598 (D.Conn.2000) (quoting *Turley v. Police Dep't of the City of N.Y.*, 167 F.3d 757, 760 (2d Cir.1999)) (other citation omitted). Thus " '[b]efore a court may set aside a special verdict as inconsistent and remand the case for a new trial, it must make every attempt 'to reconcile the jury's findings, by exegesis if necessary.' '" *Id.* (quoting *Turley*, 167 F.3d at 760) (other citations omitted). " '[A]nd[,] if there is any way to view a case that makes the jury's answers to the special verdict form consistent with one another, the court must resolve the answers that way even if the interpretation is strained.' " *Wright*, 194 F.R.D. at 57 (quoting *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1311 (2d Cir.1993)) (other citation omitted). The mere fact that a trial court may disagree with a jury's verdict does not provide a basis for granting a motion for a new trial based upon an alleged inconsistent verdict. *See Wright*, 194 F.R.D. at 57 (citing *Saloomey v. Jeppesen & Co.*, 707 F.2d 671, 679 (2d Cir.1983)).

 In assessing whether a given verdict is inconsistent, a court is not limited to examining " 'just the [jury] answers themselves.' " *See Densberger*, 125 F.Supp.2d at 598 (quoting *McGuire*, 1 F.3d at 1311) (citations omitted). The court " 'should refer to the entire case[,]' " *see id.*, including jury instructions. *See Finnegan v. Fountain*, 915 F.2d 817, 820 n. 3 (2d Cir.1990) (citing *Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108, 118–22, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)). "This duty 'derives from the Seventh Amendment's obligation on courts not to recast factual findings of a jury, . . ., and is based on the notion that 'juries are not bound by what seems inescapable logic to judges.' '" *Densberger*, 125 F.Supp.2d at 598 (quoting *Indu Craft*, 47 F.3d at 497) (other citations omitted).

 In attempting to reconcile a seemingly inconsistent verdict, the Second Circuit has held that "[w]here 'the district

court properly instructed the jury ...,
[t]here is a strong presumption that the
jury in reaching its verdict complied with
those instructions.'" *Id.* Given that
"strong presumption," the Second Circuit
has held that "[a] jury's verdict reached
after proper instructions must be upheld
where there is a reasonable explanation for
the jury's seemingly inconsistent answers."
*Bonner v. Guccione,* 178 F.3d 581, 588 (2d
Cir.1999) (internal quotation marks and ci-
tation omitted). In fact, the Second Cir-
cuit has expressly stated that "[g]iven cor-
rect instruction on the law and no clear
disregard for that instruction on the face
of the verdict, a jury verdict must remain
immune from questioning by the district
court." *Id.* at 588 (internal quotation
marks and citations omitted). As the fore-
going principles show, the Second Circuit
"has been aggressive in [its] efforts to
harmonize inconsistent jury verdicts."
Shaun P. Martin, *Rationalizing the Irra-
tional: The Treatment of Untenable Fed-
eral Civil Jury Verdicts,* 28 Creighton
L.R. 683, 717 (1995).

■ It is fundamental that " '[w]hen
a jury returns a verdict by means of an-
swers to special interrogatories [under
Rule 49(a) ], the findings must be consis-
tent with one another, as they form the
basis for the ultimate resolution of the
action.'" *Densberger,* 125 F.Supp.2d at
598 (quoting *Crockett v. Long Island R.R.,*
65 F.3d 274, 278 (2d Cir.1995)). Further-
more, "where the special verdict answers
appear to be inconsistent but there is a
'view of the case that makes the jury's
answer[s] ... consistent, they must be re-
solved that way.'" *Tolbert v. Queens Col-
lege,* 242 F.3d 58, 74 (2d Cir.2001) (quoting
*Atlantic & Gulf Stevedores, Inc. v. Eller-
man Lines, Ltd.,* 369 U.S. 355, 364, 82
S.Ct. 780, 7 L.Ed.2d 798 (1962)). Here,
because the jury was asked to make cer-
tain, specific factual findings as to the

amount of damages, and because it was not
asked to determine liability, this is a "spe-
cial" verdict under Fed.R.Civ.P. 49(a). The
present verdict further conforms with a
Rule 49(a) verdict in that it "did not offer
the jury the ultimate choice normally
called for by a general verdict—the defen-
dant is liable to the plaintiff for a specified
amount of damages, or the defendant is
not liable to the plaintiff." *See Bradway v.
Gonzales,* 26 F.3d 313, 317 (2d Cir.1994)
(internal quotation marks and citation
omitted). Consequently, in analyzing
whether or not this verdict is inconsistent,
the court will treat the same as a "special
verdict" in accordance with Rule 49(a).

■ The State, through its economist
Grossman, is claiming that the verdict is
inconsistent because purportedly when cal-
culating fair rental damages, the jury uni-
formly employed year 2000 dollars in de-
termining the yearly lost rent, but from
those amounts it subtracted dollars in the
year in which the State made payments.
It is conceivable that the jury did in effect,
as the State maintains, subtract apples
from oranges. It is "equally rational to
believe," however, that the jury did *not*
engage in such a comparison. *See Indu
Craft,* 47 F.3d at 497. In fact, keeping
with its " 'duty ... to attempt to harmon-
ize the jury's answers, if it is at all possible
under a fair reading of the responses[,]' "
the court has little difficulty finding that
this verdict is *not* inconsistent. *See Dens-
berger,* 125 F.Supp.2d at 598 (internal quo-
tation marks and citation omitted).

Examining both the verdict form and
the relevant jury instructions, as the court
must, *see Finnegan,* 915 F.2d at 820 n. 3
(citation omitted), it can be readily deter-
mined that the jury found the amount of
lost rent using dollars in the years in
which that rent was lost—not as the State
urges in year 2000 dollars. Any other
reading of the verdict would require the

court to assume that the jury disregarded the court's explicit instruction that it "should not, . . . attempt to convert the value of the dollar at the time of the injury for which you have determined damages to an equivalent value in *current* dollars[.]" Tr. at 2773 (emphasis added). In other words the jury was instructed, albeit implicitly, to award fair rent damages for each of the 204 years in the year those damages were sustained and *not* to convert the same to an equivalent value in year 2000 dollars—the year of the verdict.

Because "there is no indication to the contrary, it must be assumed that the jury followed [that] instruction[ ][.]" *See Gierlinger v. Gleason*, 160 F.3d 858, 875 (2d Cir.1998) (internal quotation marks and citation omitted). By following the instruction not to convert, it is obvious that the jury found the amount due for lost rent in each of the 204 years in the dollars of those particular years. There is no dispute that the jury then subtracted dollars of each particular year in which the State made payments to the Cayuga. *See, e.g.,* U.S. Post–Trial Memo. at 60; and Tr. at 6357. Thus, the jury *did* subtract like dollars. Consequently, there *is* a plausible explanation for the jury's answers regarding lost rent which eliminates the State's claimed inconsistency for that aspect of the jury's award.

The confusion here arises over the definition of "current." Grossman's definition of "current" is different than the meaning which the court, the lawyers and the jury attributed to "current" in connection with the instruction not to convert. According to Grossman, economically speaking "current" refers to "dollars of a particular year *in that year* [.]" *See* St. exh. 721, at 7, ¶ 18 (emphasis in original). Therefore, when Grossman read the instruction not to convert "to an equivalent value in current dollars[,]" he defined "current" differently,

*i.e.,* as "dollars of a particular year in that year." *See* St. exh. 721 at 7, ¶ 18. Applying that definition to the instruction not to convert, Grossman surmised that the jury calculated lost rent in year 2000 dollars and in keeping with his reading of that instruction, the jury did *not* convert those dollars to the years in which those losses were sustained. However, in the context of the court's instruction not to convert, "current" actually meant year 2000 dollars. Based upon that definition, the jury was instructed that it was *not* to convert the dollar at the time of injury, *i.e.,* a 1795 dollar to current or year 2000 dollars.

 The State is overlooking the fact, however, that "[l]ogical, not economic consistency is the touchstone[ ]" in evaluating a potentially inconsistent verdict. *Webb v. GAF Corp.*, 936 F.Supp. 1109, 1125 (N.D.N.Y.1996) (citing, *inter alia, Crockett*, 65 F.3d at 278). Thus, although a jury's verdict *might* be inconsistent from an economic standpoint, it does not necessarily follow, *a fortiori*, that that verdict is legally inconsistent. *See id.*

Having said that, the court recognizes that apparently to avoid the complex task of separating out specific rents for each of the 204 years at issue, the jury calculated lost rent by taking $3.5 million, or 10% of what it deemed to be the current value of the property ($35 million) and dividing it by each of the 204 years at issue. Presumably the jury found that that amount would adequately compensate the Cayuga for the accumulation of rental dollars for *all* of those 204 years. The effect of figuring lost rent in that way, when carried out over 204 years, according to the State, is to "overstat[e] the compensation in the early years and understat[e] it in the later years." St. Pre–Tr. Memo. at 75; *see also* Tr. at 6356–66. Assuming that is so, consistent with the court's explicit instruction *not* to consider interest because the

court would do so at a later date, the jury recognized that it would be possible for the court to amend those rent figures and rectify that discrepancy through its award of prejudgment interest.

There is one additional reason for refusing to apply the State's rigid economic analysis to the jury's verdict which is that it would require the court to disregard firmly established legal principles—principles which were developed wholly apart from economic principles to preserve the efficient and fair administration of our judicial system. Adjusting the jury's verdict in conformity with the State's theory would require the court to find an inconsistency or conflict where none exists, which in turn would run afoul of the general notion that whenever possible a court must "reconcile and preserve even a seemingly inconsistent jury verdict." *See Indu Craft,*

47 F.3d at 497 (citations omitted). Furthermore, adopting the State's interpretation of the jury verdict would thwart the "powerful" policy of deferring to a jury verdict—a policy which persists "even in cases in which the jury has taken action that is at first blush difficult to explain." *See Gentile v. County of Suffolk,* 926 F.2d 142, 154 (2d Cir.1991) (citing *Auwood,* 850 F.2d at 891). This policy of preserving the sanctity of a jury's verdict is especially compelling in a case of this magnitude which, as this court has previously recognized, "has so widely impacted every member, Indian and non-Indian alike, in the claim area community." *See Cayuga XIV,* 2000 WL 654963, at *4.

## II. Pre–Judgment Interest [6]

■■■ The issue of prejudgment interest first arose in this litigation in 1999 when

---

**6.** Before delving into the issue of prejudgment interest, there is a procedural irregularity which bears mentioning. Neither of the Cayuga plaintiffs expressly seek prejudgment interest in their respective complaints; only the U.S. does. *See Cayuga VIII,* 1999 WL 224615 at * 25 n. 34. Thus the issue is whether that omission constitutes a waiver of the right to seek such relief now, many years after the commencement of this action. The court finds that it does not.

Under federal common law, which this court has previously held governs the issue of prejudgment interest in this case, *see Cayuga VIII,* 1999 WL 224615, at *18, the failure of the Cayuga to explicitly request such interest in their complaints does not amount to a waiver of the right to such an award. *Cf. Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1182–83 (2d Cir.1996) (citation omitted) (plaintiff did not waive her right to award of prejudgment interest in a Title VII action, even though she did not explicitly request such relief, where the failure to request was not plaintiff's fault in that she had no reason to be aware of district court's severe backlog, which significantly delayed judgment); *Frank v. Relin,* 851 F.Supp. 87, 90–91 (W.D.N.Y. 1994) (court awarded prejudgment interest even though plaintiff failed to request the

same from jury). Furthermore, assuming they are otherwise entitled to the same, a finding that the Nation and the Tribe are entitled to a prejudgment interest award even though they did not specifically request such relief in their respective complaints is consistent with both Fed.R.Civ.P. 15(b), freely allowing amendment to complaints to conform to the evidence, and Fed.R.Civ.P. 54(c), allowing a default judgment to be entered granting "the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."

A finding of no waiver is bolstered by the fact that the State has not been prejudiced by this omission as is evidenced by the fact that it was the State which prior to Phase I first raised the specter of prejudgment interest on motions *in limine.* Therefore, the parties and the court have had ample opportunity to consider and address this issue. Furthermore, the court cannot overlook the affirmative demand for prejudgment interest in the U.S.' complaint in intervention. It stands to reason, given the trustee nature of the relationship between the U.S. and the Cayuga that this explicit demand should inure to the benefit of the Cayuga. Finally, the boilerplate language found in the Cayuga's respective

through motions *in limine* the defendants sought to bar the Cayuga from recovering any prejudgment interest whatsoever. *See Cayuga VIII*, 1999 WL 224615, at *1. In addressing those motions, this court extensively discussed the guiding legal principles which courts should apply in deciding whether to allow an award of prejudgment interest. *See id.* at *15–*22. As part of that discussion, the court reiterated a number of factors which the Second Circuit identified in *Wickham*, 955 F.2d 831, as being relevant to whether to allow recovery of prejudgment interest:

> [T]he award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.... These other 'general principles' include '[t]he certainty of the damages due the plaintiff[,]' and whether the statute itself already provides for 'full compensation and punitive damages [.]' ... In addition to the factors enumerated above, '[t]he speculative nature of the damages in question will always be relevant to a sound decision on a consideration of whether prejudgment interest should be awarded.'

*Cayuga VIII*, 1999 WL 224615, at *19 (quoting *Wickham*, 955 F.2d at 833–34, 835; and 836). In *Cayuga VIII*, the court recognized that recovery of prejudgment interest has been allowed even when a federal statute is silent on that issue, as is the Nonintercourse Act, so long as those "discretionary awards ... 'are fair, equitable and necessary to compensate the wronged party fully.'" *See id.* at *20 (quoting *Wickham*, 955 F.2d at 835). But, as this court further acknowledged, recovery of prejudgment interest has been disallowed in a number of situations, including: "'when the defendant acted innocently and had no reason to know of the wrongfulness of his actions, ... when there is a good faith dispute between the parties as to the existence of any liability, or ... when the plaintiff is responsible for the delay in recovery.'" *Id.* at *20 (quoting *Cruz v. Local Union Number 3 of the Int'l Bdh. Of Elec. Workers*, No. CV89–4240, 1995 WL 374401, at *3 (E.D.N.Y. Feb.17, 1995)) (other citation omitted).

Summarizing the import of this prejudgment interest body of case law, in *Cayuga VIII* this court commented: "What should be obvious by now is that '[i]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness.'" *Id.* (quoting *Blau v. Lehman*, 368 U.S. 403, 413, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962)). When the defendants' motions *in limine* were before this court, the record was far from complete. Thus, the court declined to "make a prejudgment interest determination in [the] factual and legal vacuum[ ]" which existed at that time. *See id.* at *21. Recognizing the possibility of an abuse of discretion if it were to do so, the court denied those motions *in limine* to the extent they sought to preclude the Cayuga from recovering prejudgment interest altogether. *See id.* at *25.

complaints, that they are seeking "such other and further relief as the Court deems just[,]" *see* Nation Co. at 25, ¶ 11; Tribe Amended Co. at 10, ¶ 11, arguably is sufficient to include prejudgment interest, particularly given that the scope of remedies in an action such as this has not been previously litigated in full.

Even if the existence of any one of the foregoing factors was insufficient to allow the Cayuga to seek prejudgment interest, given the absence of such a demand in their complaints, certainly these factors taken together justify allowing the Cayuga to proceed with their attempt to recover this interest.

Following Phase II, a five-week non-jury trial which included the testimony of a number of expert witnesses, the record is now fully developed as to the prejudgment interest issues which this litigation raises. The parties have also had ample opportunity to brief those issues. Accordingly, as Fed.R.Civ.P. 52 requires, the following constitutes the court's findings of fact and conclusions of law in this regard.

### A. *Wickham Analysis*

The initial determination for the court is whether the Cayuga are entitled to an award of prejudgment interest in the first place. Only after making that determination will the court be in a position to consider the amount, if any, of such an award. In undergoing its *Wickham* analysis, the court will address the second factor listed therein, "fairness and relative equities," last because, as will be seen, the court is convinced that that factor is relevant not only to the issue of a party's entitlement to prejudgment interest, but also to the issue of the amount of any such award.

### 1. *Full Compensation*

 Among other things, a prejudgment interest "award should be a function of ... the need to fully compensate the wronged party, for actual damages suffered." *See Wickham*, 955 F.2d at 833. In arguing that a prejudgment interest award is necessary to fully compensate it, the Cayuga contend that they must be compensated for the lost "opportunity" cost, or, as the U.S. puts it, for the "time value of money[,]" *see* Pre–Trial Memorandum of the Plaintiff–Intervenor, U.S. ("U.S.Pre–Tr.Memo.") at 11 (internal quotation marks and citation omitted); that is, for not having the stream of rental income available to them over the past two centuries. The Cayuga also contend that the

jury verdict was relatively low and hence prejudgment interest is necessary to assure that they are fully compensated. The State agrees that full compensation in the context of *Wickham* encompasses a "plaintiff receiv[ing] the full value of ... money over the time during which plaintiff was deprived of that sum[,]" but it disagrees that " 'full compensation[ ]' ... is ... a function of the amount of damages a jury awards[.]" *See* St. Pre–Tr. Memo. 33.

Case law discussing "full compensation" as that phrase is used in *Wickham* is scant and not particularly instructive in this context. However, lost opportunity cost as a part of full compensation is a widely accepted concept from a legal standpoint. Case law is replete with references to the time value of money. *See, e.g., Osterneck v. Ernst & Whitney*, 489 U.S. 169, 176, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989) (internal quotation marks and citations omitted) ("[W]e have repeatedly stated that prejudgment interest is an element of [plaintiff's] complete compensation."); *Proctor & Gamble Distrib. Co. v. Sherman*, 2 F.2d 165, 166 (S.D.N.Y.1924) (Hand, J.) ("The present use of my money is itself a thing of value, and, if I get no compensation for its loss, my remedy does not altogether right my wrong."); *Prager v. New Jersey Fidelity & Plate Glass Ins. Co.*, 245 N.Y. 1, 5–6, 156 N.E. 76 (1927) (Cardozo, J.) ("While the dispute as to the value was going on, the defendant had the benefit of the money, and the plaintiff was without it. Interest must be added if we are to make the plaintiff whole."). Courts' recognition of the time value of money is based upon the following reasoning, as succinctly put by one legal commentator:

If justice were immediate, there would never be an award of prejudgment interest. The injured party would receive an enforceable judgment immediately, with no loss in value from the time value of money. Because justice often takes

many years to achieve, interest is added to the original judgment to ensure that compensation is complete.

Michael S. Knoll, *Primer on Prejudgment Interest,* 75 Tex. L.Rev. 293, 294 (Dec. 1996) (footnotes omitted).

Furthermore, although the three economists who testified during Phase II differed greatly in their conclusions as to the proper amount of prejudgment interest which this court might award, they agreed as to the meaning of opportunity cost and its relationship to prejudgment interest in this case. As the Cayuga's economist Dr. Temin defined it, "opportunity cost ... [is] an economic term for the cost of [an] alternate activity[.]" Tr. at 5734. In terms of the Cayuga's lost opportunity cost in particular, Dr. Temin expounded:

> If the Cayugas had not been injured at that time in the amounts the jury determined for each year, they theoretically would have had the amounts for each year which the jury awarded, and could have used or invested those funds .... Without that property or money, they incur the opportunity cost of property or money.... If we compensate for an injury in 1795 (or other past year) as if it took place today, we ignore the opportunity cost of this injury. We compensate the injured party for the dollar amount of the injury, but not for the foregone use of the injury sustained as the injury at the time of loss.

Nat. exh. 64 at 6, ¶¶ 16 and 17. In a similar vein, the U.S.' economist Dr. Berkman explained:

> [I]f the jury found that there was a loss to the tribe, ... as a consequence of actions in 1795 and they've identified those stream of losses, those losses by themselves don't compensate [the Cayugas] for those losses, ... because it fails to recognize this opportunity cost ..., that they, in addition to having those

moneys, could have used those moneys for a variety of purposes or invested them, and we have to account for the fact that they would have benefitted from those incomes and prejudgment interest captures that additional benefit that they would have received, and that's the missing piece to make them whole.

Tr. at 5929. And although the State's economist, Dr. Grossman, radically departed from the other two economists insofar as his conclusion as to the amount of prejudgment interest which should be awarded here, he too agreed that the Cayuga had sustained a lost opportunity cost or, as he put it, the "missed opportunity of being able to invest." Tr. at 6087.

The economists are thus in agreement that in addition to sustaining monetary damages for the loss of their homeland over the past two centuries, the Cayuga have sustained monetary losses because they did not have that money available to them for investment or other purposes over the years. Such loss makes prejudgment interest necessary here to fully compensate the Cayuga. This conclusion is bolstered by the fact that the jury was explicitly instructed *not* to include prejudgment interest in its award, and as previously explained, it followed that instruction. *See National Communications Association, Inc. v. Telephone and Telegraph Col,* No. 92–CIV. 1735(LAP), 1999 WL 258263 at *4 (S.D.N.Y. April 29, 1999) (plaintiff did not receive full compensation where no evidence suggested that the jury calculated and added such interest). Therefore, the Cayuga did not receive "complete compensation," which the Supreme Court has, as recently as June of this year, repeatedly defined as including such interest. *See State of Kansas v. State of Colorado,* —— U.S. ——, ——, 121 S.Ct. 2023, 2029, 150

L.Ed.2d 72 (2001) (citations omitted) ("Our cases since 1933 have consistently acknowledged that a monetary award does not fully compensate for an injury unless it includes an interest component.").

The Cayuga point out, as the court has noted, that the jury verdict of nearly $37 million was less than the $335 million suggested by the U.S.' real estate appraisal expert. *See Cayuga Indian Nation of New York v. Pataki*, Nos. 80–CV–930 and 80–CV–960, slip op. at 8 n. 4 (N.D.N.Y. April 19, 2000). The verdict also was less than that suggested by the State's real estate appraisal expert who "testified that total damages ranged from approximately 62 million dollars to approximately 40 million dollars." *See id.* In light of the foregoing, in the absence of prejudgment interest the Cayuga assert that the $37 million jury award "does not constitute full or sufficient compensation ... for the loss of their homeland." *See* Cayugas' Pre–Trial Memorandum ("Cay.Pre–Tr. Memo.") at 26. The court agrees with the Cayuga that prejudgment interest is necessary for full compensation; but the court is highly skeptical that such interest should be used as a vehicle to augment or increase the jury's verdict.

██ The Cayuga have not cited to any authority wherein a court has held that prejudgment interest is necessary to fully compensate a plaintiff based upon the supposed inadequacy of the verdict. What authority there is pertaining to how, if at all, verdict size impacts prejudgment interest is contradictory and does not involve a *Wickham* analysis. In *In Design v. K–Mart Apparel Corp.*, 13 F.3d 559 (2d Cir.

1994), the Second Circuit affirmed a district court's *denial* of prejudgment interest in a copyright case because there was a "sizable damage award" of $632,000.00. *See id.* at 569. The Second Circuit reached the opposite result, however, in *Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371 (2d Cir.2000), where it held that in denying prejudgment interest the district court improperly relied upon its belief that "the jury's award was already surprising[ly] genero[u]s[.]" *Id.* at 375 (internal quotation marks and citation omitted). Given the lack of directly relevant precedent, the court finds that regardless of the size of the verdict, the underlying purpose of prejudgment interest, to make the plaintiff whole again, *see City of Milwaukee v. Cement Division, National Gypsum Co.*, 515 U.S. 189, 196, 115 S.Ct. 2091, 2096, 132 L.Ed.2d 148 (1995), would best be served by an award of prejudgment interest in this case.

### 2. *Nature of Statute* [7]

██ Another *Wickham* factor which impacts an award of prejudgment interest "is whether the federal statute under which damages have been obtained is remedial or punitive in nature." *See Nu–Life Construction Corp. v. Board of Education of the City of New York*, 789 F.Supp. 103, 104 (E.D.N.Y.1992). Where a statute is remedial, such as Title VII, which aims "to make persons whole for injuries suffered on account of unlawful employment discrimination[,]" *see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), an award of prejudgment interest is appropriate. *See, e.g., O'Quinn v. New York University Medical Center*, 933 F.Supp.

---

**7.** In *Wickham* the Second Circuit identified "the remedial purpose of the statute involved," and whether the statute itself already provides for full compensation and punitive damages, as separate factors which are a "function" of a prejudgment interest award. *See Wickham*, 955 F.2d at 834 and 835. Because those factors are so closely related, it is logical for the court to consider them together.

341, 344 (S.D.N.Y.1996) (Title VII plaintiff entitled to prejudgment interest on back pay award given, *inter alia*, the "obvious remedial purposes" of that statute); *National Communications Association*, 1999 WL 258263, at *5 (quoting 47 U.S.C. § 206 (1982)) (remedial purpose of Communications Act which "provides that a carrier which has violated th[at] Act 'shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation[ ]' " required prejudgment interest award). On the other hand, "where the statute itself already provides for full compensation or punitive damages," as do the antitrust laws, the Second Circuit has "suggested that prejudgment interest is improper[.]" *See Wickham*, 955 F.2d at 835 (citing, *inter alia*, *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 80 (2d Cir.1971)) (prejudgment interest unnecessary given Clayton Act's treble damage provision, combined with absence of congressional intent as to prejudgment interest), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

■ Naturally the plaintiffs and the State strongly disagree as to the nature of the statute at issue herein—the Nonintercourse Act. The Cayuga argue that because the purpose of that statute is to "prevent Indians from improvident dispositions of their lands and becoming 'homeless charges[,]' " it is remedial, thus mandating an award of prejudgment interest thereunder. *See* Cay. Post–Trial Memo. at 4 (quoting *Cayuga Indian Nation of New York v. Cuomo*, 565 F.Supp. 1297, 1323 (N.D.N.Y.1983) ("*Cayuga II* ")). Echoing this argument, the U.S. declares that "the oft-recognized protective purposes of the Nonintercourse Act against alienation of Indian lands easily encompasses the invocation of prejudgment interest in this case." U.S. Pre–Tr. Memo.

at 28; and U.S. Post–Tr. Memo. at 7. The State's view of the Nonintercourse Act is the antithesis of the Cayuga's. The State deems that Act to be "prohibitory," and hence this court should refuse to award prejudgment interest. *See* St. Pre–Tr. Memo. at 50.

The Nonintercourse Act does not fit neatly into the category of either a remedial or a punitive statute. That statute *may*, as the State urges, be prohibitory in that broadly speaking it proscribes the acquisition of Indian lands without the Federal Government's approval. However, that prohibition does not necessarily render the Nonintercourse Act punitive. In fact, this court has previously recognized as much, albeit in a slightly different context, when in *Cayuga II* it held that it could not "accept the view that ... the Nonintercourse Act ... imposes a 'penalty' or 'punishment'[.]" *See Cayuga II*, 565 F.Supp. at 1327. This court went on to explain that the Nonintercourse Act "declares that certain transactions in land are of no validity in law or equity[;]" and "[t]he purpose of this restraint against alienation, ..., was to protect Indian possessory rights." *Id.* In concluding that the Nonintercourse Act was "not penal[,]" this court further reasoned "[t]hough enforcement could work great hardship upon those who claim title through a transaction which is invalid under the Act, it is ... manifest that the statutory disability was established *not to punish*, but to accomplish 'some other legitimate governmental purpose.' " *Id.* at 1328 (quoting *Trop v. Dulles*, 356 U.S. 86, 96, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)) (emphasis added). In light of the foregoing, the State's argument that the Nonintercourse Act is prohibitory or punitive is misplaced.

The absence of a punitive damage provision in the Nonintercourse Act lends further credence to the view that that statute

is not punitive. Moreover, as this court thoroughly explained in *Cayuga II*, there is a "judicial consensus" as to the purpose of the Nonintercourse Act, which is that Congress intended "'to protect the lands of the Indian tribes in order to prevent fraud and unfairness.'" *Id.* at 1322 (quoting *In Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 388 F.Supp. 649, 656 (D.Me.1975)). As the case law outlined in *Cayuga II* shows, that protective purpose is "rather self-evident." *Id.* at 1323. In fact, in recognizing an implied private cause of action under that statute, the Second Circuit acknowledged the availability of a concomitant damage remedy, even in the absence of statutory language to that effect. *See Oneida Indian Nation of New York State v. County of Oneida*, 719 F.2d 525, 540 (2d Cir.1983). Consequently, even though "the Nonintercourse Act of 1793 did *not* establish a comprehensive remedial plan for dealing with violations of Indian property rights," and even though it "contains *no* remedial provision[,]" *Oneida County, N.Y. v. Oneida Indian Etc.*, 470 U.S. 226, 239, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ("*Oneida II*") (emphasis added), that lack of a remedial framework does not undermine the fact that at its core the Nonintercourse Act is remedial in nature.

Neither the silence of the Nonintercourse Act as to prejudgment interest, nor the fact that it does not expressly provide for "full" or "just" compensation alters the court's view that fundamentally this statute is remedial. The fact that there is no mention of prejudgment interest in the Nonintercourse Act does not mean, as the State suggests, that such interest is not recoverable thereunder. Indeed, in *Wickham* the Second Circuit catalogued a number of Supreme Court decisions wherein recovery of prejudgment interest was allowed "under a variety of federal laws, *despite the silence* of the laws on the sub-

ject of interest." *See Wickham*, 955 F.2d at 834 (and cases cited therein) (emphasis added). *Wickham* itself was such a case; there, the Second Circuit upheld an award of prejudgment interest under the Labor Management Relations Act ("LMRA"), even though that statute is silent on the issue of such interest. *See id.* at 933–936; *see also Securities & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir.1996) (affirming prejudgment interest award of approximately $52 million despite, *inter alia*, the absence of explicit statutory authorization).

This court is fully aware, as the State notes, that it is possible to infer intent to deny prejudgment interest from a statute's silence. Pursuant to *Wickham*, such intent may be inferred "from (i) the state of the law on prejudgment interest, for the type of claim involved, at the time the statute was passed, and (ii) consistent denial by the courts of prejudgment interest under the statute and failure by Congress, despite amendments to the statute, to address prejudgment interest awards." *Wickham*, 955 F.2d at 834 (citing *Monessen Southwestern Ry. Co. v. Morgan*, 486 U.S. 330, 336–39, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988)). Neither of those criteria are met in the present case however. Despite the vast record and the voluminous briefs, there is absolutely nothing before this court regarding the state of the law with respect to prejudgment interest when the Nonintercourse Act was first enacted in 1790. The State attempts to make much of the fact that the Nonintercourse Act has gone through a number of permeations with no mention of prejudgment interest. As already discussed though, that silence is irrelevant because prejudgment interest is recoverable even when a statute is silent on that issue.

In any event, the second criteria for inferring intent to deny recovery of

prejudgment interest is also absent here. There is no history of denial of prejudgment interest under the Nonintercourse Act. Therefore, the Nonintercourse Act's silence regarding prejudgment interest is of little consequence in determining whether to allow the recovery of same here, and certainly does not foreclose such an award in this case.

Moreover, the extremely limited history of prejudgment interest recovery under the Nonintercourse Act is to the contrary. As the Cayuga note, in *Oneida II,* another eastern land claim case brought pursuant to the Nonintercourse Act, the district court did "award[ ] the Oneidas damages in the amount of $16,694, *plus interest* [.]" *See* 470 U.S. at 230, 105 S.Ct. 1245 (emphasis added). As outlined in *Cayuga X,* given the posture of that case on appeal, "[t]he propriety of an interest award was not before either the Second Circuit or the Supreme Court[ ]" in that case. *See Cayuga Indian Nation of New York v. Cuomo,* 1999 WL 509442, at *17 (N.D.N.Y.1999) ("Cayuga X"). Therefore, the court rejects the Cayuga's argument that the *Oneida* district court's award of prejudgment interest for a mere two years, on damages less than $20,000.00, somehow provides justification for an award of prejudgment interest in this case where, among other differences, the damages span two centuries.

■ Likewise, the court does not give much credence to the State's argument that because the Nonintercourse Act does not contain explicit language authorizing "just" or "entire" compensation thereunder, the Cayuga should not be allowed to recover prejudgment interest. It is the presence, not the absence, of such language which augurs against an award of prejudgment interest. In a similar vein, because the Nonintercourse Act does not provide for exemplary damages or other

excess recovery, the *Wickham* Court's admonition against the recovery of prejudgment interest under those circumstances is inapplicable here. *See Webb v. GAF Corp.,* 949 F.Supp. 102, 106 (N.D.N.Y.1996) (citing *Wickham,* 955 F.2d at 839).

To conclude, the court agrees with the Cayuga that the Nonintercourse Act's silence does *not* bar prejudgment interest here. Nor does the fact that that statute does not expressly provide for full or just compensation prevent the recovery of prejudgment interest. Furthermore, on balance the court is convinced that the Nonintercourse Act is essentially remedial, so that if otherwise appropriate, prejudgment interest should be allowed thereunder.

**3. "Other General Principles"**

As mentioned at the beginning of this court's *Wickham* analysis, among the "other general principles" which courts have deemed relevant to the issue of whether to award prejudgment interest in any given case are "[t]he certainty of the damages due the plaintiff[,]" and conversely "[t]he speculative nature of the damages in question[.]" *See Wickham,* 955 F.2d at 835 and 836. The former factor, the certainty of the damages, "is the progeny of the old common law rule that forbade prejudgment interest when the damages were unliquidated or unascertainable up until the time of judgment." *Webb,* 949 F.Supp. at 106 (citing 5 Corbin On Contracts § 1048 (1964)). That rule has been relaxed, however, and "[p]rejudgment interest is now commonly awarded in cases where the loss cannot be determined with certainty at the time of injury, but is susceptible to calculation by the time of trial or judgment, e.g., wrongful termination cases, securities fraud cases, [and] patent infringement cases." *See Thomas v. City of Mount Vernon,* No. 89 Civ. 0552, 1992 WL 84560, at *1 (S.D.N.Y. April 10, 1992) (citing

*Wickham*, 955 F.2d at 835–36). On the other hand, where damages awarded to a plaintiff in a section 1983 action for her false arrest were "unliquidated and inherently speculative[,]" in that they were based "exclusively" on her "emotional injuries[,]" and she had not sustained any "economic injury[,]" the court denied her motion for prejudgment interest. *See Sulkowaska v. City of New York*, No. 99 Civ. 4228, 2001 WL 428253, at *6 (S.D.N.Y. April 25, 2001) (internal quotation marks and citations omitted).

Only the State addressed these "other general principles" which are relevant to a "sound decision" as to whether or not to award prejudgment interest. *See Wickham*, 955 F.2d at 836. Prior to Phase I the State baldly declared "that a damages calculation which rests upon estimates of fair market value and rental or cash value of what was in effect wilderness land over 200 years ago is highly uncertain and speculative." State of New York Defendants' Trial Memorandum (St. Ph. I Tr. Memo.) at 66. Thus, reasoned the State, application of prejudgment interest "to such an award [would] severely exacerbate[ ] this inherent weakness in the damage calculation." *Id.* After the jury verdict and prior to Phase II, the State refined its argument. Given the admittedly "contradictory testimony" as to the proper methodology for valuing the subject property, and the experts' "widely divergent opinions as to the ultimate value of lost rents for property in the claim area[,]" the State now asserts that the jury's *methodology* for calculating damages was speculative, and hence it "caution[s] *against* an award of prejudgment interest where the other factors tip in favor of the State." St. Pre–Tr. Memo. at 53 and 52 (emphasis added).

The State's argument does not carry much weight with this court. Given the extraordinarily unique nature of this litigation, obviously the damages awarded by the jury were not as readily quantifiable as, for example, a back pay award in a Title VII case. *See, e.g., McIntosh v. Irving Trust Co.*, 873 F.Supp. 872, 882 (S.D.N.Y.1995) (emphasis added) (amount of back pay award in Title VII action "calculable by reference to the *specific amounts* of *money* the plaintiff has lost and the defendant has withheld[ ]"). By the same token, however, the damages awarded in this case are not "so conjectural that prejudgment interest should not be awarded." *See Wickham*, 955 F.2d at 836. To illustrate, this is not a situation such as that presented in *Thomas*, 1992 WL 84560, at *3, wherein the court observed that even if it had the discretion to award prejudgment interest, it would not because "plaintiff sustained no economic injury; he was not deprived of money he would have otherwise earned but for the wrongdoing of the defendants." Plaintiff's injuries in *Thomas* "were, for the most part, intangible and defendants' unconstitutional behavior did not enable them to obtain any financial benefits from their wrongdoing." *Id.* at *4 (citation omitted). *Accord McIntosh v. Irving Trust Co.*, 873 F.Supp. 872, 882 (S.D.N.Y.1995) (citations omitted) (refusing to award prejudgment interest under New York CPLR § 5001 for pain and suffering because those damages were "not so easily calculated and represent[ed] the jury's translation into monetary terms of a loss that is difficult to quantify[ ]"—a loss "not easily divided into specific periods like back pay and [which] does not represent an amount that the defendant has withheld from the plaintiff in the same way that awards in contract or property actions do[ ]").

By contrast, in the present case there is no dispute that the Cayuga sustained economic loss as a result of being deprived of their homeland for more than 200 years, and the jury so found. Undoubtedly the

fair rental value damages in particular were difficult for the jury to calculate given the conflicting and varying methodologies offered by the real estate appraisal experts during Phase I. That difficulty does not render the damages inherently speculative, however. After all, the Cayugas did sustain a tangible loss—their property. The difficulty or complexity of calculating damages "should not obscure the fact that there was a reasonable basis in the evidence to support the jury's award[,]" and "the overall basis for the damage award was [not] so speculative as to render it invalid." *See National Communications Association,* 1999 WL 258263, at *4 (internal quotation marks and citation omitted).

■ Moreover, as the *Wickham* Court astutely recognized, "while the presence of abstruse inquiries and difficult questions of proof in the calculation of damages are factors to be considered carefully, these problems must be considered *together* with other factors that may favor prejudgment interest." *Wickham,* 955 F.2d at 836 (internal quotation marks and citation omitted) (emphasis added). Here, the other *Wickham* factors discussed to this point favor an award of prejudgment interest. So, while admittedly there is a "degree of speculation" in trying to ascertain the fair rental value of the subject property across a 200 plus year time frame, the court will not rule out a prejudgment interest award on the basis of this factor alone.

Furthermore, the State misses the mark when it focuses upon the purportedly speculative nature of the method by which the jury calculated damages. It is the speculative or conjectural nature of the damages themselves which potentially could impact an award of prejudgment interest—not the method by which those damages were calculated. Finally, as should be evident by now, the court wholeheartedly disagrees

with the State that the *Wickham* factors discussed in the preceding sections weigh in its favor, and thus the purportedly speculative nature of the damages herein should weigh against an award of prejudgment interest. That is not to say, however, that the relative uncertainty of the damages will not enter into this court's calculation of the amount of prejudgment interest due here. It *may* be that, in taking into account the fairness and relative equities of a prejudgment interest award, the relative uncertainty of the damages, could be a basis, among others, for reducing the amount of any such interest which the court may award in this case.

### 4. Fairness and Relative Equities

"Considerations of fairness and relative equities" dominated Phase II. *See Wickham,* 955 F.2d at 834. Here, analysis of this particular *Wickham* factor has centered on the State's claim that at all relevant times it acted in good faith in its treatment of the Cayuga, and the related claim that the Cayuga delayed in bringing this action. For now the court will focus on the State's claim of good faith which was one of the most significant and contentious issues of Phase II, as is evidenced by the extensive historical proof.

Before considering how the State's good faith or lack thereof impacts the issue of prejudgment interest, there is a need for some clarification. The U.S. insists that in examining the fairness and relative equities, the court should concentrate on the jury award itself. As *Wickham* makes clear, however, the focus is on the fairness and relative equities of the prejudgment interest award, not the jury award. *See Wickham,* 955 F.2d at 834. With that in mind, the court will next address the parties' arguments as to what role fairness and relative equities should play in analyzing the prejudgment interest issue.

By arguing that "the State's claim of 'good faith' does *not* affect prejudgment interest[,]" and that "[n]either [that asserted] 'good faith' nor 'laches' present an obstacle to an award of prejudgment interest in this case," the Cayuga are taking the position that despite *Wickham* and its progeny, this court should *not* weigh the relative equities in deciding whether to award such interest. *See* Cay. Pre–Tr. Memo. at 31. Similarly, the U.S. maintains that "notions of 'fairness' and the 'equities,' . . . *cannot be seen as justification for a . . .* decision to *deny or limit* prejudgment interest on monies historically owing . . . , to the Cayugas." U.S. Pre–Tr. Memo. at 18–19 (citation omitted) (emphasis added). The U.S. further reasons that "assuming, *arguendo,* that either the State was acting in good faith, *or . . .* that the Cayugas were less than innocent in all of these proceedings, the propriety for an award of prejudgment interest here would not change." *Id.* at 18 (citing *City of Milwaukee,* 515 U.S. 189, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995)) (emphasis added). In other words, the plaintiffs are arguing that regardless of whether or not the State acted in good faith, and regardless of whether or not the Cayuga delayed in bringing this action, they are entitled to an award of prejudgment interest. The court's reading of the relevant case law does not support these arguments.

In arguing that fairness and relative equities have no place in this court's analysis of prejudgment interest, the plaintiffs are effectively arguing that *Wickham* is no longer good law. In support of that proposition, the plaintiffs heavily rely upon two Supreme Court cases, *West Virginia v. United States,* 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), and *City of Milwaukee,* 515 U.S. 189, 115 S.Ct. 2091, 132 L.Ed.2d 148, which they contend substantially erode the notion of balancing the equities in the context of prejudgment interest.

To be sure, in *West Virginia,* the Supreme Court did reject the view "that whether [prejudgment] interest had to be paid depended on a balancing of equities between the parties[.]" *See West Virginia,* 479 U.S. at 311 n. 3, 107 S.Ct. 702. It is likewise true that in *City of Milwaukee,* the Supreme Court explained that by reading *West Virginia* "as disapproving of a 'balancing of the equities' as a method of deciding whether to allow prejudgment interest[,]" . . . , the Seventh Circuit "deepened an existing Circuit split regarding the criteria for denying prejudgment interest in maritime collision cases." *City of Milwaukee,* 515 U.S. at 193, 115 S.Ct. 2091 (citations omitted). The Court in *City of Milwaukee* further explained that prejudgment interest should be awarded in maritime collision cases, "subject to a limited exception, for 'peculiar' or 'exceptional' circumstances." *Id.* at 195, 115 S.Ct. 2091 (citations omitted). That limited exception does not include "the existence of a legitimate difference of opinion on the issue of liability" because such a dispute "is merely a characteristic of most ordinary lawsuits[;] [i]t is not an extraordinary circumstance that can justify denying prejudgment interest." *Id.* at 198, 115 S.Ct. 2091 (citation omitted). In holding, *inter alia,* that a good faith dispute over liability does not justify denying prejudgment interest, and indeed that such a dispute "carries little weight[,]" the Supreme Court reasoned that "[i]f interest were awarded as a penalty for bad-faith conduct of the litigation, the City's argument would be well taken. But prejudgment interest is not awarded as a penalty; it is merely an element of just compensation." *Id.* at 197, 115 S.Ct. 2091.

This court is fully cognizant of the Supreme Court's rulings in both *West Virgi-*

*nia* and *City of Milwaukee.*[8] Those two cases are readily distinguishable from the present case. In finding that *City of Milwaukee* does not govern this court's analysis of prejudgment interest, the court first notes that *City of Milwaukee* involved a maritime collision where there is a "traditional hospitality to prejudgment interest[.]" *See City of Milwaukee*, 515 U.S. at 196, 115 S.Ct. 2091. In fact, the observation has been made that "[a]dmiralty courts have long been more sympathetic to the award of prejudgment interest than have the law courts[,]" and "have developed an independent approach to the prejudgment interest problem." *See* Comment, *Prejudgment Interest: Survey and Suggestion,* ("Survey"), 77 Nw. U.L.Rev. 192, 193 and 214 (1982) (footnote omitted).

Moreover, the prejudgment interest award in *City of Milwaukee* was calculated for a mere 18 years between the date of the accident and the entry of judgment. The present land claim litigation is a far cry from a typical admiralty case such as *City of Milwaukee*. Here, the initial injury occurred in 1795, and hence there is a potential for prejudgment interest spanning over two centuries. Also in sharp contrast to admiralty cases where the time between injury and judgment is relatively short, in this land claim action there is no precedent for remedies, let alone a "traditional hospitality to prejudgment interest[.]" *See City of Milwaukee*, 515 U.S. at 196, 115 S.Ct. 2091. Given the obvious factual distinctions between *City of Milwaukee* and the current action, the court does not read that case as broadly as do the Cayuga, *i.e.,* indicating that it is *never* appropriate for a court to balance the equities in deciding whether or not to award prejudgment interest.

Likewise, *West Virginia*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639, is easily distinguishable from the present case. Again, the Court's rejection in *West Virginia* of a balancing of the equities approach to prejudgment interest was in an entirely different context than here. The issue in *West Virginia* was whether a state was obligated to pay prejudgment interest to the Federal Government, and the Court held that it was. The propriety of a prejudgment interest award in a dispute between a state and the Federal Government implicate very different policy concerns than those here. In *West Virginia*, the Court was guided by the fundamental principle that "States have no sovereign immunity as against the Federal Government[.]" *West Virginia*, 479 U.S. at 313, 107 S.Ct. 702. Obviously that policy has no bearing on the present litigation which in its current posture pits the Cayuga and the U.S. against the State of New York.

The temporal relationship between *West Virginia* and *Wickham* also militates against a finding that *West Virginia* governs the issue of prejudgment interest herein. *West Virginia* preceded the Second Circuit's decision in *Wickham* by almost exactly five years. Thus, if the Second Circuit deemed *West Virginia* to have altered the standards by which prejudgment interest should be awarded in this Circuit, surely it would have mentioned that Supreme Court decision in *Wickham*, but it did not. And although *City of Milwaukee* was decided several years after *Wickham*, that does not necessarily mean that the former case undermines the continuing vitality of *Wickham*. That is especially so given that *City of Milwaukee* was a maritime collision case and arguably limited to that context. Thus, despite the

---

**8.** In fact, as the parties are well aware, in *Cayuga X* this court discussed *West Virginia*, albeit in the context of the State's alleged sovereign immunity from liability for prejudgment interest. *See Cayuga X,* 1999 WL 509442, at *15–*16.

Cayuga's arguments to the contrary, nothing in either *City of Milwaukee* or *West Virginia* persuades this court to abandon its earlier views, as expressed in *Cayuga VIII*, that fairness and relative equities including the State's asserted good faith are relevant to an analysis of prejudgment interest. *See Cayuga VIII*, 1999 WL 224615, at *20–*21.

In arguing against balancing the equities, time and again the Cayuga harken back to the compensatory nature of prejudgment interest. The court is keenly aware of this aspect of prejudgment interest. *See, e.g., Securities and Exchange Commission v. Tome*, 638 F.Supp. 638, 640 (S.D.N.Y.1986), *aff'd on other grounds*, 833 F.2d 1086 (2d Cir.1987) (quoting *Norte & Co. v. Huffines*, 416 F.2d 1189, 1191 (2d Cir.1969)). The court is equally cognizant, however, that the Second Circuit has recognized more than once, that these "compensatory principles *must be tempered by an assessment* of the *equities.*" *See Lodges 743 and 1746, Etc. v. United Aircraft*, 534 F.2d 422, 447 (2d Cir.1975) (internal quotation marks and citations omitted). Tempering the compensatory nature of prejudgment interest with the equities is critical in this unique lawsuit for a number of reasons, not the least of which is the conclusion of the Cayuga's economist that they are entitled to recover $1.7 billion in prejudgment interest.

To summarize, the court finds no merit in the Cayuga's argument that in deciding whether to award prejudgment interest, the court need not consider the equities. Indeed, considerations of fairness and relative equities will factor into the court's initial determination as to the propriety of awarding the Cayuga prejudgment interest, as well as into the court's calculation of such award, if any.

Even though the court will consider fairness and relative equities, the court does not agree with the State that those equities are "dispositive" and require *denying* an award of prejudgment interest. *See* St. Pre–Trial at 35. More specifically, the State contends that its "level of ... culpability" is a "determinative factor[;]" and because in the State's view there has been no showing of culpable conduct on its part with respect to any aspect of the underlying treaties, the court should deny prejudgment interest altogether to the Cayuga. *See id.* at 38.

This argument is disingenuous at best. Since its April 15, 1999, decision in *Cayuga VIII*, the court has stressed that in all likelihood it would be guided by *Wickham*, which involves not one, but a host of factors, in deciding the availability of prejudgment interest in any given case. Therefore, it should come as no surprise to the State that the court gives no credence to the notion that the level of a party's culpability is somehow dispositive of the issue of whether to award prejudgment interest. Moreover, the thoroughly developed historical record in this case belies the State's assertion that it did not engage in *any* culpable conduct insofar as the Cayuga are concerned. Even if the State could show that it acted in good faith, that would "not automatically render an award of interest improper." *See Association of Surrogates and Supreme Court Reporters Within the City of New York v. State of New York*, 772 F.Supp. 1412, 1418 (S.D.N.Y.1991) (citing *E.E.O.C. v. County of Erie*, 751 F.2d 79, 81 (2d Cir.1984)). Consequently, the State's good faith, even if proven, would not be a sufficient basis upon which to bar an award of prejudgment interest especially where, as here, the other *Wickham* factors tip in favor of such an award.

In addition, the State is conveniently overlooking case law which contradicts its argument that it can avoid liability for

prejudgment interest by proving its good faith. In *Webb*, 949 F.Supp. 102, the court rejected such an argument reasoning that because "prejudgment interest is compensatory, not punitive,...'wrongdoing by a defendant is not a prerequisite to an award[,]' " the "defendant's good faith d[id] not shift the balance of equities away from a grant of prejudgment interest [.]" *Id.* (quoting *Lodges 743 and 1746*, 534 F.2d at 447). Applying the same reasoning as the *Webb* court, in *Trapani v. Consolidated Edison Employees' Mutual Aid Society, Inc.*, No. 85 CIV. 2690, 1988 WL 138129 (S.D.N.Y. Dec.14, 1988), the court rejected defendant's argument that prejudgment interest "should be denied because [its] actions were at all times motivated by good faith and because defendant did not divert any of its funds for improper or venal purposes." *See id.* at *1 (citations omitted).

▇▇▇ Having determined that it is not only proper but necessary for the court to consider fairness and relative equities in resolving the issue of prejudgment interest, the court is compelled to comment briefly upon the scope of its equitable discretion. The State is arguing that if this court decides to award prejudgment interest, "[a]n assessment of the relative equities[,]" including the State's alleged good faith, should have some bearing on the court's calculation of that award. *See* St. Pre–Tr. Memo. at 35 n. 6. The Cayuga disagree, claiming that the "[c]ourt may *not* use the State's purported good faith to reduce the [amount of] prejudgment interest rightfully due to the[m]." Cay. Post–Tr. Memo. at 26. The U.S. similarly maintains that "[t]he [c]ourt lacks discretion to *limit* prejudgment interest based on the equities." U.S. Pre–Trial Memo. at 17 (emphasis added). The issue thus becomes whether the court may rely on fairness and relative equities in deciding the

amount of any prejudgment interest which it may award herein, or whether those factors are only relevant to the decision as to the availability of such an award in the first place.

"[C]ourts have done little to sketch the limits of acceptable discretion[ ]" when it comes to the issue of prejudgment interest. *See Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1334 (7th Cir.1992). Keeping in mind that prejudgment interest is above all else an equitable remedy, *see Commercial Union Assur. Co., plc v. Milken*, 17 F.3d 608, 614 (2d Cir.1994) (citation omitted), however, the court is of the conviction that its discretion encompasses not only the threshold decision as to whether to allow recovery of prejudgment interest, but also the discretion to determine the amount, which encompasses setting the rate, the accrual date and the methodology for computing such interest.

#### a. Burden of Proof

There is another issue—the burden of proof—which the court must address before scrutinizing the historical proof which is the cornerstone of the parties' equitable arguments. There are two components to the burden of proof issue here. The first is which party bears the burden in terms of the prejudgment interest award itself. Resolution of that issue is relatively straightforward.

▇▇▇ "Prejudgment interest, ..., is 'an element of complete compensation.' " *Loeffler v. Frank*, 486 U.S. 549, 558, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988) (quoting *West Virginia*, 479 U.S. at 310, 107 S.Ct. 702). As such, this court has previously held that "the Cayugas must shoulder the burden of proof with respect to damages[.]" *Cayuga VIII*, 1999 WL 224615, at *12. Consistent with the foregoing, the plaintiffs concede, and the State agrees, that they have the burden of estab-

lishing "the extent and scope of prejudgment interest[.]" *See* Plaintiff–Intervener United States' Response to Defendants' Post–Hearing Brief ("U.S.Resp.") at 22; *see also* St. Post–Tr. Memo. at 62 (citations omitted) ("[A] plaintiff should bear the burden of establishing the existence and breadth of [its] entitlement to prejudgment interest[.]").

█ That burden does not necessarily require that the Cayuga prove their initial entitlement to a prejudgment interest award. For one reason, prejudgment interest "is presumptively available to victims of federal law violations." *Worthington v. City of New Haven*, No. 3:94–CV–00609, 1999 WL 958627 (D.Conn. Oct.5, 1999), at *17 (internal quotation marks and citation omitted). Cognizant of this presumption, the court in *Maney v. United Sanitation, Inc.*, No. 99 Civ. 8595, 2000 WL 1191235, at *6 (S.D.N.Y. Aug.21, 2000), exercised its discretion in favor of awarding plaintiff prejudgment interest in an action to confirm an arbitration award pursuant to the LMRA.[9] Arguably the Cayuga are presumptively entitled to recover prejudgment interest because this court has previously held that they were subject to Nonintercourse Act violations in 1795 and again in 1807. Second, and even more important even if the Cayuga are not entitled to the benefit of this presumption, arguably at this point they are entitled to an award of prejudgment interest because the three *Wickham* factors discussed so far all weigh in favor of such an award. As they recognized, however, the burden of proof still remains with the plaintiffs to establish the amount of prejudgment interest to which they may be entitled.

█ The second and more vigorously disputed burden of proof issue pertains to the State's good faith or lack thereof. As previously noted, the parties' equitable arguments are framed principally in terms of such good faith. The Cayuga assert that in the present case because the State claims that its good faith should relieve it from liability for any prejudgment interest award, or, alternatively, that its good faith should reduce the amount of such an award, the State must prove the same by a preponderance of the evidence. In terms of defining the scope of that good faith burden, without citing to any authority and without defining its terms, the Cayuga are taking the position that the State must prove that it "acted *affirmatively* in good faith." *See* Cay. Reply at 23 (emphasis added).

█ On the other hand, the State contends that to establish their entitlement to prejudgment interest, the Cayuga bear the burden of proof, which according to the State, "includes showing that the State did not act in good faith." *See* St. Pre–Tr. Memo. at 61; and St. Reply at 7. The court agrees with the Cayuga that because the State's good faith argument is akin to an affirmative defense in that it is responding to the Cayuga's claim for prejudgment interest, *see National Union Fire Ins. v. City Sav., F.S.B.*, 28 F.3d 376, 393 (3rd Cir.1994), the burden lies with the State to prove the same. The court does not agree that the State has an obligation to show that it *affirmatively* acted in good faith, however.

This good faith/bad faith inquiry falls under the rubric of the second *Wickham*

**9.** *Accord Raybestos Products Co. v. Younger*, 54 F.3d 1234, 1247 n. 18 (7th Cir.1995) (citation omitted) (presuming the jury's award included an interest augmentation "in no way conflict[ed] with th[at] circuit's well-established principle that prejudgment interest is presumptively available to victims of federal law violations[ ]"); and *S.E.C. v. Antar*, 97 F.Supp.2d 576, 591 (D.N.J.2000) ("[P]rejudgment interest in federal court litigation is generally the rule and not the exception.").

factor—considerations of fairness and relative equities. There is limited case law expounding upon this particular *Wickham* factor. Recognizing that an award of prejudgment interest "should be based on fundamental considerations of fairness," the Second Circuit in *Norte*, 416 F.2d 1189, a derivative stockholders' action, remanded on the issue of prejudgment interest. In so doing, the Second Circuit directed the district court to "make specific findings, . . ., on the personal wrongdoings" of the defendants. *Id.* at 1191. Consistent with that directive of the *Norte* Court, the district court in *Securities and Exchange Commission v. Tome*, 638 F.Supp. 638 (S.D.N.Y.1986), *aff'd on other grounds*, 833 F.2d 1086 (2d Cir.1987), held, *inter alia*, that the equities did not weigh in favor of the defendant because he "*willfully violated* the securities *laws* and thereafter *attempted*, through lies and deceit, to *cover-up* his role in the illegal activity[.]" *Id.* at 640 (emphasis added). The court also pointed to the fact that the defendant "remained outside the United States to avoid prosecution on related criminal charges." *Id.* Likewise, in *S.E.C. v. Drexel Burnham Lambert, Inc.*, 837 F.Supp. 587 (S.D.N.Y. 1993), *aff'd on other grounds*, 16 F.3d 520 (2d Cir.1994), the district court awarded prejudgment interest against two repeat offenders under the securities laws who had participated in a "blatant scheme to defraud," and who had continuously refused to recognize the wrongfulness of their actions. *Id.* at 609.[10] In examining fairness and relative equities, at least in the securities context, courts evaluate a defendant's intent and the nature of the defendant's wrongdoing.

Outside the securities law context a party's intent has also been deemed relevant to an assessment of the fairness and relative equities of a prejudgment interest award. For example, in *Cruz*, 1995 WL 374401 at *4 (emphasis added), the court granted an award of prejudgment interest because, among other reasons, the "relative equities" supported such an award in that the defendant "Union *did not act innocently nor was it unaware of its actions* with regard to its failure to fairly represent the plaintiffs." *Id.* at *4 (emphasis added). In reaching this conclusion, the district court observed that on an earlier appeal "[t]he Second Circuit [had] agreed that the evidence supported the jury's finding that the Union failed, *arbitrarily*, to pursue the plaintiffs' grievances." *Id.*

In fact, in *Wickham* itself the Second Circuit affirmed an award of prejudgment interest where, among other reasons, "there [wa]s *no basis* in the history of the dispute between Wickham and the union *for concluding* that the union *acted innocently or that* the *union's actions* against Wickham were *taken in good faith.*" *Wickham*, 955 F.2d at 839 (emphasis added). Furthermore, the Second Circuit reasoned, "[t]here is every indication in this case that the union *knew* it was *clearly violating* a *specific statutory duty* erected by the LMRA." *Id.* (emphasis added). Beyond this the Court did not elucidate what constitutes good faith for prejudgment interest purposes.

In light of the foregoing, in demonstrating its good faith the State must show more than simply the absence of bad faith. The court will examine the record to determine, *inter alia*, whether the State knew it was clearly violating the Nonintercourse

---

**10.** *But see Mecca v. Gibraltar Corp. of America*, 746 F.Supp. 338, 349–50 (S.D.N.Y.1990) (declining to award prejudgment interest in securities case where investors were fully compensated for injuries; defendants were liable only on claim requiring no reliance or causation; and jury exonerated defendants on fraud and racketeering charges).

Act and whether it willfully violated that statute. The court will also consider whether the record as it is presently constituted supports a finding that the State "acted innocently and had no reason to know of the wrongfulness of [its] actions," see *Wickham,* 955 F.2d at 834 (citing *Jackson County,* 308 U.S. at 352–53, 60 S.Ct. 285), not just with respect to the Nonintercourse Act, but in terms of all its dealings with the Cayuga as chronicled in the vast historical proof before the court. The State will not, however, be required to show that its actions were primarily directed to protect the Cayuga and their interests during the relevant time frames.

### Historical Evidence

**"What is history but a fable agreed upon?"** [11]

#### Napoleon Bonaparte

During Phase II the court heard the testimony of three experts regarding the historical aspects of this land claim litigation: Laurence M. Hauptman, Ph.D., currently a State University of New York ("SUNY") Distinguished Professor of History at SUNY at New Paltz, on behalf of the Cayuga; Peter M. Whiteley, Ph.D., a cultural anthropologist, who is a professor at Sarah Lawrence College, on behalf of the U.S.; and Alexander von Gernet, Ph. D., an ethno-historian who is an assistant, non-tenured professor in the Department of Anthropology at the University of Toronto at Mississauga on behalf of the State of New York.[12] Before examining the substance of their testimony, the court has a few comments as to the nature of this proof generally.

Inevitably, as happened here, "disputes about controversial historical questions spill over into arguments about ideological motivation and methodological shortcomings." Daniel A. Farber, *Adjudication of Things Past: Reflections on History as Evidence,* 49 HASTINGS L.J. 1009, 1026 (1998) (*"Reflections on History"*). Thus, in the present case, in an effort to diminish the credibility of opposing historians and to inflate the credibility of their own historians, each of the parties vigorously attacked the ideology and methodology of the opposing historians. This tactic often backfired though because the parties ended up engaging in vitriolic rhetoric, which unfortunately carried over into their posttrial memoranda. What is more, many of these attacks bordered on the petty or trivial, such as the Cayuga's attack on Dr. von Gernet for not seeking tenure. These attacks were ineffective for two reasons. First, they only served to obscure those times when a party did have a legitimate dispute with a particular historian's point of view or methodology. Second, the party engaging in this conduct did nothing to prove or further the objectivity of its own expert historian.

Nonetheless, after reviewing their respective reports and *curriculum vitaes,* listening to their testimony, including how they responded to direct challenges on cross-examination, the court finds that each historian had something of value to offer, and their differing perspectives aided the court in obtaining a more complete picture of the historical events at issue. In fact, as will be seen, the court's findings as to the historical evidence are an amalgam of each of the differing viewpoints of these expert witnesses.

The court recognizes that "the task of any historian ... is a difficult one: if he

---

**11.** THE HOMER BOOK OF QUOTATIONS, CLASSICAL AND MODERN 902 (Stevenson, Burton eds., 9th ed.1964).

**12.** For convenience, the court will generically refer to these three experts as historians.

[or she] inserts and stresses material detrimental to the reputation of his [or her] subject he [or she] is inevitably accused of bias in one direction, and if he [or she] omits such material he [or she] is open to the charge of bias in another direction." *In re Long Island R. Co.*, 91 F.Supp. 439, 444 (E.D.N.Y.1950). In any historical survey there is an "inherent subjective factor involved in the selection of 'significant' facts[.]" *See Hume v. Moore–McCormack Lines*, 121 F.2d 336, 346 (2d Cir.1941). Recognizing this inherent subjectivity, the court has a few observations about each expert historian which, to a certain extent, bear upon the weight which the court is willing to accord their testimony.

The State ridicules Dr. Hauptman's report for being "a cut-and-paste package of recycled material from articles and books he wrote in other contexts in years gone by." *See* St. Reply at 62, n. 32. Tr. at 3851. The court does not criticize Dr. Hauptman's report for its form, as does the State, but the court does question the academic rigor of this report, in part because it contains many broad, rhetorical statements, not all of which find support in this historical record.

As will be more fully discussed below, the court is well aware that complete objectivity or neutrality in recounting these historical events is all but impossible to achieve. Perhaps more so than the other two historians who testified, however, Dr. Hauptman's testimony seemed to be unduly influenced by two areas in which he has conducted extensive research over the years—New York State transportation policies and interests and land speculation vis-a-vis the Iroquois Confederacy. The culmination of this research is Dr. Hauptman's book entitled, "Conspiracy of Interests Iroquois Dispossession and the Rise of New York State." Notably, the primary focus of this book is what Hauptman deems to be "two key Iroquois nations," the Oneida and the Seneca. *See* Nat. exh. 1 at xvi. The Cayuga, and the 1795 and 1807 transactions in particular, receive only passing mention. In making these observations, the court is not challenging the merits of Dr. Hauptman's scholarship, particularly as reflected in this book. The court is simply pointing out that because his research, especially in recent years, has focused heavily upon transportation interests and land speculation, naturally that is the lens through which he has viewed the historical events at issue in this lawsuit, and his perception of these events has been colored by that lens.

The U.S.' expert historian, Dr. Whiteley, was not without his own bias. As with Dr. Hauptman, the court cannot dispute Dr. Whiteley's credentials. The court is struck, however, by the fact that this is Whiteley's first exposure to eastern land claims, which undisputably raise very different issues and concerns than typically arise in western land disputes, such as those involving the Hopi Indians, with which Dr. Whiteley has had so much firsthand experience.[13] Dr. Whiteley referred to himself as an "objective" historian, Tr. at 3408, who had done "an objective assessment of the historical record[ ]" in this case. Tr. at 3119. In contrast to Dr. Hauptman in particular, Whiteley was relatively candid in acknowledging the difficulty which any social scientist has in remaining completely neutral. Dr. Whiteley still had a tendency to place a modern construct on these centuries' old events, and to portray the U.S. as the "good guy" and the State as the "bad guy." Given

---

**13.** Not only has Dr. Whiteley written two books pertaining to the Hopi, but he has done extensive field and archival research on the Hopi and their history. *See* Gov. exh. 361 at 1 and 3; St. exh. 723; and Tr. at 3104–19.

that perspective, it is not surprising that throughout his testimony Whiteley consistently interpreted documents and events in a way which supports that rather simplistic version of the historical events at issue herein.

Insofar as the State's history expert, Dr. von Gernet, is concerned, the court is acutely aware that his version of the historical events at issue admittedly is the "minority" view when compared to the other two testifying historians, as well as when compared to the views of well-recognized scholars in this area such as Dr. Barbara Graymont; and Dr. William Fenton, author of "A Political History of Iroquois Confederacy," and "generally regarded in the academic community as the dean of Iroquois research." [14] Tr. at 4855–56; *see also* St. exh. 623. While his scholarly views are not as "iconoclastic" as the Cayuga depict them, *see* Cay. Pre–Tr. Memo. at 55, it is fair to say, as Dr. von Gernet himself testified, that "[a]s of September 1999, [he] was the *only* scholar" who had arrived at the opinion that "New York treated the Cayugas fairly in 1795 and 1807[.]" Tr. at 4819–20 (emphasis added). Dr. von Gernet attributed this opinion, which is outside the "mainstream," to the fact that he was "the *only* scholar who had looked into this in any great detail[.]" *Id.* at 4819 (emphasis added). To von Gernet "great detail" meant "look[ing] into the speeches in all of the primary sources[,]" an aspect of Dr. Fenton's research with which von Gernet takes issue. The court is not in a position, nor would it be proper for it to compare the depth of Dr. von Gernet's with that of other historians, especially those, like Fenton, who did not testify. von Gernet's research was thorough, but that does not distinguish it from much of the other historical evidence before the court, including Dr. Whiteley's report. What distinguishes Dr. von Gernet's research here is the conclusions which he reached.

Naturally, each party tried to depict its respective historian as an objective scholar, researcher, and reporter of history. The court is mindful, however, that "[h]istory is not an exact science[;] [it is] more in the nature of an art[.]" *See Hume*, 121 F.2d at 346. Indeed, as one legal scholar has astutely observed, "the very subject matter of history is value loaded[.]" *Reflections on History* at 1028. In fact, "even the greatest believer in objective historical truth must admit that there are limits to historical knowledge." *Id.* at 1027. Practically speaking, "[t]here are limits . . . to the degree of objective truth we can expect to attain. When we seek to interpret documents, ascribe causes, assign probabilities, or reconstruct cultures," all of which the expert historians in this case were asked to do, "we become involved in a complex web of fact and theory, making the establishment of a definitive answer more problematic." *Id.* at 1031 (footnote omitted). Moreover, it is difficult to be a completely dispassionate historian because we are all humans who understandably view events through the unique lens of our own life experiences. Thus, the historians' opinions expressed

---

14. "Barbara Graymont is a professor of history and has written the authoritative text on the Iroquois and the American Revolution." Tr. at 2970–71. Dr. Fenton is very well regarded in academic circles for his research regarding the Iroquois Confederacy. Dr. Hauptman testified that "without question" Dr. Fenton is "the person who has written [the] most on the Iroquois since 1933 and he, among others is one of the really outstanding scholars in this field." *Id.* at 3939. (Interestingly, even though Dr. von Garnet and Dr. Hauptman are on different sides of this historical debate, von Gernet agreed with Hauptman regarding Fenton's stature as an Iroquois scholar.) Although historians such as Graymont and Fenton did not testify, some of their works are part of this record.

during Phase II were necessarily "colored" to a certain extent—colored by their experiences, both personally and professionally, and by the task which they were asked to perform.

Complete objectivity is an unobtainable goal as Dr. von Gernet recognized when he candidly testified that he does not think that it is "ever possible to have complete objectivity in any historical matter, particularly when you're dealing with events so long ago." Tr. at 5241. Nonetheless, in making the following findings as to the historical proof, the court is striving for relative objectivity, recognizing that "[a]s a practical matter, there are some events whose true facts will forever remain debatable because of the ambiguities in the historical record, and some facts whose import will always be subject to conflicting interpretations." *See Reflections on History* at 1027.

The State's view of the events at issue is, in short, that it did no wrong. The State contends that in the years before 1795 and for a time thereafter, it was the Cayuga who wanted to dispose of their land, and the State was simply accommodating them. Characterizing the State's view of history as "parochial and narrow-minded[,]" the Cayuga respond that the State did not act in good faith and in fact, that its policy "toward Indians, including the Cayuga, was characterized by greed, duplicity and racism[.]" Cay. Pre–Tr. Memo. at 37 and 33. Consequently the "relative equities" tip decidedly in their favor, the Cayuga believe.

The U.S. criticizes the State for not only "ignor[ing] the[ ] damaging historical facts, but [for] rewrit[ing] them[,]" U.S. Post–Tr. Memo. at 30; and in so doing "invent[ing] a revisionist, one-sided story that relies on out of context incidents and 'sound bites' and ignores any and all aspects of the historical record inconsistent with its general theory that only the Cayuga and the U.S. can be blamed for the State's illegal actions in 1795 and 1807." U.S. Resp. at 1. Believing that it has taken the proverbial "high road" in its recitation of the record, the U.S. cavalierly responds that "no argument can be made to deny that New York consistently and uniformly acted in bad faith toward the Cayugas for decades leading up to, during, and even after the illegal transactions." U.S. Post–Tr. Memo. at 19. The U.S. goes so far as to assert that "[w]ithin mere generations, the State successfully implemented a plan to rob the Cayuga of the entirety of their age-old homeland." *Id.* The U.S. makes this bold assertion despite the fact that the historical record affirms that the U.S. did little, if anything, to protect or defend the interests of their wards, *i.e.,* the Cayuga, up until 1992 when it intervened on their behalf in this lawsuit.

Without exception, *each* of the parties has to a certain extent overstated and oversimplified their respective versions of "history." In some instances there are legitimate conflicting interpretations of these events. For example, the historical evidence proffered as to the State's good faith, or lack thereof, in its dealings with the Cayuga is at times consistent, at times in conflict, and often not incapable of discernment with any degree of exactitude. The court will attempt, as best it can, to present the parties' respective proffers with the objective of adopting that version of evidence in question that is best supported by the proof. To the extent possible, the court will rely upon the contemporaneous documents, keeping in mind that interpretations often vary, depending upon one's point of view.

In analyzing the fairness and relative equities, the court cannot simply examine the circumstances immediately surrounding the 1795 and 1807 treaties. During

Phase I of this litigation, where the issue was valuing the subject property, the old adage that real estate is "location, location, location," was often-invoked. In a variation on that theme, as each of the historians made abundantly clear (and as is rather self-evident in any event), history is "context, context, context." Therefore, before considering the 1795 and 1807 treaties themselves, it is necessary to examine in some detail the historical backdrop of those treaties.

## I. Pre–Revolutionary War

The Cayuga's method of governance; their protocols and their early history of dealings with the State are helpful to an understanding of the context of the 1795 and 1807 treaties. These earlier events can help shed some light on those treaties in terms of expectations and motivations, not just with respect to the Cayuga, but also with respect to the State and the U.S.

In "pre-European times[,]" Gov. exh. 362 at 8 n. 1; *see also* Tr. at 4394–95, the Cayuga, along with four other Iroquois based language nations (the Mohawk, the Oneida, the Onondaga and the Seneca), "were part of a confederacy variously known as the Five Nations Iroquois, *Haudenosaunee,* League of the Iroquois, or Iroquois Confederacy." St. exh. 623 at 7; *see also* Gov. exh. 362 at 8, n. 1. The Five Nations became the "Six Nations" in the early 18th century when the Tuscarora joined that confederacy. *See id.; see also* Tr. at 4401; and Tr. at 2842. Prior to the Revolutionary War, Cayuga territory comprised approximately 1700 square miles, spanning from Lake Ontario southward into Pennsylvania. *See* Gov. exh. 436; Tr. at 2841; 2846–47; *see also* Nat. exh. 61 at 6; St. exh. 623 at 7. And in 1771, also prior to the Revolutionary War, there were approximately 1,040 Cayuga in that area. *See* St. exh. 623 at 7.

In 1768, the British Crown and the Six Nations entered into a Treaty, which set the boundaries of the Nations' territory. Tr. at 2843–44; *see also* Gov. exh. 435; Tr. at 4658. That Treaty provided, *inter alia,* that the Six Nations were "the true and absolute [P]roprietors of the [L]ands northwest of a . . . line that subsequently became known as the old line of property." *Id.* at 2843 (internal quotation marks and citation omitted); *see also* Tr. at 3132. In terms of the Cayuga territory in particular, this 1768 Treaty recognized the same because their territory was included within the Six Nations' property boundaries. *See id.* at 2847. The Indians viewed this Treaty as "settl[ing] a permanent boundary between the[y] and whites." Gov. exh. 228 at 260.

In 1777, New York State adopted a Constitution. Stressing that it was "of great importance" to the State's "safety" to "support[ ] and maintain[ ]" "peace and amity with the Indians," and also expressing awareness of "frauds too often practiced towards the . . . Indians," Article 37 of that Constitution expressly provided:

That *no purchases or contracts for the sale of lands* made since the 14th day of October, in the year of our Lord one thousand seven hundred and seventy-five, or which may hereafter be made *with or of the said Indians, within the limits of this state, shall be binding on said Indians, or deemed valid, unless made under the authority and with the consent of the legislature of this state.*

*See* Gov. exh. 491 at 185 (emphasis added). This appears to be a carryover from the second session of New York's Colonial Assembly, held in 1684, which expressly required that "from henceforward noe Purchase of Lands from the Indians shall bee esteemed a good Title without Leave first had and obtained from the Governour." St. exh. 623 at 8 (internal quotations marks

and footnote omitted). Dr. von Gernet characterized this Constitution as "provid[ing] for a protectionist philosophy, [while] at the same time a mechanism for alienation which involved the preemption right." Tr. at 4661.

## II. American Revolution

In the early stages of the American Revolution the Six Nations remained neutral. See Tr. at 2848–49; Nat. exh. 61. at 7; Gov. exh. 362 at 9; and St. exh. 623 at 10; and Tr. at 4484. In 1777, however, the Iroquois policy of military neutrality began to break down. As Anthony Wallace, one of the leading scholars in Iroquois history, see Tr. at 3837–38, wrote in his book, "The Death and Rebirth of the Seneca," in the early summer of 1777, British agents formally requested that the Six Nations fight on behalf of the Crown. See Gov. exh. 324 at 132. Initially the Six Nations could not come to a consensus as to this request, with some concern being expressed that the Indians should not involve themselves in this "white man's" feud. See id. at 133. Eventually, though, "[a] majority of the warriors passed a resolution" to support the British. Id.

Despite that resolution, the Six Nations did not stay united in their support for Britain. The Cayuga, along with the Seneca, the Onondaga and the Mohawk, continued to side with the British Crown, even after a plea from Congress to join with the Americans. The Oneida and the Tuscarora split the Six Nations' allegiance by supporting the Americans. See Gov. exh. 362 at 9; Tr. at 4835; Nat. exh. 61 at 7.

The U.S.' historian, Dr. Whiteley, opined that it is an "oversimplifi[cation]" to characterize "the Cayuga Nation merely as enemies of the Patriots in the Revolutionary War[.]" Gov. exh. 362 at 10. As Dr. Whiteley testified, there is some indication in the record that not all Cayuga were staunch supporters of the British Crown; "evidently [some were] neutral or in sympathy with the Americans." Id. at 9; see also id. at 10. Even though Dr. Whiteley admitted that he could not name or point "to a historic instance where somebody reported . . . a band of Cayugas . . . fighting alongside American forces[,]" Tr. at 3146, that does not significantly undermine his opinion that perhaps not all Cayuga were loyal to the British during the Revolutionary War. It is unrealistic to think that every member of any nation is always in agreement with the policies of that nation, especially when it comes to war; and certainly these divided loyalties were evident among other Iroquois member nations. See Gov. exh. 363 at 438–39; see also Tr. at 2850 (emphasis added) ("[W]ithin all tribes, the historical record indicates that there was a division of views."). At the end of the day though, the court agrees with the assessment of the State's historian "that there is [in]sufficient evidence to overturn an academic consensus that the Cayuga were participants in the American Revolution on the British side." Tr. at 4835.

There were a number of significant battles during the American Revolution. Two battles were prominent in the historical proof presented during Phase II—the battle at Wyoming Valley and the Sullivan–Clinton Campaign. The significance of the Wyoming Valley battle as will be seen, lies not so much in what transpired there as the fact that it was a major impetus for the Sullivan–Clinton Campaign.

### A. Wyoming Valley

The battle at Wyoming Valley, part of the ongoing battles of the Revolutionary War was "the first major event of the 1778 fighting-season[.]" See Gov. exh. 324 at 137. Wyoming Valley was one of "two

major and strictly military engagements[ ]"... "during which Iroquois warriors had participated as brothers-in-arms with British troops[.]" *See id.* at 137 and 138. Thus the battle at Wyoming Valley was by no means "primarily or exclusively a Native American battle." Tr. at 4837. Insofar as Cayuga participation at Wyoming Valley is concerned, Dr. von Gernet stated that "[i]n June, 1778 a large party of Cayuga warriors joined Butler's Rangers and other Indians in the devastating assault on the Wyoming Valley in Pennsylvania." St. exh 634 at 10; *see also* Tr. at 4659. Although Dr. von Gernet did not cite a source for this statement, there is corroborating proof in the record that the Cayuga were among those Indians fighting at Wyoming Valley. In her book entitled "The Iroquois in the American Revolution," Graymont indicates that of the Indians who participated at Wyoming Valley, they were *"mostly* of the Seneca and Cayuga tribes." Gov. exh. 228 at 168 (emphasis added).

The attack by the British and the Iroquois warriors resulted in the Americans retreating, and the battle became a "rout[.]" *See* Gov. exh. 324 at 137. Thereafter, "[t]he settlements in the valley of Wyoming were ... burned and looted, and most of the inhabitants fled into the mountains." *Id.* The fighting at Wyoming Valley had devastating consequences, *see, e.g.,* Gov. exh. 228 at 172, but it is widely accepted among historians that these events were greatly exaggerated. *See* Tr. at 3592–93. As Dr. von Gernet so astutely observed, "truth is the first casualty of war[,]" and so it was with the Wyoming Valley battle. *See* St. exh. 623 at 10; and Tr. at 4659. Wallace, a leading Iroquois scholar, echoed this sentiment: "[A]lthough there was neither massacre nor torture of prisoners, the fleeing survivors spread lurid tales of atrocities; indeed, Wyoming became a symbol of Indian ra-

pacity." Gov. exh. 324 at 137–38; *see also* Gov. exh. 228 at 172; and Tr. at 3594 ("Almost as soon as the invaders left, the rumors began to fly, magnifying the horrors of the battle and fabricating atrocities."). This depiction of the Wyoming Valley battle as a "massacre" stems, Graymont asserts, because "Whites have always been prone to label any overwhelming Indian victory a massacre and to call any of their own battle triumphs over Indians a great victory." Gov. exh. 228 at 174. Regardless of how it is described, whether in more inflammatory terms as a massacre, or in more innocuous terms as a battle, the record clearly establishes that the British and the Indians, including the Cayuga soundly defeated the Americans at Wyoming Valley. *See id.*

### B. Sullivan–Clinton Campaign

The battle at Wyoming Valley was but one of a number of such raids by the Loyalists and the Iroquois warriors which prompted retaliation by the Americans. *See* Gov. exh. 324 at 141 ("The effectiveness of the Iroquois and Tory raiders in laying waste a fifty-to one-hundred-mile belt of frontier land, ... was by now a matter of major concern to the Continental commanders."). This retaliation took the form of what is known as the Sullivan–Clinton Campaign, after its two military leaders. In an effort to show that it acted in good faith, the State attempts to depict that Campaign as exclusively an operation of the U.S. asserting that "[t]he physical displacement of the Cayuga from their homeland *was not at the hands of New York,* but the plaintiff-intervenor U.S." *See* State Pre–Tr. Memo. at 2 (emphasis added). The State further asserts that "[s]uch displacement was the direct consequence of the Cayugas' acts of war against the U.S., and it was achieved by [*U.S.*] military forces carrying out [*U.S.*] policy at the

*express direction* of *George Washington."* *Id.* (emphasis added). Consistent with this view, the State takes the U.S. to task for making the "amazing assertion that the Sullivan Campaign was really a New York State action because it was 'instigated' by Governor George Clinton." State Post–Tr. at 3 (citations omitted). In its attempt to distance itself from the Sullivan–Clinton Campaign, the State makes its own "amazing assertion" that that Campaign was solely within the powers of the U.S. Close examination of the record demonstrates that the State has oversimplified history.[15] The Sullivan–Clinton Campaign was *not* exclusively an enterprise of the U.S. or of the State of New York. Each had an integral role in that Campaign. As Dr. Whiteley testified, and as documents found in New York State's Division of Archives and History establish, the U.S. is asserting "that New York was involved in promoting the campaign." Tr. at 2857. Such promotion does not render the Sullivan–Clinton Campaign solely a New York State action, and the historical record belies that view. The Sullivan–Clinton Campaign was a joint effort between the U.S. and several states, one of which was New York.

The Sullivan–Clinton Campaign came about in part because in the aftermath of Wyoming Valley and other similar victories by the British and their Indian allies, "the appeals of the menaced patriots to Governor George Clinton, to the New York Legislature, to Washington and to Congress for protection became piteously insistent." *See* Gov. exh. 417 at 9. Consequently, "Clinton promised that he would do everything within his power for the protection and the comfort of the frontiersmen." Tr. at 2856 (internal quotation

marks omitted). Although Clinton "advised a winter attack on the Indian strongholds[,] . . . that suggestion did not materialize, [but] the correspondence of Washington shows that he devoted a great deal of attention to the 'Indian expedition' during the winter and spring of 1778–79." *Id.*

On February 25, 1779, Congress voted to authorize "Washington's plan for the 'Indian expedition[,]'" and it appropriated "nearly a million dollars for equipment and supplies[.]" Gov. exh. 417 at 9 and 12. Washington appointed General John Sullivan to lead the Campaign. *See id.* at 9. "General James Clinton, the brother of [New York] Governor George Clinton, was regarded as second in command, and was given direct charge of the army which was assembled in New York[.]" *Id.* at 9–10; *see also* St. exh 623 at 10. For its part, "[o]n March 13, 1779, the Legislature of New York ordered 1000 men to be recruited to defend the frontier, and forts to be erected." *Id.* Significantly, New York was not the only state to lend its support to this cause. "Officers and soldiers participated from . . . Pennsylvania, New Jersey, New Hampshire and Massachusetts." *Id.* at 12. Thus, the Sullivan–Clinton Campaign was a collaborative effort between the fledgling American government and several states, including New York. Not only does the historical evidence before the record establish this, but *common sense* dictates that it would have been practically impossible for any of these neophyte governments to have singlehandedly mounted what has been called "one of the largest offensive movements in the whole War of Independence." *See* Gov. exh. 417 at 12.

**15.** As usual, the State is not the only party to oversimplify or overstate history here. In his report, Dr. Whiteley asserts that "The Sullivan–Clinton Campaign moved in to annihilate the Cayuga." Gov. exh. 362 at 10. As set forth above, however, that Campaign was not directed exclusively at the Cayuga.

Under George Washington's organization, there were four parts to the Sullivan–Clinton Campaign plan. *See* Gov. exh. 417 at 10. Two of those parts related directly to the Cayuga. The strategy behind the opening of that Campaign in the spring of 1779 was to "permit the leaders . . . to devote all their attention to the Cayugas and Senecas." *Id.* at 12. Then, during "[t]he main body of the expedition under General Sullivan[,]" the Continental troops were to "move up into the Cayuga and Seneca territory[ ]" in anticipation of breaking the power of those two nations. *See id.* Broadly stated, the purpose of this Campaign was to "attack and destroy the Iroquois enemies in their homeland, to destroy as many towns and the resources of those towns as possible and thereby deal a very powerful blow against the British and their most significant allies." Tr. at 2852 and 2854. Dr. Whiteley's interpretation of the purpose of the Sullivan–Clinton Campaign is borne out by the writings of Washington himself. In "instructions" to Major–General Sullivan, in late spring of 1779, Washington wrote:

> The expedition you are appointed to command is to be directed against the hostile tribes of the Six Nations of Indians, with their associates and adherents. The *immediate objects* are the *total destruction and devastation of their settlements,* and the capture of as many prisoners of every age and sex as possible. It will be essential to ruin their crops now in the ground & prevent their planting more[.]

St. exh. 725 at 460; *see also* Tr. at 3157–58 (emphasis added).

Washington's objectives were achieved. Prior to the Sullivan–Clinton Campaign, the Cayuga practiced a "mixed economy," consisting of "agriculture, hunting[,] . . . gathering[,] . . . fishing, and a pastoral economy." Tr. at 2860. The Sullivan–

Clinton Campaign "completely destroyed" that economy. *Id.; see also* Gov. exh. 417 at 15–16 ("The hostile Senecas and Cayugas were terribly punished. Their homes were burned, their vast cornfields and gardens were all destroyed, and their orchards were cut down or killed."). As military journals from the time show, a number of Cayuga villages on the east and west sides of Cayuga Lake also were destroyed. *See generally* Gov. exh. 422; and Tr. at 2861–2864; *see also* Nat. exh. 61 at 7; Gov. exh. 324 at 143 and 144 ("[S]ullivan's army . . . succeeded in laying waste [to] . . . all the main Cayuga settlements[.]" "[W]ith the conclusion of the summer of 1779, . . . Cayuga towns had all been destroyed or abandoned[.]") The destruction of the Cayuga's villages and resources was devastating, "fundamentally displac[ing] [the Cayuga] from their homes." *See* Tr. at 2870. Indeed, "the majority of the Cayugas never returned to Cayuga Lake to live[,]" and "although the figures aren't as complete as one would like[,] . . . Wallace, . . . , records that the Six Nations population declined by half from immediately prior to the Revolutionary War to the early 1790s." *Id.* at 2870 and 2871.

The court does not credit the State's argument that it had little or no role in the Sullivan–Clinton Campaign, and thus the State acted in good faith at that time. Nor does the court credit State's implied argument that the Sullivan–Clinton Campaign was somehow justified by the atrocities which preceded it at Wyoming Valley, and other similar battles where the British and Iroquois prevailed over the Americans. Wyoming Valley and the Sullivan–Clinton Campaign demonstrate nothing more that then, as now, warfare is brutal and can have devastating consequences for all concerned. Furthermore, the court cannot overlook the fact that these battles were part of a larger picture—the Ameri-

cans' efforts to defeat the British in the War for Independence.

### C. Articles of Confederation

In 1781 the states adopted the Articles of Confederation. *See* Gov. exh. 362 at 14; Gov. exh. 362 at 267; and Tr. at 2872. One clause of Article IX gives Congress "the sole and exclusive right and power of determining peace and war" and of "entering into treaties and alliances." Gov. exh. 228 at 268 (citation omitted). Clause four of that same Article also gives Congress "the exclusive right of 'regulating the trade and managing all affairs with the Indians, not members of any of the states, *provided that the legislative right of any state within its own limits be not infringed or violated.'*" *Id.* (emphasis added). In what a former Assistant Attorney General for New York, describes as "two-faced" language, Gov. exh. 438 at 24, "[t]he Articles of Confederation [thus] left the question of jurisdiction [over Indian affairs] up in the air." Gov. exh. 218 at 604. Graymont identifies the constitutional issues raised by the inherent tension between the two clauses quoted above: "Were the Iroquois to be considered members of New York State: And what did the term 'members of any states' mean?" *See* Gov. exh. 228 at 268.

Dr. von Gernet declined to "enter[ ] into this fray," as to "how the Indian-related clauses in the Articles of Confederation should be interpreted." St. exh. 623 at 15 n. 41. When Whiteley was questioned as to his interpretation of the Articles of Confederation he took the position that Congress had the *sole* right to negotiate Indian treaties thereunder. *See* Tr. at 3138–39. Suffice it to say for present purposes that the issue of New York's treaty making activities at the time "was one of great complexity and delicacy, involving the matter of states rights versus federal powers."

*See id.* at 269. As will be seen, New York's governor, George Clinton, clearly aligned himself with the anti-federalists— those favoring, *inter alia,* state jurisdiction over the Indians, believing them to be "members" of New York State. *See* Tr. at 3167–69; and Gov. exh. 218 at 604. Clinton "wanted to retain control over Indian affairs within the state." *Id.* at 3170. The federalists, on the other hand, advocated centralized control over Indian affairs by the new confederal government.

Given these differing interpretations to the Articles of Confederation, arguably it was reasonable, at least at this particular juncture, for New York to believe that it was permissible for it to deal in land matters with the Cayuga to the exclusion of the Federal Government. Indeed, some 200 years thereafter, this court held, in an opinion affirmed by the Second Circuit Court of Appeals, that Article IX, Clause IV of the Articles of Confederation gave the states the power to purchase Indian land within their borders and extinguish Indian title to such land so long as such activity did not interfere with Congress's paramount powers over war and peace with the Indians. *See Oneida Indian Nation of New York v. New York,* 649 F.Supp. 420 (N.D.N.Y.1986) (McCurn, J.), *aff'd* 860 F.2d 1145, 1154 (2d Cir.1988).

### D. Cayuga Factions

During and after the American Revolution the Cayuga dispersed producing roughly three separate enclaves. *See* Nat. exh. 61 at 8. The first faction, which the court will refer to as the "Buffalo Creek Cayuga" or the "Cayuga majority," was led by Cayuga Chief Fish Carrier, who was the "principal spokesperson" for that Cayuga. *See* St. exh. 623 at 21(footnote omitted); Tr. at 2896. After the War, Fish Carrier along with "many other Cayuga chose to settle south of Fort Niagara

at Buffalo Creek where they associated themselves with a large Seneca community." St. exh. 623 at 20; and Tr. at 4671–72. The second group, referred to by von Gernet as a "splinter group," was led by Steel Trap until his death in 1794. *See* St. exh. 623 at 21. Like Fish Carrier, Steel Trap fled to Niagara after the Sullivan–Clinton Campaign; but unlike Fish Carrier, Steel Trap returned to the eastern side of Cayuga Lake after the war. *See id.;* *see also* Tr. at 4672. The court will refer to this group as the "Cayuga Lake faction," or the "Cayuga minority." A third group fled to Canada after the war, residing on the Six Nations reserve which the British established. *See* Nat. exh. 61 at 8; and Tr. at 2895.

The majority and minority Cayuga factions had diverse interests. Fish Carrier and the Cayuga majority were "determined to dispose" of their former homelands, whereas Steel Trap and the Cayuga minority "wanted to maintain at least some of those homelands as territories where they would continue to live, and he was interested in . . . encouraging the Cayuga Nation to return to th[os]e homelands." *See* Tr. at 4673. It is these divergent interests which, in part, contributed to confusion in later years as to the intent of the Cayuga Nation as a whole with respect to their lands.

### E. 1784 Fort Stanwix Treaties

In 1783 a general peace accord Treaty was reached between the U.S. and Britain, The Treaty of Paris, ending the American Revolution. *See* Tr. at 3166–67. That Treaty did not address the status of the Iroquois post-war, however, *see id.* at 3167; and Tr. at 4674, leaving the U.S. and individual states to each attempt to exert their authority over Indian Nations, such as the Cayuga.

Peace efforts in the aftermath of the American Revolution included two separate treaties both entered into at Fort Stanwix in 1784—New York instigated one of those treaties, and the Federal Government the other. Given the inherent tension in the Articles of Confederation, in 1783 Congress was preparing to exercise its "exclusive" right to manage Indian affairs under the Indian Commerce Clause by entering into a peace treaty, which included land cessions with the Six Nations. *See* Gov. exh. 438 at 24; *see also* Tr. at 3226. Even though the State and the Federal Government were each proceeding in accordance with the Articles of Confederation, there was an undeniable tension between those two governments.

New York was motivated not only by trying to achieve peace with the Six Nations, but also because it was in competition with other states such as Massachusetts and Connecticut for land within its borders. *See* Gov. exh. 438 at 24–25; Tr. at 2873; 3225; and 3227–28; and Gov. exh. 362 at 14. Just after the Revolutionary War there was also "a tide of land speculators who formed companies to try and acquire large tracts of land in the area." Tr. at 2873. Thus, insofar as the State was concerned, its *"primary object,* . . . was not only to conclude a peace but to *obtain a land cession."* Gov. exh. 228 at 267 (footnote omitted) (emphasis added). The U.S., on the other hand, while also motivated to make peace with the Six Nations, *see* Gov. exh. 228 at 266, was concerned with, among other things "extinguish[ing] Indian title, including any claims held by the Iroquois tribes of New York[,]" and "punish[ing] the hostile tribes [of which the Cayuga was one][.]" Gov. exh. 211 at 55. Another concern of the U.S. was the possibility of another Indian war "if the . . . State of New York should insist upon expelling the Six Nations from all the country they inhabited previous to

the [Revolutionary] war, within their territory[.]" Gov. exh. 438 at 46 (internal quotation marks and citations omitted); *see* also Tr. at 2879 and 2880–81. Thus, while the State at this juncture was motivated more by a desire to acquire Indian lands, the motivation of the U.S. was more political in nature. Given these differing objectives, and also because of the newness of the Republic, the State and the confederal governments each sought to independently negotiate peace with the Indians following the American Revolution.

Because "New York ... was a step or two ahead of Congress, ..., and, concerned for its own interests," it was the first to enter into a Treaty with the Indians at Fort Stanwix in 1784. *See* Gov. exh. 228 at 267; *see also* Tr. at 4890–91. The State met with representatives of "the five core members of the Iroquois Confederacy." Tr. at 4959. Even though the State was interested in land cessions, it was unable to procure any. *See* Gov. exh. 211 at 53; *see also* Gov. exh. 363 at 449 ("[N]o land had passed out of the possession of the Indians, as Clinton had hoped."). Nor was the State able to obtain recognition of its sovereignty. *See* Gov. exh. 211 at 53. Instead, the State's Treaty simply "re-established some terms of peace and provided for the possibility of commerce[.]" *See* Tr. at 3223.

The second Fort Stanwix Treaty of 1784 was between the U.S. and the Six Nations. *See* St. exh. 727. Like the State Treaty, this Treaty too was an effort to make peace with the Six Nations following the American Revolution. *See* Tr. at 2871. But unlike the State Treaty, this confederal Treaty involved a cession of "[p]robably millions of acres of land." Tr. at 3238. More specifically, the "principal" term of this Treaty "involved a cession of lands west of Lake Erie and south of the Pennsylvania line, to the U.S., in return for

which the U.S. recognized Iroquois possession of their lands in what became New York State." *Id.* at 2871–72; *see also* Tr. at 4888.

New York's Governor Clinton was invited to participate in this federal Treaty, but he refused. *See* Tr. at 3172; Tr. at 5364–65; and Tr. at 2883. Despite the fact that the State refused to formally participate in the confederal Treaty negotiations, it had a presence there. To further its own interests, in September, 1784, Governor Clinton instructed Major Peter Schuyler and Peter Ryckman to remain behind after the State negotiations at Fort Stanwix to "observe the Conduct of the Commissioners of Congress in their proposed Treaty," and to discern the U.S.' objectives. Clinton further instructed Schuyler and Ryckman to "*use* [their] *most undivided influence to Counteract and frustrate* [ ] any actions by the U.S." which "may [e]ventually proved [d]etrimental to [it.]" *See* Gov. exh. 425 at 379 (emphasis added); *see also* Tr. at 2884–85. In response the U.S. posted sentinels. *See* Tr. at 2885; and Tr. at 4892–93. As historian Graymont so aptly wrote, this is one "graphic example of the ... rivalries and jealousies between the states and the Congress in the early years of the Republic." Gov. exh. 228 at 272 (footnote omitted); and Tr. at 4892.

The U.S. attributes bad faith, or at the very least a lack of good faith, to the State in connection with the U.S.' Fort Stanwix Treaty because purportedly New York "wanted to expel the Cayuga," and it "attempt[ed] to '[c]ounteract and [f]rustrate' Congress' peace Treaty." U.S. Post–Tr. Memo. at 21. In an effort to demonstrate its good faith, the State responds by criticizing the U.S. for its method of treaty making, asserting that the U.S. was "arrogant" in its treatment of the Iroquois at Fort Stanwix because supposedly it "dispensed with customary diplomatic proto-

cols and sought to impose upon the defeated tribes (including the Cayuga) the [U.S.]' terms of peace." St. Post–Tr. Memo. at 8; and St. Pre–Tr. Memo. at 3. The court will address these arguments in reverse order.

There was an abundance of testimony, especially from Dr. von Gernet, regarding the contrasting negotiation styles of the state and confederal governments at Fort Stanwix. von Gernet depicts the U.S. as adopting an "uncompromising" tone. *See* Tr. at 4887; *see also* Tr. at 4665. In contrast, von Gernet characterized Clinton's style as one of "rekindl[ing] forest diplomacy[,]" by "allud[ing] to all of the typical Iroquois metaphors that ha[d] become part of the standard parlance of the time[,]" such as "nation ... council fire or ... brethren, sachems, [and] warriors." *Id.* at 4663–65. Clinton also "reminded the Iroquois of the longstanding relationship that they had with one another that preceded the Revolution by well over a century, and he stressed the state's preemption right and basically asked the Iroquois to abide by this 'ancient rule and custom.'" *Id.* at 4666; *see also* Gov. exh. 375 at 115. The issue of this undisputed difference in negotiating styles, which the State raises, does not bear directly on the issue of its good faith. The State's good faith cannot be determined simply by showing that it acted at least partially in accordance with Iroquois protocols and the

U.S. did not. The State's method of negotiating, as a basis for finding good faith, is further weakened by record evidence that even assuming those protocols were strictly adhered to prior to the American Revolution (a highly doubtful supposition), after the war, that was not the case.

Likewise, the court is unwilling to find bad faith on the part of New York simply because at the end of the Revolutionary War its interests were antithetical to those of the U.S. And although Governor Clinton did instruct Schuyler and Ryckman to "frustrate[ ]" the Congressional Treaty, that in and of itself does not support a finding of bad faith, especially considering that in the end the State was not successful in thwarting the U.S.' treaty efforts. After all, the U.S. obtained a significant land cession from the Iroquois without paying any consideration. The actions of the State and confederal governments before and during the Fort Stanwix treaties amounted, in this court's opinion, to nothing more than those governments each trying to assert their respective sovereignty muscles over the Iroquois—a theme which was to occur in the years follow.

### F. Livingston Lease

Evidently in an effort to circumvent the New York State Constitution,[16] which required that any "purchase[ ] or contract[ ]" for the sale of Indian lands be "made under the authority and with the consent

---

**16.** Dr. Whiteley expressly disagreed "that the Livingston lease was an effort to end run around the New York's constitutional prohibition against sales of Indian lands to private parties[,]" Tr. at 3247. The historical consensus which can be drawn from the present record is to the contrary, however. One historian has commented that the Livingston Lease was a "[s]cheme devised to evade the Letter of the fundamental Law [the 1777 New York Constitution], while it defeated its Spirit." *See* St. exh. 35 at 119 n. 1. Historian Graymont concurred: "The purpose of the

999 year lease of the Genesee Company was to circumvent the provision of the state constitution which forbade private purchase of Indian lands without express license from the Legislature." Gov. exh. 363 at 457 (footnote omitted). Dr. von Gernet expressed the same view. *See* Tr. at 4677 ("It seems clear that the New York Genesee Company of Adventurers tried to circumvent the constitutional requirement that sales not proceed with private parties ... by making it a 999–year lease for ten centuries[.]").

of the [state] legislature[,]" *see* Gov. exh. 491 at 185, in 1787 a group of private individuals entered into a 999 year lease, known as the Livingston Lease, with the Six Nations. *See* St. exh. 35 at 120–22. The Livingston Lease "ceded *all* of the [Iroquois] lands...west of the old line of property in New York State except those lands that the sachems and chiefs chose to reserve." *Id.* at 2888 (emphasis added); *see also* Tr. at 3308 and St. exh. 623. Those who entered into that Lease were land speculators operating as the New York Genesee Company of Adventurers ("Genesee Company"). Among the prominent members of that group were a former Commissioner of Indian Treaties, a New York State Senator, and numerous past, present and future State Assembly members. *See* Gov. exh. 324 at 153; and St. exh. 35 at 120; *see also* Tr. at 2889; and Gov. exh. 362 at 21. Indeed, Peter Ryckman, one of those instructed by Clinton to frustrate the 1784 Congressional Treaty at Fort Stanwix, was one of the principals in the Genesee Company. *See* Tr. at 2895.

The Livingston Lease purports to be with "the Chiefs or Sachems of the Six Nations[,]" but actually only four member Nations were signatories, one of which was the Cayuga under Fish Carrier's leadership. *See* St. exh. 35 at 120 and 122. The Cayuga Lake minority, under Steel Trap's leadership, did not agree to this lease. *See* Tr. at 2909; and Tr. at 3358. According to the State's historian, the Cayuga majority was motivated to agree to the terms of this Livingston Lease because they "regarded this as part of their long-term goal to convert their former territories into a source of revenue[.]" Tr. at 4678. Not completely inconsistent with this view, the

U.S.' historian testified that the Cayuga were willing to enter into this lease because they were in "desperate straits and they needed any sort of economic support they could get." Tr. at 2887; and Gov. exh. 362. Under the terms of the Livingston Lease the signatory Nations were to receive "an annual rent or ... annuity, [which] would have been a source of income in very difficult circumstances." *Id.* The total of this annuity was $2,000, St. exh. 35 at 121 n. 1; and Tr. at 3257; and assuming that it was divided evenly among the four signatory Nations, "at the very most, each one would [have] be[en] entitled to $500[.]" Tr. at 466–67.

The State of New York was *not* a party to the Livingston Lease. Moreover, none of the Genesee Company individuals were acting on behalf of the State when they entered into that lease. *See* Tr. at 3243. Despite the State's lack of participation in that Lease, the Cayuga majority perceived the Genesee Company as "legitimate representatives of the [S]tate[.]" *See* Tr. at 2889. Fish Carrier explained to Governor Clinton[17] that the Cayuga majority "doubted ... the [p]ropriety of [proposals by the Genesee Company]," because the majority suspected that those proposals were contrary both to the State law and to the Cayuga's ancient customs. *See* St. exh. 35 at 415; and Tr. at 4915–17. The majority's concerns were allayed, however, by assurances from the Genesee Company that the Governor and other "Chiefs of State had 'authorized' this lease proposal to the Cayuga." *See id.* "[I]nduced" into believing the Genesee Company, the Cayuga majority agreed to the Livingston Lease, not believing that they were doing anything "wrong" or "disagreeable" to the

17. Joseph Brant "was one of very few Iroquois individuals who received an education and was a fluent speaker of English and fluent reader and writer of English." Tr. at 2905. He corresponded with Governor Clinton on behalf of Fish Carrier and the Cayuga majority.

State. *Id.* at 415–16. The Cayuga were also "induce[d]" into entering into the Livingston Lease because they were under the impression that unless they agreed to that Lease, the State would cede all the Cayuga land to others with no payment in return. *See* St. exh. 35 at 416–17; *see also* Tr. at 5233.

After execution of the Livingston Lease, the Genesee Company sought ratification by the Legislature, but it refused.[18] *See* Tr. at 3248. The State quashed the Livingston Lease for several reasons. First, the State believed that that Lease violated the State's right of preemption, which gave the State the first right of refusal or to purchase Indian lands. *See id.* at 2890–91; and 2910; and Tr. at 4913. Further, the State believed that the Livingston Lease violated the New York State Constitution, which implicitly proscribed such private leases. *Id.* at 4913. Also, the State was concerned about a secessionist movement by the Genesee Company. *See* Tr. at 2890–9; and 2910; and Tr. at 4918. Besides quashing the Livingston Lease on March 17, 1788, the State Legislature enacted a statute to punish "infractions" of Article 37 of the New York State Constitution which prohibited purchase of Indian lands without the Legislature's approval. *See* St. exh. 35 at 438–440 n. 1; and Tr. at 3249–50.

Not surprisingly, the import of the Livingston Lease is vastly different depending upon which of the parties is viewing it. The Cayuga assert that the Livingston Lease was significant "because it is the first of many instances in which the Iroquois, including the Cayuga, sought to give a lease, as opposed to an outright surrender of title, in exchange for funds to sus-

tain their people." Cay. Post–Tr. Memo. at 35. Further, the Cayuga assert that the lease "presages the recurring refusal of the State to refuse to consider any arrangement that would permit the Iroquois to retain title to their lands." *Id.* In a similar vein, the U.S. contends that the Livingston Lease is important to understanding the context of the 1795 and 1807 treaties because it "set the standards for State attempts to acquire cessions of Iroquois lands." *See* U.S. Pre–Tr. Memo at 3; and U.S. Post–Tr. Memo. at 21; and Gov. exh. 362 at 22 and 23.

Instead of focusing on the motivation of the private individuals, the State paints the Livingston Lease as an effort by the Cayuga "to skirt" New York's Constitution and "dispose of all of their lands through 999–year leases for less consideration than they could later receive from New York in 1789 and 1795." St. Pre–Tr. Memo. at 4. Somewhat ironically, the State then goes on to assert that in effect, by quashing this Lease, the State was protecting the Cayuga from themselves: *"Only by virtue of New York's intervention* were the private speculators and the Cayuga foiled in their efforts to alienate all of their lands in New York." *Id.* (emphasis added). New York's motivation was not altogether altruistic. Less than a month after quashing the Livingston Lease, "in reaction to what was going on in the previous months[,]" including that Lease, the State enacted a statute appointing commissioners to enter into treaties with the Six Nations. Tr. at 4922; *see also* Tr. at 2891.

### G. *1789 Treaty at Albany*

In July, 1788, New York ratified the U.S. Constitution which gives Congress

---

18. To this point the court has referred to only one Livingston Lease. Actually there were two. After New York invalidated the original Livingston Lease, the Six Nations, including Fish Carrier and a number of other Cayuga,

entered into a modified version of that original Lease, which the legislature also refused to ratify. *See* St. exh. 623 at 23; and Tr. at 4678–79.

the sole right to enter into treaties. Article I, § 10, ¶ 1 of the Constitution expressly provides: *"No State shall enter into any Treaty, Alliance, or Confederation [.]" See* Gov. exh. 363 at 458 (internal quotation marks and citation omitted) (emphasis added). "And Article II, Section 2, Paragraph 2 specifically grants the Treaty making power to the President of the [U.S.], by and with the Advice and Consent of the Senate." *Id.* Ignoring this unequivocal language, the State forged ahead on its own in 1788 and 1789, making several treaties with various constituents of the Six Nations, including the Cayuga. *See id.* at 458–60.

In September 1788, through two separate treaties, the State obtained "major land cessions" from the Oneida and the Onondaga. *Id.* at 459. As will be seen, there are striking similarities between those treaties and the one which the State later entered into with the Cayuga in February 1789. As with the Cayuga, relatively small Reservations were set aside for the Oneida and the Onondaga, and each received some compensation plus an annuity. *See id.* Also as with the Cayuga, the State dealt with the minority factions of the Onondaga and Oneida. *See* Tr. at 2899.

The State and the U.S. agree that it is necessary to explore in some detail the 1789 New York Treaty with the Cayuga at Albany because this Treaty "provide[s] the most central background of all for an understanding of the Treaty of Cayuga Ferry in 1795, and for the purchase of remaining Cayuga lands in 1807[ ]"—the two transactions are at the heart of this litigation.

The 1789 Treaty of Albany was relatively short, containing only five paragraphs, and its terms were fairly straightforward. In the first decretal paragraph it succinctly stated that "[t]he Cayugas do cede and grant *all* their lands to the People of the State of New York forever." St. exh. 728 at 216, ¶ 1 (emphasis added). This cession represented approximately 1600 square miles. *See* Tr. at 2893. The 1789 Treaty allowed the Cayuga to retain a portion of this land, however, "for their own use and cultivation but not to be sold, leased or in any other manner aliened or disposed of to others[.]" *Id.* at 216, ¶ 2. This portion is roughly 64,000 acres, or about 100 square miles, located at the north end of Cayuga Lake, and it is the subject of this lawsuit. *See* Tr. at 2892–93.

In consideration for this land cession, the State agreed to pay the Cayuga "five hundred dollars in Silver," payable at that time; an additional $1,625.00 payable the following year; and an annual payment of "five hundred dollars in silver[ ]" in "posterity forever[.]" *See* St. exh. 728 at 217, ¶ 4. The Cayuga could elect, however, to receive all or part of the annuity payment in the form of "clothing or provisions[,]" *see id.* which, according to Whiteley indicates that the Cayuga Lake faction was very bad off economically "and willing to treat for the cession of their lands in order to sustain themselves." Tr. at 2893.

As "further consideration" the State granted to the Cayuga's "adopted child Peter Ryckman," *inter alia,* a one mile square tract of land located within the area reserved to the Cayuga. *See id.* at 217, ¶ 4; *see also* Tr. at 2895. This is the same Peter Ryckman who was one of the principals in the Livingston Lease, and who was instructed by Governor Clinton to "frustrate" the 1784 Congressional Treaty at Fort Stanwix. Although Ryckman was mentioned by name in the Treaty, other settlers who were not named therein also were permitted to remain on the Reservation after the 1789 Treaty. John Richardson, "who had direct ties to the Genesee Company[,]" and who was "one of the State's four Commissioners at the Treaty

of Cayuga Ferry in 1795," and others with a connection to Richardson and the Livingston lessees also were allowed to settle on the Reservation. *See* Gov. exh. 362 at 29 and 30. Seemingly at odds with allowing settlers to remain on Cayuga lands, in this Treaty the State pledged that it would protect the Cayuga on the Reservation from encroachment. *See* St. exh. 728 at 217–18, ¶ 5; *see also* Tr. at 2899–2900.

The 1789 Treaty negotiations took place at Denniston's Tavern in Albany. *See* Tr. at 2892; and St. exh. 35 at 272. The Treaty was between the State and the Cayuga Lake, or minority faction, led by Steel Trap. *See* Tr. at 2897 and 2909; and Tr. at 3250. Although invited, the Cayuga majority from Buffalo Creek was *not* present and did not participate in those negotiations.

The documents which provide the most helpful understanding of the 1789 Treaty negotiations and their repercussions are several letters between Governor Clinton and various Five Nation Chiefs, and recorded speeches of the Cayuga Lake faction. Obviously there is no way for the court to gain first-hand knowledge of these ancient Treaty negotiations; nonetheless, the court finds these documents to be particularly compelling evidence of what transpired in terms of the 1789 Treaty.

In a June 2, 1789, letter, the Buffalo Creek Cayuga leader, along with others, advised Governor Clinton that they were aware of "the Purchases," *i.e.* the 1789 Treaty with the Cayuga Lake faction, and they expressed concern that the "[i]ndividuals" who entered into the treaty earlier that year were *"without Authority"* to do so. *See* St. exh. 35 at 331 (emphasis added); *see also* Tr. at 2898. That letter further states: "We did not expect that you, after advising us to shun private Treaties with Individuals and avoid selling our Lands to your disobedient [sic] Chil-

dren, . . . would yourself purchase Lands from a few of our wrong headed young Men, without the Consent or even the Knowledge of the Chiefs[.]" *See id.;* and Tr. at 2902–03. The court concurs with Dr. Whiteley's interpretation that these few "wrong headed young Men" refer to the Steel Trap minority from Cayuga Lake. *See* Tr. at 2903. It is less clear from the context, however, that, the reference to "Chiefs" means "the properly instituted chiefs of the Six Nations[,]" Tr. at 2903, but the fact that that letter was signed by representatives from the Onondaga, Cayuga, Seneca and Mohawk Nations is supportive of this view. *See* St. exh. 35 at 331–32. In any event, despite those apprehensions about the manner in which the State negotiated the 1789 Treaty, the Chiefs go on to state that they do *not* "have any Objections to [Governor Clinton] . . . having the Lands[,]" but the majority faction wants what it perceives to be its "fair share" of the monies to be paid thereunder. *See id.* at 331.

In direct response to that June 2nd letter, on July 14, 1789, Governor Clinton first expressed concern that the 1789 Treaty "should create any Uneasiness in your Minds[.]" *Id.* at 336. The Governor then explained that prior to the negotiation of the 1789 Treaty, "[i]nvitations were . . . sent agreeable to ancient Usage, to the *different Nations* [.]" *Id.* (emphasis added). When "some of the Nations" could not attend at the proposed time, the meeting was postponed and "Notice [given] to our Brethern." *Id.* The Onondaga and Oneida attended, but even after "many [d]ays" the Cayuga did not show up. *Id.* Before leaving, according to Clinton, "[i]nvitations" were "again" sent to the Cayuga "to attend at a Council Fire which we purposed [sic] to kindle at this Place in the Winter." *Id.* at 337. Clinton wrote, "[t]he Cayugas accordingly came, and the same

Reasons which influenced our Treaties with the Oneidas & Onondagas, produced a similar Agreement with us and the Cayugas for their Lands." *Id.* Next, responding to the Cayuga majority's complaint about not receiving any of the Treaty funds, Clinton indicated that he had advised "[d]istribution of the Money among those of their Nation who are intitled [sic] to it, as is consistent with Justice and the Usage among the Indian Nations." *Id.*

The Cayuga majority was not the only faction dissatisfied with the 1789 Treaty. Following directly on the heels of the majority's June 2nd letter to Clinton, on June 3, 1789 Steel Trap, the Cayuga minority spokesperson, delivered a speech to the Governor wherein he implored Clinton to keep his pledge under the 1789 Treaty to prevent encroachment onto the Reservation by outsiders. *See* St. exh. 35 at 325. In that speech, Steel Trap also reminded Clinton that Clinton had "[[p]romised]" the Cayuga Lake minority that he would enlarge "[their] Reserve." *Id.* at 326. Steel Trap wanted a larger Reservation in anticipation of the Buffalo Creek faction returning to Cayuga Lake. *See* Tr. at 4684.

Not satisfied with Clinton's July 14th response, the Cayuga majority and others sent a second letter to him dated July 30, 1789. This letter was signed by Fish Carrier, along with nine other majority Chiefs, as well as various other Nation Chiefs. The Chiefs advised Clinton that they had "endeavored to explain to [him] that [he] had not treated with the Chiefs, nor with Persons authorised by them to dispose of [their] Country[.]" St. exh. 35 at 340. The Chiefs further expressed that they were "now sorry to find [Clinton] did not wish to be convinced of an Error, which [he] took no previous Steps to avoid." *Id.* at 340.

The Chiefs then directly challenged Clinton's view that the 1789 Treaty "gave

great satisfaction to the Indians and would be much to their Advantage[:]"

> Undoubtedly a large Sum of Money to a few Indians, *void of Principal,* would be pleasing, and their Ideas of Advantage are but momentary and never discend to Posterity, and they are too blind to see the Traps laid to disunite the Nations to which they belong. What you mean by offering your Assistance to see the Money fairly divided among those of their Nations who are entitled to receive it, we do not understand, unless you think none entitled to it but those who remain in the reserved *Trap* and who are entirely in your Power. Our Ancestors made no Distinction in a Nation; they held their Lands in common, and we do not wish to deviate from their Customs.

*Id.* (emphasis in original). Again the majority attacked Clinton for dealing with the minority Cayuga Lake faction:

> [I]t was not the Custom of our Ancestors to call a Council and treat on Business of importance to their Nations and Posterity, without the presence or Knowledge of the Chiefs, nor was it the Custom of yours to require it; therefore we now see clearly what we before had only a glimmering View of, and that your solemn Deliberations were the dictates of Policy and *your Determination was to effect a Disunion, which would terminate in our Ruin.*

*Id.* at 341 (emphasis added).

Despite their bitter complaints that the State had improperly dealt with the Cayuga Lake minority when it entered into the 1789 Treaty, the Cayuga majority Chiefs ended that letter in a more conciliatory tone: "It is equal to us who possess the Country, as we have sold it according to our Customs fairly and now only wish to have the Money paid that we may divide it amongst the People who are entitled to receive it; and as for the Reservation we

seek no more than we made at Buffaloe Creek." *Id.* The Chiefs did, however, request Congressional intervention, reasoning that "[p]erhaps self Interest throughout your State is too prevalent to admit of impartial Decision in a Matter where they are so deeply interested." *Id.* at 342. The Chiefs closed: "We ..., see more clearly the *Attempt on our Disunion,* and again request that neither your Surveyors nor Settlers proceed further till an Accommodation takes Place." *Id.* (emphasis added). The State postulates that the Cayuga majority's real concern was that it did not want the State to proceed with surveying under the Treaty because it might "jeopardize[ ] their own private land deals with the [Livingston] lessees." Tr. at 4974.

In a subsequent speech to the Cayuga, Clinton gave the State's version of how it came to be that the 1789 Treaty was between the State and the Cayuga minority, instead of between the State and the Cayuga majority. Clinton reiterated that two years prior he had "proposed kindling a Council fire at this Place, and [he] invited *my Brethern of the 5 Nations* to attend it in the Beginning of June." *Id.* at 410 (emphasis added). In fact, Clinton "intreated" all of them to attend. *See id.* When be became aware that Congress had also proposed a similar meeting with the Five Nations, Clinton postponed his and "renewed my Invitation to my *Brethern of the 5 Nations* to attend there." *Id.* (emphasis added). When he arrived, only the Onondaga were there; so he waited 14 days and then proceeded. Even with those invitations, Clinton explained that *"the Cayugas, the only remaining Nation with whom we had Business to transact, did not attend." Id.* (emphasis added). After waiting a long time for the Cayuga's arrival and their not showing up, Clinton sent them yet another "Letter of Invitation ... to attend a Council Fire which [he] proposed to kindle at Albany in the beginning of the

Winter." *Id.* In keeping with that invitation, Clinton went to Albany and after waiting "a long time," finally a "[n]umber" of Cayuga arrived. *Id.* Clinton forestalled negotiations, though, because he had "some Hopes that a greater Number of their Nation would attend[.]" *Id.* Eventually Clinton began negotiating, "finding our Embarrassments to the Westward increasing by an additional Number of People going to settle there, and despairing that any other of our Brethern of the Cayugas would meet us[.]" *Id.* Significantly, Clinton proceeded with negotiations because he had been "previously assured by the Cayugas who attended, that having taken all Circumstances into consideration *they were sufficiently authorized and would stand justified to their Nation in entering into an Agreement with us* [.]" *Id.* (emphasis added); *see also* Tr. at 4967.

By entering into a Treaty with the Cayuga Lake minority faction in "[d]isregard[ ][of] well-known Iroquois protocols," the Cayuga contend that the State did not act in good faith. *See* Cay. Post–Tr. Memo. at 35. The U.S. takes this argument one step farther, calling New York's 1789 Treaty "duplicitous and fraudulent." *See* U.S. Post–Tr. Memo. at 22 (emphasis added). Furthermore, the U.S. accuses the State of engaging in a "divide-and-rule effort[ ] to break the Cayuga Nation[.]" Gov. exh 362 at 32. As further evidence of the State's lack of good faith, the U.S. points to the fact that this 1789 Treaty violated the U.S.' Constitution, which the State had ratified just seven months earlier and which expressly prohibits states from entering into treaties.

Retorting that this 1789 Treaty *was* negotiated in good faith by Clinton, the State asserts that "[a]lthough the entire Cayuga leadership had been invited to the Treaty session, Fish Carrier and his followers did not show up." St. Post–Tr. Memo. at 14.

Countering the U.S.' allegations that the State "pursued a deliberate divide-and-rule strategy with the two Cayuga groups[,]" U.S. Pre–Tr. Memo. at 4, the State claims that Clinton "was uninformed in 1789 as to the extent of disunion within the Cayuga Nation." St. Post–Tr. Memo. at 14 (footnote omitted).

As detailed above, prior to the 1789 Treaty negotiations, in keeping with Iroquois protocol pre-Revolutionary War, the State invited *all* of the Five Nations to attend. In fact, Clinton postponed his originally scheduled session when he learned that Congress had proposed a similar session; and upon learning of that conflict he sent a second invitation—again, to all Five Nations. When the Cayuga did not attend, he sent another invitation, and when finally only a few arrived, he forestalled negotiations, hoping that more Cayuga would arrive. Eventually, after waiting some time, Clinton commenced negotiations with those few Cayuga because they assured him that they were authorized to treat on behalf of the Nation.

These assurances, combined with the fact that the faction which did come to negotiate was the one residing on the Cayuga Lake land which was the subject of that 1789 Treaty, and hence actually had an interest in the subject land, *see* Tr. at 4680, made it reasonable for Clinton to assume that he could proceed with negotiations with this faction. Certainly once Clinton had assurances that the Cayuga Lake faction was authorized to enter into a Treaty with the State, he did not have an affirmative obligation to ensure the veracity of that statement. This is especially so given that approximately five months earlier the State had entered into separate treaties with the Onondaga and the Oneida. The willingness of those Nations to enter into separate treaties, apart from the Five Nations as a whole, supports an infer-

ence on Clinton's part that it was permissible to negotiate a Treaty with the Cayuga Lake faction.

In addition, even assuming that the "theoretical ideal" of 50 Chiefs agreeing to a Treaty was the practice prior to the American Revolution, given that the unity of the Iroquois confederacy was fractured by that War because various constituent Nations pledged their allegiances to Britain or the U.S., *see* Gov. exh. 363 at 438, it was reasonable for Clinton to believe the Cayuga minority's assertion that it was authorized to enter into a Treaty with the State on behalf of the Nation as a whole.

Moreover, as the foregoing discussion demonstrates, despite the U.S.' protestations to the contrary, certainly Clinton did *not* "intentionally" deal with the "unauthorized minority" Cayuga Lake faction. *See* U.S. Post–Tr. Memo. at 22. He dealt with the Cayuga minority based upon their representations to him that they had the authority to treat with the State. Nor did Clinton, as the U.S. alleges, *"knowing[ly]* violat[e] Iroquois protocols[.]" *See id.* (emphasis added). In fact, it appears that he attempted to conform to those protocols by initially inviting all Five Nations, and when they had a conflict, he rescheduled and sent a second invitation, again, to all Five Nations.

Furthermore, although the U.S. asserts otherwise, the record is devoid of any proof of fraud on the part of the State in connection with this 1789 Treaty. The U.S.' argument that the State acted in bad faith because supposedly it pursued a divide and conquer strategy is equally weak. In the court's opinion, this is nothing more than speculation with the advantage of hindsight. There is little if any concrete evidence in the record to support this theory. Moreover, the following year this Treaty was ratified by *both* factions of the Cayuga Nation. This subsequent ratifica-

tion seriously undermines the U.S.' divide and conquer theory, as does the fact that Clinton attempted to secure attendance of both Cayuga factions, even waiting a number of days for more to arrive. The court also observes that regardless of the scope of Clinton's knowledge regarding the extent of the Cayuga's disunion, the State should not be held accountable for this internal dissension among the Cayuga Nation.

On the other hand, the Cayuga's contention that New York did not act in good faith in connection with the 1789 Treaty is supported by the State's disregard for the U.S. Constitution. Surely the State did not act innocently when it proceeded to negotiate a Treaty with the Cayuga after it had ratified the U.S. Constitution which prohibited such conduct.

The following year, in 1790, both the Cayuga majority and the Cayuga minority still were discontent with the 1789 Treaty, but for different reasons. The Cayuga majority continued to be displeased because it had not been part of the negotiations, and it did not like the Treaty's terms. Aware of the Cayuga majority's complaints, in April 1790, Governor Clinton wrote a letter directly to "the Sachems, Chiefs and Warriors of the ... Cayugas *who were not present at the Treat[y] held with that Nation[]* ... *at Albany in the Year 1789* [,] inviting them to a Council Fire at Fort Stanwix where he would explain what transpired at Albany in 1789." *See* St. exh. 35 at 369 (emphasis added) and 370.

In the meantime, the Cayuga minority continued to express concern about settlers encroaching on the Reserve in contravention of the 1789 Treaty. *See* St. exh. 35 at 373. Steel Trap requested the State's assistance in removing the settlers and in preventing such encroachment in the future. *See id.* The Governor "as-

sured [the Cayuga] that effectual Measures [w]ould be taken to remove the Intruders ... and to prevent ... like Abuses in [the] future." *Id.* at 374.

When Fish Carrier and the Cayuga majority arrived at the Council Fire in June, 1790, he and Clinton engaged in a series of speeches and negotiations which culminated in the majority ratifying the 1789 Treaty. *See* St. exh. 35 at 403–29. Portions of those speeches are particularly noteworthy. In response to Fish Carrier's complaint that their "ancient Customs" were not "strictly regarded" because the Onondaga transacted business with the State before the Cayuga arrived, the Governor apologetically stated:

> I do not pretend to be perfectly acquainted with all your ancient Customs. It is but a short time since I was first called upon to transact Business with my Brethern of the 5 Nations. This much however I can say; that *I have never intentionally,* on my part, *deviated from your ancient Usages....* Perhaps the peculiar Situation of our Brethren might have induced them to dispense, in some Degree, with the Observance of their former Customs; but this is not to be imputed to me, for it always has been my Desire strictly to adhere to them.

*Id.* at 404 (emphasis added). Seemingly appeased, Fish Carrier replied: "The Reasons you have assigned for any Departure which may have been made from ancient Usages, are satisfactory to us, and remove from our Breasts some Difficulties which had lodged there." *Id.*

Thereafter negotiations proceeded, with Fish Carrier and the Cayuga majority seeking $4,000.00 for the entire tract of land, including the reserved lands, which had been ceded a year prior in the 1789 Treaty. *See* Tr. at 2932; Tr. at 4693; and St. exh. 35 at 420. That proposal was

motivated in large part by the fact that at that point the majority did not view any of the land as theirs because of the encroachment of white settlers, including Sullivan–Clinton Campaign veterans. *See* Tr. at 3323–25. Of further concern to the Cayuga majority was the fact that those white settlers would bring with them "overpower[ing] . . . strong waters[,] or alcohol." *See id.* at 3320. Basically, the Cayuga majority "had no interest in the Reservation, and . . . they requested that a large part of it be given to one of the private lessees, and Fish Carrier[.]" Tr. at 4694; *see also* St. exh. 35 at 420.

To Clinton this position seemed contrary to the intentions of the Cayuga minority expressed to him one year earlier. Clinton then admonished the Cayuga majority for its "unlawful Sales," the Livingston Leases by which the majority "had parted with the Places of your Nativity & even with the Bones of your Ancestors; reserving a few Acres only of your country for the convenience of Fishing." *See* St. exh. 35 at 422. Clinton continued: "We have no Right, nor are we disposed to interfere, if some of you choose to reside in one Place and others in another; but while any of you wish to continue at your ancient Place of Residence, we cannot consistent with Justice dispose of any of the Lands comprized in the Reservation." *Id.*

Following several days of negotiations at the Council Fire, on June 22, 1790, the Buffalo Creek majority ratified the 1789 Treaty which Steel Trap and the Cayuga Lake minority had entered into with the State. *See* Tr. at 5372; and St. exh. 35 at 428–29. That ratification did not change any of the terms of the 1789 Treaty, including the provision which provided that the Reservation was not to be alienated in any way; the ratification did however provide for an additional "benevolence" of $1,000.00. *See id.;* Tr. at 4696; and St.

exh. 35 at 429. Given that the State now had both the Cayuga majority *and* minority agreeing to the 1789 Treaty, seemingly this ratification "significantly strengthened th[at] treaty," because the 1789 Treaty "intended to protect the minority faction is then fully sanctioned by the Cayuga Nation[.]" *See* Tr. at 4695–96.

### H. Nonintercourse Act

Exactly one month after ratification of the 1789 treaty, on July 22, 1790, Congress adopted the first in a series of acts "to Regulate Trade and Intercourse with the Indian Tribes." *See* Gov. exh. 363 at 460. The first such statute specifically provided, among other things:

> That no sale of lands made by any Indians, or any nation or tribe of Indians within the [U.S.], shall be valid to any person or persons or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty held under the authority of the [U.S.].

*Id.* (quoting U.S. Stat., I, 137–38). In a "reply of the President of the [U.S.] [George Washington] to the speech of . . ., Chiefs and Councillors of the Seneca nation of Indians[,]" he explained the history and purpose of this first Nonintercourse Act:

> I am not uninformed, that the Six Nations have been led into some difficulties, with respect to the sale of their lands, since the peace. But I must inform you that these evils arose before the present Government of the [U.S.] was established, when the separate States, and individuals under their authority, undertook to treat with the Indian tribes respecting the sale of their lands. But the case is now entirely altered; the General Government, only, has the power to treat with the Indian

nations, and any treaty formed, and held without its authority, will not be binding.

Here, then, is the security for the remainder of your lands. No State, nor person, can purchase your lands, unless at some public treaty, held under the authority of the [U.S.]. The General Government will never consent to your being defrauded, but it will protect you in all your just rights.

Hear well, and let it be heard by every person in your nation, that the President of the [U.S.] declares, that the General Government considers itself bound to protect you in all the lands secured to you by the treaty of Fort Stanwix, the 22d of October, 1784, excepting such parts as you may since have fairly sold, to persons properly authorized to purchase of you.

Nat. exh. 44 and St. exh. 741 at 142; *see also* Tr. at 3929–30.

### I. Richardson Lease

Despite the 1790 ratification of the 1789 Treaty, including the provision for the payment of an annuity to the Cayuga, by 1791, the Cayuga majority had not received any such payments, thus contributing to their poor financial situation. *See* Tr. at 2938; *see also* Gov. exh. 362 at 39; and 39 n. 13. Approximately thirteen months after ratifying the 1789 Treaty, which expressly stated that "[t]he Cayugas shall of the ceded lands hold to themselves and to their posterity forever, for their own use and cultivation but *not to be* sold, *leased* or in any other manner aliened or disposed of to others," St. exh. 728 at 216 (emphasis added), the Buffalo Creek majority sought to lease the land reserved under the 1789 Treaty (64,000 acres), "less 1 mile square, which was to be reserved for the Cayuga Lake faction." Tr. at 4697. The majority sought to lease that land to John Richardson for 20 years, and in return they were to receive a $500.00 annuity payment in

cash and cattle. *See id.*; Tr. at 5203; and Gov. exh. 404 at 4. Richardson, although not one of the named Livingston lessees, was one of a number of settlers who lived on the Cayuga Reservation "as a result of an agreement with th[os]e ... lessees." (7/17/00) at 2924 and 2941.

Fish Carrier and Richardson approached U.S. Commissioner Pickering about this lease proposal in July, 1791, while Pickering was reaffirming a peace treaty with the Six Nations on behalf of the U.S. *See* Tr. at 2938–39. Originally Pickering "had determined to give no countenance to a lease of the Cayuga reservation," because, as he told Richardson, it could potentially violate the State's preemption right. *See* Gov. exh. 203 at 170; and Tr. at 2943. Undaunted, a few days later "the Cayuga chiefs and Richardson" again approached Pickering regarding this lease. *See id.* This time Richardson informed Pickering that as a result of the Livingston Lease, the State had passed a law which allowed for leases, so long as they did not exceed a 21 year term. *See id.*, Gov. exh. 203. Pickering asked for and received a copy of this State statute but it did not contain such a lease provision. *See id.*; and Tr. at 2944.

Nonetheless, Pickering was further informed "that at the treaty last year [1790], at Fort Stanwix, Governor Clinton *expressly assured [ ]* "the *Cayugas* that, if they pleased, they might lease their lands." " *Id.* (emphasis added), *see also* Tr. at 2943. Moreover, Pickering was also advised that a 15 year lease with the Cayuga had been allowed without State Legislative sanction because the term was less than 21 years. *See id.* Even though, in Pickering's words, "[a]ll this information was repeated to [him] in such a manner as to afford a strong presumption of its truth[,]" he consulted with a New York

State county court judge who "generally confirmed" this information. *Id.*

Once again the Cayuga majority and the Cayuga minority had different objectives. After the Buffalo Creek majority agreed to the Richardson lease, the minority led by Steel Trap "sought to have [it] declared void[.]" Gov. exh. 362 at 40 (citation omitted); *see also* Tr. at 2945. Prior to that, perhaps anticipating the minority's disapproval of the Richardson Lease, "[c]oncerned that the lease would be voided, Fish Carrier [on behalf of the Cayuga majority,] asked Richardson to write to ... Pickering and Clinton to protect it[.]" *Id.* (citation omitted). Thereafter, Pickering ratified the lease on behalf of the U.S. *Id.*

Less than a month after ratification of the Richardson Lease, in a letter to Governor Clinton, then Secretary of War Knox explained that Commissioner Pickering had "incautiously, at the earnest request of the Cayugas present, ...ratif[ied] ...certain lease of lands, belonging to the Cayuga Nation of Indians, to John Richardson[.]" *See* Nat. exh. 9 at 1. In that letter, Secretary Knox unequivocally stated that New York's preemption right to the "Cayuga lands[,]" was *"unquestioned,* and ... that... said right embraces *all* possible alienations of said lands by the Indians, with the concurrence of the United States, according to the constitution and laws." *Id.* (emphasis added). Consequently, as "command[ed][by] the President of the United States," Knox "explicit[ly] disavow[ed]" Pickering's ratification of the Richardson Lease. *See id.* at 1–2. Knox also advised the Governor that Pickering's acts were *"unauthorized* by his instructions, and will be considered as *entirely null and void* by the [U.S.]." *Id.* at 2 (emphasis added). In conclusion, Knox added that if the State thought that it might "derive any benefit" from execution

of the Richardson Lease, "the [U.S.] [w]ould do every thing [sic] which may be proper, upon the occasion." *Id.*

Evidently the State did not believe that it would "derive any benefit" from the Richardson Lease because, as with the Livingston Lease, it quashed the former. Dr. Whiteley offered three explanations for Clinton's motivation in quashing the Richardson Lease. First, Whiteley opined that Clinton thought that that Lease violated the State's preemption right. *See* Tr. at 2944–45. "[T]he principal reason" for quashing the Richardson lease, however, was that Clinton disfavored it because it was signed by Pickering, a federal agent; whereas there were other leases extant which had "not received federal approval[,][but] which the state ha[d] been willing to either ignore or go along with." *Id.* at 2945. Then, based upon a September 20, 1791, letter from a State County Court Judge to Pickering, Whiteley surmises that Governor Clinton disapproved of the Richardson Lease because Clinton is "seeking to in some way speculate in the lands of the Cayuga Reservation and [he] doesn't want to have a lease of this nature to be approved by the federal agent." *Id.* at 2949.

In an effort to expel Richardson from the Cayuga Reserve, in October, 1791, Governor Clinton issued orders to the Sheriff of Herkimer County, who "proceeded with a posse of 84 men and burned out 19 families of [white] settlers, but apparently left other houses standing." Tr. at 2950. Richardson was arrested, but even in the face of that adversity he remained on the Cayuga Reservation. *See id.*

The Cayuga and the State have differing views as to the significance of the Richardson Lease. As with the Livingston Lease, the Cayuga contend that the Richardson Lease is further evidence of their "intent

to *lease,* as opposed to sell their lands[.]" Cay. Post–Tr. Memo. at 42 (emphasis added). Further, according to the Cayuga, this Richardson lease evinces the State's "insistence on dispossessing the Cayugas and ridding the State of their presence." *See id.* The State is taking the opposite view: the Richardson Lease is yet another example of the Cayuga's intent to dispose of their Reservation lands. *See* St. Ph.II Memo. at 7. Rather than entering into this fray, the U.S. maintains that the State's quashing of the Richardson Lease is indicative of the State's bad faith because supposedly by quashing the Lease the State is demonstrating its own interest in speculating on the Cayuga Reservation lands. *See* Gov. exh. 362.

Inferring bad faith on the part of the State based on its conduct solely with respect to the Richardson Lease would require improper speculation by the court. The U.S.' assertion that the State was motivated by its own land speculation desires is not borne out by the record. Moreover, given the State's undisputed preemption right, combined with Knox's letter to Governor Clinton apologizing for the U.S.' improper ratification of the Richardson Lease, and the State's earlier efforts to insure a Reservation for the Cayuga Lake faction, at this point the court cannot find bad faith on the part of the State with respect to this particular lease.

### J. 1793 State Statute

On March 11, 1793, the State passed "AN ACT relative to the lands appropriated by this State to the use of the Oneida Onondaga and Cayuga Indians." *See* Gov. exh. 498 at 880 (footnote omitted). By the terms of that statute, Israel Chapin, John Cantine and Simeon De Witt were appointed agents of the State for the purpose of:

coven[ing] the Indians of the Oneida, Onondaga and *Cayuga* nations, severally, and at their usual place of residence, and being so convened *to propose* to the said nations severally, that they should *quit claim to the people of the State, so much of the rights reserved to them* in the lands appropriated to their use by this State, *as they may think proper to dispose of,* and that for every square mile of the lands, to which the rights so by them to be quit claimed, the people of *the State shall pay the said Indians an annuity not exceeding the sum of five dollars in perpetuity,* the first payment whereof shall be made on the execution of such quit claim by the said Indians.

*Id.* at 880–81 (emphasis added). Chapin was named as one of the State's Commissioners because evidently he had given Governor Clinton a request from the Cayuga to dispose of their land. *See* Tr. at 5037; *see also* St. exh. 19 at 862; and Gov. exh. 202 at 862.[19]

Perhaps not coincidentally given the ongoing battle between the federal and state governments regarding control of Indian affairs, this State statute was passed only ten days after Congress had passed a second Nonintercourse Act "strengthen[ing] the requirement that Congress negotiate treaties for land cessions with Indians." *See* Tr. at 2954. Despite this second, stronger Nonintercourse Act, and despite the fact that the first such Act was authorized in July, 1790, more than two and a half years *before* the passage of the 1793 State statute, that statute does not give

---

19. State exhibit 19 and Government exhibit 202 are both entitled "American and British Claims Arbitration Cayuga Indians[ ], Appendix to the Answer of the U.S.[,] Vol. II, Parts III, IV and V." The court received those two exhibits subject to a later determination of their relevancy. Obviously the court has deemed them relevant to the issues discussed above. Hereinafter cites will only be to State's exhibit 19, however.

even passing mention to any federal participation in these proposed land cessions—a requirement of both the original Nonintercourse Act, and the second, more stringent version. As Graymont remarked, "It is clear from the terms of this [1793] act that New York State intended to maintain complete control over Indian affairs and transfers of Indian real property within its borders, *without* recourse to the federal government." Gov. exh. 363 (Graymont 1976) at 461 (emphasis added). Concurring, the State's historian testified that the 1793 State statute was "probably intended" to protect New York's interests. *See* Tr. at 5033.

Pursuant to this statute, in the fall of 1793 Governor Clinton invited representatives of all Six Nations to meet with the Commissioners in Albany. *See* Tr. at 5035; and 5042. The Cayuga majority at Buffalo Creek responded that they could not meet until the following year. However, in January, 1794, the Cayuga Lake minority, but not the Buffalo Creek majority, journeyed to Albany intent on negotiating with the State regarding a proposed land sale. *See* Tr. at 2960–61; and Tr. at 5034. Dr. von Gernet, the State's historian, testified that originally the Cayuga Lake faction had "wanted a large reserve because they thought the Cayuga Nation would come back to settle there[.]" Tr. at 5034. By January 1794, however, von Gernet opined that the Cayuga Lake faction realized that the entire Cayuga Nation would not be reunited there. Realizing then that they had more land than they needed, the Cayuga Lake faction "decided to dispose of the entire western half of the reservation." *Id.* That faction wanted to retain the eastern half of the Reservation though because it was still residing thereon. *See* Tr. at 2960. Despite the seeming interest of both Cayuga factions in disposing of at least part of their Reservation lands, no land cession ever came to fruition

between the Cayuga and the State under the 1793 statute. *See* Tr. at 3446. The State did, however, obtain "two large tracts of land" from the Onondaga under that statute. *See* Gov. exh. 363 at 461–62; *see also* Tr. at 5033–34.

Once again the Cayuga's bad faith argument revolves around the State's intent—this time with respect to the enactment of the 1793 statute. That legislation, according to the Cayuga, is further evidence of the State's repeated attempts to improperly purchase Cayuga lands, especially given the State's pledge in the 1789 Treaty that the lands reserved to the Cayuga therein "shall" be held "by them[ ] and to their posterity forever, for their own use and cultivation but *not to be sold, leased or in any other manner aliened or disposed of* to others[.]" *See* Gov. exh. 728 at 261, ¶ 2 (emphasis added). Given that pledge, the Cayuga argue that Governor Clinton acted "disingenuously," *see* Cay. Post–Tr. Memo. at 42; and U.S. Post–Tr. Memo. at 24, when purportedly he advised the Cayuga Lake faction that selling part of the Reservation in accordance with the 1793 statute would strengthen the 1789 Treaty terms. *See* Tr. at 2962.

The State, on the other hand, contends that the 1793 statute was motivated by the Cayuga's desire to sell their land. Thus, rather than indicating "an intent[ ] to purchase" on the part of the State, this statute was an "enabling act[,]", which von Gernet defined as a "mechanism" or "legal framework" whereby the Indian Nations named therein could alienate their lands to the State if they decided to do so. *See id.* at 5030; 5031; and 5041. von Gernet further described the 1793 statute as "reactionary" in that it was enacted in response to the Livingston and Richardson Leases. *Id.* at 5023. Additionally, from von Gernet's perspective, the State preferred to purchase land in the manner set forth in the 1793

statute, as opposed to the illegal private lease arrangements, to avoid "chaotic land tenure[.]" *See id.* at 5031. In short, the State maintains that this 1793 statute did nothing more than give certain Indian Nations, such as the Cayuga, the prerogative to transfer all or part of their lands to the State.

The record is ambiguous as to the *precise* reason for the State's enactment of the 1793 statute. A series of 1794 speeches between Governor Clinton and the Cayuga recounts some of the history of the transactions between the State and the Cayuga since the end of the American Revolution. *See generally* St. exh. 19 at 860–66. Insofar as the 1793 statute is concerned, those speeches indicate that after learning that the Richardson Lease had been voided the State was "soon . . . informed" of the Cayuga's dissatisfaction "because [they] wished to sell or lease [their] lands." *See id.* at 862; and Tr. at 5039 and 5040. As Clinton explained to the Cayuga, in 1793 General Chapin "mentioned" to the Governor the Cayuga's interest in selling or leasing their lands. *See id.* Clinton then communicated that interest to the State legislature "[u]pon which the[ ] [Legislature] appointed three Commissioners, one of whom was Genl. Chapin, to confer with [the Cayuga] on this subject in order that [the Cayuga's] minds might be made easy." *Id.;* and Tr. at 5039–40. From these remarks it can be inferred, as Dr. von Gernet testified, that the State enacted the 1793 statute as a "direct consequence" of the Cayuga's previously expressed desire to sell their land to the State. *See id.* at 5038.

The record contains minimal proof to the contrary in the form of a speech by Clear Sky, an Onondaga who was traveling with the Cayuga contingent to Albany in March, 1794. *See* Tr. at 5053. In a speech to General Israel Chapin, Sr., the federal Indian agent for the Iroquois, *see* von Gernet Report at 40 (footnote omitted), Clear Sky declared that "we never have been to the Govenor [sic] and offered our lands to him[ ] and hope he will not endeavor to presuade [sic] us to sell our Lands at Albany." Gov. exh. 280 at 33–34; St. exh. 59 at 33–34. Of course, it may well be that the Cayuga and Onondaga themselves had not met with the Governor regarding the sale of their lands, but as set forth above their intent was communicated to the Governor via Chapin. Regardless of whether or not the Cayuga actually met with the Governor in an effort to sell their land to the State prior to the enactment of the 1793 statute, the record establishes that the State had the impression that the Cayuga were interested in disposing of their lands. Thus, the State's impression, whether unfounded or not, while perhaps not the sole reason for the enactment of the 1793 statute, was at least partial motivation for its enactment.

Moreover, regardless of the motivation for enacting the 1793 statute, the fact remains that that statute clearly gave the Cayuga the prerogative, among others, to dispose of whatever amount of appropriated lands they "think proper[.]" *See* Gov. exh. 498 at 881. That statute did *not* put the Cayuga under any obligation to dispose of all or, for that matter, any of their land. Nor, despite the U.S.' assertion to the contrary, were the Commissioners named therein directed "to *purchase* the Cayuga Reservation[.]" *See* U.S. Post–Tr. Memo. at 24 (citation omitted) (emphasis added). Rather, the plain language of the statute indicates that the three appointed Commissioners were to *"propose"* not just to the Cayuga, but also to the Oneida and the Onondaga, that those Nations "should quit claim to the people of the State, so much of the rights reserved to them in the lands appropriated to their use by this State, *as they may think proper to dispose*

*of* [.]" *See* Gov. exh. 498 at 881 (emphasis added). This broad language significantly weakens the U.S.' argument that the 1793 State statute proposed that the State purchase outright the Cayuga Reservation. *See* U.S. Post–Tr. Memo. at 24. Furthermore, because this statute gives much discretion, not just to the Cayuga but also to the Oneida and Onondaga, in terms of disposing of their property, taken alone it hardly establishes that the State was impermissibly trying to purchase the Cayuga Reservation in 1793.

### 1. Aftermath of the 1793 Statute

Following passage of the 1793 State statute, during February and March 1794 in particular, the two Cayuga factions had several meetings with Governor Clinton regarding the possibility of transferring certain of their lands, but they were never able to come to any resolution. The record contains a fair number of speeches by the Governor and different Cayuga members during that time frame. *See generally* St. exh. 19. It is not necessary to set forth each of those speeches in great detail. The following excerpts are sufficient to show the general tenor of those meetings and to provide a backdrop for the Federal Government's Treaty with the Cayuga, and the other Nations of the Iroquois confederacy in late 1794.

In early 1794, the Cayuga Lake faction proposed to Clinton selling the western part of the Reservation to the State. *See* Tr. at 5034; *see also* St. exh. 19 at 848. Clinton reminded them, however, that he had previously "informed [them] that [their] agreement [with the State] was firm and binding [and] that the dish [*i.e.* the land] reserved for [them] was [their] own." St. exh. 19 at 849. Further, the

Governor noted that "the agreement was so firm and strong that no one man however great his power could break or alter it—that the Voice of your Nation and the Great Council of our white People [*i.e.* the State Legislature] could only do it[.]" *Id.; see also* Tr. at 4704; and St. exh. 623 at 37. Despite his misgivings about the Cayuga Lake faction's request, Clinton assured them that he would communicate the same to the State Legislature, *see* St. exh. 19 at 849–50; and St. exh. 623 at 38, but that it needed time to deliberate because of the potentially harsh consequences of that request. *See id.* at 849–52; and St. exh. 623 at 39.

In March 1794, some Onondaga and some Buffalo Creek Cayuga traveled to Albany to meet with Governor Clinton regarding their land. *See* St. exh 623 at 40. Along the way they stopped at Canandaigua to consult with General Chapin, Sr. *See* Gov. exh. 59 at 32. In a speech by Clear Sky, he boldly informed Chapin that the Cayuga and the Onondaga considered Clinton to be "one who wishes to defraud us of our Lands." Gov. exh. 280 at 33. Clear Sky went on: "As we mean this meeting to be the last respecting the lands—Former purchases made by the Govenor [sic] has much disturbed our minds, as he has traded with (Boys & ____) in future we mean to have the Govenor [sic] cum [sic] forward into our Country and make his Bargain Bargains at Buffaloe [sic] Creek. The Reason why we go to Albany is not because we expect to obtain presents & ____. Former bargains have made much difficulty, and has broke the Nations apart, we wish therefore that the Govenor [sic] will cum [sic] forward and make such Bargains as will give content to the whole[.]"[20] *Id.* Clear Sky was

---

**20.** The omissions in this quote result from an inability to accurately translate the original handwritten version of this document.

an Onondaga, but at this point, he is speaking on behalf of the Cayuga as well.

Clinton responded that he had been attempting to "reconcile" the two Cayuga factions "and do equal Justice to both parties[.]" St. exh. 19 at 864. Moreover, the Governor explained that the State "*never* desired to buy [the Cayuga's] reserved Lands[.]" *Id.* at 865 (emphasis added). The Governor further explained the State's view that it had a "duty to Protect [the Cayuga] in the enjoyment of the[ir] [lands] according to the covenant between [the State and the Cayuga.]" *Id.* Clinton proclaimed that the State had "always been ready" to protect the Cayuga in that way, but through the Cayuga's "friend" General Chapin, he had become aware that the Cayuga were "discontent[ ][and] . . . wanted to sell or Lease [their] Lands[.]" *Id.* According to Clinton, Chapin had repeatedly informed him that the Cayuga and Onondaga wanted to know the Governor's "[i]ntentions" regarding their lands. St. exh. 19 at 867. In fact, by September 27, 1794, Chapin, on behalf of the Cayuga and Onondaga, had written to the Governor no less than three times because those nations "appear[ed] anxious respecting their Lands[.]" *Id.* at 866–67. Thus, despite the fact that there was a mechanism in place—the 1793 statute—which would have allowed the Cayuga, if they so desired, to dispose of all or part of their land to the State of New York, and despite the fact that the Cayuga appeared interested in doing so, during the years 1793 and 1794 no land transfers took place between the Cayuga and the State.

### K. *1794 Federal Treaty of Canandaigua*

What the State government was unable to accomplish in the early part of 1794, the Federal Government was. On November 11, 1794, at Canandaigua, the U.S. entered into a "peace Treaty" with the Six Nations. *See* Tr. at 2968–69; *see also* Gov. exh. 203 at 349, Art. 2. Colonel Timothy Pickering, the Secretary of War, *see* Gov. exh. 363 at 462, was the U.S.' "sole agent" for negotiating that Treaty. *See* Gov. exh. 203 at 349. In that 1794 Treaty "the [U.S.] agreed to ratify the [State's] Treaty of Albany of 1789 recognizing the existence of the Cayuga Reservation [*i.e.* the 64,000 acres]", as well as to ratify the State's 1790 Treaty with the Cayuga, thereby maintaining the *status quo* with respect to those prior two Treaties. *See* Tr. at 2968; and 3456–57. Maintenance of the *status quo* is also evident in the next provision of Article two of the 1794 Treaty wherein the U.S. explicitly declares that it will "never claim [the lands], nor disturb the[ ] [lands], or either of the Six Nations, nor their Indian friends, residing thereon, and united with them, in the free use and enjoyment thereof[.]" Gov. exh. 203 at 349, Art. 2.

In consideration "of the peace and friendship . . . established" under this 1794 Treaty, the U.S. delivered to the Six Nations goods valuing $10,000.00. Gov. exh. 203 at 349, Art. 6. The U.S. further agreed to the payment of an annuity totaling $4,500.00. *See id.* "[F]ifty-nine sachems and war chiefs of the Six Nations[ ]" signed the 1794 Treaty, *id.*, including Sachems or Chiefs from each of the two Cayuga factions. *See* Tr. at 5374; and Gov. exh. 218 at 703. Approximately two months later, in January 1795, the U.S. Senate ratified the 1794 Treaty of Canandaigua. *See* Gov. exh. 218 at 706.

Obviously the 1794 Treaty was preceded by negotiations between the U.S. and the Six Nations. For their part, during these negotiations the Cayuga once again stated a willingness to dispose of their land. In particular, several days prior to the signing of the 1794 Federal Treaty, in a speech to Colonel Pickering (who was negotiating

on the U.S.' behalf), Fish Carrier, the Cayuga majority spokesperson, expounded upon the Cayuga's intent:

> The reason why we say there is something heavy on our minds is the situation of our Land. We have a little piece, and we would wish to do with it as we ourselves please: It is but a little piece, and we reap no benefit from it, not even to the value of a penny. *We want to dispose of it,* so that our women and children may reap some benefit from it.
>
> *We now desire the privilege of disposing of that land as we see fit:* and we desire that privilege to be granted to us by the State of New York.
>
> The York people not coming forward to bargain for our land according to our request altho' they have got all our country for a small trifle; *and we having but a little piece left would wish to dispose of it as we see fit.*
>
> Now I have laid our mind before you, we desire by all means that our request may be complied with by the York people.
>
> I mentioned having your [Pickering's] assistance and General Washinton's [sic]: and we now want you to sign this paper, to show that it was here agreed on, and that we may then send it to the York People.

St. exh. 72 (emphasis added). Fish Carrier continued, noting that even given several Cayuga inquiries to Chapin, a "great majority of [the Cayuga] nation" had not received any of the $500 annuity as the State had promised in 1789. *See id.* Therefore, Fish Carrier requested, as he had before, that the State yearly pay the $500.00 to Chapin, a federal official, and he in turn "would see it was divided right[ ]" among all members of the Cayuga Nation. *Id.*

On November 16, 1974, just five days *after* signing the 1794 Treaty of Canan-

daigua, the Cayuga Chiefs, along with the Onondaga Chiefs, "finally agreed on the following expression of their minds to Col[onel] Pickering." St. exh. 73 at 104. In yet another speech to Pickering, the Cayuga and the Onondaga again clearly expressed a "desire to dispose of [their] land[,]" but this time they specified the "for an *annual rent,* to be paid to [them] and [their] posterity *forever."* St. exh. 73 at 104 (emphasis added); *see also* Tr. at 3464. The Chiefs offered the following justification for this request:

> For we have nothing to leave to our children but what our little pieces of land will produce; and all they will produce will be but a trifle when divided among so many families: but it will at least relieve the poor, if we can obtain the just value of our land.... When we desire to dispose of our lands in this manner, we do not mean to take the seats away from any families of our nations who now live upon our reservations: So much as shall be proper, we still desire to have reserved for their use. These reserves we will agree on among ourselves if the liberty we request is granted.

*Id.* at 104–05; *see also* Tr. at 3464. Then, just a few days prior to the execution of the 1794 Treaty, Fish Carrier repeated his earlier request that the State, as it had promised, pay the $500 annuity to "General Chapin who [wa]s appointed by General Washington to take care of [the Cayuga]" because he "would make a just distribution[.]" *Id.* at 104.

Finally, Fish Carrier implored Pickering to have General Washington ask the State to comply with these requests. *Id.* The next day, November 17, 1794, the "principal Chiefs ... begged" Colonel Pickering, "importunately," not to forget their requests "respecting their lands." *Id.* at 105. In light of the foregoing, on cross-

examination the U.S.' historian, Dr. Whiteley, was forced to agree that "even at the Treaty of Canandaigua which recognized federal recognition of the [1789] reservation ..., Fish Carrier and his group were earnestly requesting Pickering to arrange for the sale or lease of that tract[ ]" to the State. *See* Tr. at 3466.

Insofar as the Cayuga are concerned, the State's actions in the years between 1793 and 1794 as recounted above are indicative of its continued efforts to purchase the Cayuga Reservation when purportedly all the Cayuga wanted to do was to lease their land, not to sell it outright. *See* Cay. Post–Tr. Memo. at 43. (citation omitted). The State takes the opposite view of these events, asserting that because in 1794 the Cayuga petitioned the State to sell the western portion of their Reservation and even after the federal treaty, Fish Carrier sought Pickering's assistance regarding the possibility of the Cayuga selling their land to the State, the Cayuga were "willing sellers who were *not* induced by New York to enter into a Treaty for the sale of their lands." St. Pre–Tr. Memo. at 8 (emphasis added). "Rather, they actively sought to treat with responsible New York officials to sell their reservation, even as they were signing the 1794 Treaty of Canandaigua with the [U.S.]." *Id.*

In support of their argument that the Cayuga did not intend to entirely dispose of their land through a sale to the State, the Cayuga exclusively rely upon Fish Carrier's request in his November 16, 1794 speech to Pickering for "annual rent" from the State. This selective reading of that speech ignores the fact that Fish Carrier had further requested that such annual rent be paid "to [the Cayuga] and [their] posterity *forever.*" *See* St. exh. 73 at 104 (emphasis added). Arguably, as the State is quick to point out "[l]ike the 999–year Livingston 'lease,' a lease that lasts 'forev-

er' is tantamount to a sale[ ]"—a factor which significantly weakens the Cayuga's argument that they were interested only in leasing their land, especially when just a few days before signing the 1794 Treaty Fish Carrier had repeatedly declared that the Cayuga wanted to "dispose" of their land. *See* St. exh. 72. The State's historian, Dr. von Gernet, admitted that when Fish Carrier informed Pickering that the Cayuga "desired the privilege of disposing of th[eir] land as [they] s[aw] fit[,]" that could possibly include leasing. *see* St. exh. 72. This interpretation is in keeping with Fish Carrier's speech shortly after the signing of the 1794 Treaty, wherein he sought annual rent "forever." *See* St. exh. 73 at 104. Thus, at least at that juncture seemingly the Cayuga still wanted to dispose of their land to the State.

### L. *New York State's 1795 Act and the Council of Revision*

Not too long after Congress had ratified the Treaty of Canandaigua, on April 9, 1795, the New York legislature passed an act entitled: "AN ACT *for the better support of* the Oneida Onondaga and Cayuga Indians, and for other purposes therein mentioned." St. exh. 48 (emphasis added). Purportedly this Act came about because of the earlier private lease agreements between those three Nations and white settlers, and the controversy which ensued therefrom. *See id.; see also* Tr. at 2970. Given that situation, along with the fact that "said tribes ... ha[d] intreated [sic] the legislature to make such arrangement[s] ... as shall tend to prevent future [such] controvers[ies,]" and "to render th[ose] [lands] more productive to the tribes[,]" that Act appointed Philip Schuyler, John Cantine, John Richardson and David Brooks, "or any three of them[,]" as "agents" of the State "to make such arrangements with the Oneida, Onondaga and Cayuga tribes ... respectively rela-

tive to the lands appropriated to their use as may tend to promote the interest of ... said Indians, and to preserve in them that confidence in the justice of this State[.]" St. exh. 48 at 614. Pursuant to the terms of this Act, tribal lands transferred thereunder would be purchased from the Indians for four shillings, or the equivalent of fifty cents per acre, but at the same time, that Act provided that those lands were to be sold at public auction for less than sixteen shillings, or two dollars per acre. *See id.* at 616, ¶¶ III and VII; and Tr. at 2972.

In 1795, "the Council of Revision was a three-person body" comprised of Governor Clinton, Supreme Court Justice Chancellor Robert Yates, and Supreme Court Justice Egbert Benson. *See* Tr. at 2973–74. The Council examined any bills proposed by the legislature and it had the power to veto the same. *See id.* at 2974. As it had the authority to do, the Council of Revision ("the Council") vetoed the 1795 Act. Echoing the views of historian Graymont, the U.S.' historian testified that the Council vetoed that Act because it believed that it would not result in a "disposition in favor of the Indians[,] but a disposition something like three-fourths in favor of the state[.]" *See id.* at 2975; *see also* Gov. exh. 363 at 465. The State's historian, von Gernet, agreed that the Council "clearly [was] opposed to [the 1795 Act]" for three reasons: (1) it "did not perceive [that Act] as being solely for the benefit of the Indians[;]" (2) it "concluded that the restrictions on the [State's] agents regarding the prices ... was inconsistent with the assurances in the [A]ct[;]" and (3) "the Indians would only receive one quarter of the benefit of the sales under the [A]ct[.]" Tr. at 5065. As von Gernet testified, the interests of those two State political bodies were divergent, with the Council, in effect, protecting the interests of the Indians, while the State Legislature had a broader

interest in protecting the State's interest as a whole. *See* Tr. at 5065 and 5067. Nonetheless, examining the bigger picture convinces the court that the State was putting its own profit motives ahead of those of the Cayuga Nation, among others.

Given that the terms of the 1795 Act were so patently disadvantageous to the Indian's best interests, the Act's title, "for the better support" of the Indians is clearly a misnomer. The terms of the Act itself demonstrate the State's obvious profit motive—a profit which was to be had at the expense of the Indians. Thus, if the State did not exhibit bad faith in overriding the Council's veto of the 1795 Act, the State's motives were highly questionable. As Dr. Graymont put it so well, "[t]he members of the [State] [L]egislature thus proved themselves to be even more covetous of securing Indian lands at bargain rates than was Governor Clinton." *See* Gov. exh. 363 at 465 (footnote omitted); and Tr. at 2977. It appears that the State, if not through Governor Clinton, than surely through the Legislature, was more interested in its own monetary gain than it was in providing "better support" to the Cayuga and other Iroquois Nations. Bluntly put, the State cannot be said to have acted in good faith with respect to the Cayuga when it forged ahead with the 1795 Act, putting its own financial gain above all else.

### M. 1795 Treaty of Cayuga Ferry

This court has previously held that the 1795 Treaty is invalid under the Nonintercourse Act in that the State entered into that Treaty without obtaining Congressional ratification as the U.S. Constitution requires. *See Cayuga IV,* 730 F.Supp. at 489. That holding is now the law of the case, and thus there is no need for this court to revisit the issue of the 1795 Treaty's validity under that Act. *See Aramony*

*v. United Way of America,* 254 F.3d 403, 411 (2d Cir.2001) (internal quotations marks and citations omitted). Certain aspects of the 1795 Treaty negotiations do shed light on the issue of the State's alleged bad faith though.

After the State Legislature overrode the Council's veto and passed the 1795 State Act, Governor Clinton did not "take any actions to stop the purchase of the Cayuga Reservation[,]" *see* Tr. at 2977; and the State Commissioners appointed thereunder began the treaty making process authorized by that Act. In the 1795 Treaty of Cayuga Ferry, the Buffalo Creek majority transferred to the State the approximately 64,000 acres which had been previously reserved to the Cayuga Lake minority in the State's 1789 Treaty with that faction. *See* Gov. exh. 427 at 1. In exchange for that land, the State agreed to pay an $1,800.00 annuity, *see id.* at 1–2; and Tr. at 2995, and there is no dispute that the State has paid from that time to this.

The Cayuga allege that the State exhibited bad faith in a number of ways in connection with this 1795 Treaty, particularly with respect to the negotiations. The court will address the Cayuga's contentions *seriatim.*

### 1. State's Awareness of Nonintercourse Act

Five years prior to the Cayuga Ferry Treaty, in July 1790, Congress enacted the first Nonintercourse Act. The Cayuga argue that the State had prior knowledge of that Act's requirements for the purchase of Indian lands, especially as they pertain to the 1795 and 1807 treaties which are at the heart of this lawsuit. Armed with that knowledge, the State entered into those two treaties in violation of the Nonintercourse Act, which the Cayuga argue is evidence of the State's bad faith here. More so than perhaps any other issue, to resolve the issue of "what did the State know" and "when did it know it" in terms of the Nonintercourse Act, the court is able to rely almost exclusively upon contemporaneous (or nearly so) historical documents.[21]

### a. Pre–1795 Awareness

Through circumstantial evidence the U.S. is attempting to establish that the State knew of the Nonintercourse Act shortly after it was first enacted in 1790. In this regard, the U.S. observes that the first Nonintercourse Act was passed in 1790 in New York City at a time when "Clinton and the New York Indian Commissioners frequently met there[.]" *See* Gov. exh. 362 at 50 (citation omitted); *see also* Tr. at 2957. Next, the U.S. observes that also at that time U.S. Secretary of State Thomas Jefferson "regularly wrote to Governor Clinton ... enclosing 'sundry

---

**21.** During Phase II the court mentioned that it had previously held "in effect ... that the [S]tate...was aware of the Non–Intercourse Act and that when [it] entered into the[ ] [1795 and 1807] treaties," it did so "improperly." *See* Tr. at 2958. To clarify, by that comment the court did not intend to imply, as the Cayuga seem to believe, that it had previously decided the extent of the State's knowledge of the Nonintercourse Act as it relates to the bad faith issue. That issue continues to be an important aspect of the Cayuga's argument that the State acted in bad faith.

In addition to relying upon this court's comment during Phase II to show bad faith, the Cayuga rely upon Judge Port's statement in the liability trial of *Oneida Indian Nation of New York v. Oneida County,* that "[t]he bad faith consisted of the violation of the Non–Intercourse Act by the State[.]" *See* Cay. Post-Tr. Memo. at 41 (internal quotation marks and citation omitted). In making this argument the Cayuga are completely disregarding this court's holding in *Cayuga XII,* 79 F.Supp.2d 78, that a finding of a Nonintercourse Act violation does not conclusively establish bad faith. *See id.* at 87–89.

Acts of Congress' . . . ." *Id.; see also* Tr. at 2957. Despite that general proof, the U.S.' historian Dr. Whiteley readily admitted that he could not "find a direct record of Jefferson sending Clinton the [Nonintercourse] Act[.]" *See* Tr. at 2958. Perhaps there is no such record because "many of the records in the. . .State Archives were destroyed in a fire in 1911." *Id.* Regardless, based solely upon this scant proof the U.S. infers that in 1790 Governor Clinton "[i]ndisputably" knew of the Nonintercourse Act. *See* Gov. exh. 362 at 50. In the complete absence of any proof that in 1790 Clinton was actually made aware of the newly-enacted Nonintercourse Act, or that he was actually provided with a copy of same, the court declines to make that inferential leap.

Attempting to trace the State's knowledge of the Nonintercourse Act back to the summer of 1791, four years *prior* to the 1795 Cayuga Ferry Treaty, the Cayuga rely upon two different letters from that time. The first is a July 26, 1791, letter from Captain Abraham Hardenbergh to Governor Clinton questioning the "validity" of the Richardson Lease. *See* Gov. exh. 405. Hardenbergh informed Clinton that he had written to Pickering advising him that prior to the Nonintercourse Act, the State had entered into a Treaty (the 1789 Treaty of Albany) with the Cayuga for those same lands which were the subject of the Richardson Lease. *See id.* According to the U.S., again through its historian Dr. Whiteley, this letter is "[d]*irect evidence* of *Clinton's knowledge* of the [Nonintercourse] *Act, and* of its import that *Congress alone* had the *authority* to *make treaties with Indians* [.]" *See* Gov. exh. 362 at 50 (emphasis added). Further, the U.S. contends, this letter demonstrates Hardenbergh's "understanding (and *implicitly* that of Governor Clinton . . .) that the [Nonintercourse]

Act was governing in New York in 1791[.]" *See id.* at 51 (emphasis added).

The Cayuga's historian, Dr. Hauptman, relies upon a different 1791 letter, which again was directed to Governor Clinton and again involved the Richardson Lease, to show the State's awareness of the requirements of the Nonintercourse Act at this time. On August 17, 1791, U.S. Secretary of War Knox advised Clinton that the State's right of preemption to the Cayuga lands was "unquestioned," and that that right "embraces all possible alienations of said lands by the Indians, with the concurrence of the [U.S.], according to the constitution and laws." *See* Nat. exh. 9 at 1. On the basis of that right, as detailed earlier herein, Knox informed Clinton that the U.S. considered the Richardson lease to be "entirely null and void[.]" *See id.* at 2.

In terms of establishing the State's awareness of the Nonintercourse Act, Drs. Whiteley and Hauptman place far too much emphasis on these two 1791 letters and are reading more into them than the text actually supports. Neither of these letters is particularly germane to the issue of the State's knowledge of the Nonintercourse Act. In the first place, both letters primarily discuss the propriety of the Richardson Lease, which involved a private individual who wanted to lease Cayuga lands. That lease did not pertain to the transfers of Cayuga lands to the State under a treaty such as the Cayuga Ferry Treaty. Second, both of these letters were addressed to Governor Clinton. However, John Jay, not Clinton, was governor when the 1795 Cayuga Ferry Treaty was signed, and the record is void of any indication that Jay received either of these two letters directed to Clinton. Furthermore, it is easy to infer from the present record that even if Clinton had a full understanding of the Nonintercourse Act and its impact on subsequent State treaties with the

Indians, he would not necessarily have passed that information along to his successor Jay given that Jay and Clinton were on opposite sides of the political spectrum then. Clinton was an ardent advocate of states rights, and Jay was a federalist. For all of these reasons, the record as presently constituted does not mandate a finding that in 1791 the State was aware of the Nonintercourse Act, at least as it relates to New York State treaties with Indians.

### b. 1795 Awareness

By comparison, the record does contain a series of letters in the months up to the July 27, 1795, execution of the Cayuga Ferry Treaty which provide some insight into the State's awareness of the Nonintercourse Act.

The first series of correspondence is between federal officials. In part because of its unequivocal language, one of the most significant in this series of letters is the June 16, 1795, opinion of U.S. Attorney General William Bradford, with letter of transmittal to Secretary of War Knox. Framing the issue as "whether the State of New York has a right to purchase from the Six Nations or any of them the lands claimed by those nations and situate[d] within the acknowledged boundaries of that state, without the intervention of the [federal] government[,]" Bradford responded in the negative. *See* Gov. exh. 267 at 1.

Reciting the pertinent language of the March 1, 1793, Nonintercourse Act, Bradford reasoned that "[t]he language of this act is too express to admit of any doubt upon the question unless there be something in the circumstances of the case under consideration to take it out of the general prohibition of the law." *Id.* Recognizing, among other things, that the State had made a Treaty with the Cayuga

prior to the enactment of the "present [U.S.] Constitution[,]" Bradford further opined that the land reserved under that Treaty did nothing more "than to secure to the State...the right of preemption[.]" *Id.* In closing, Bradford forcefully elaborated that although New York held the preemption right, those lands were "*still the lands of those nations,* and *their claims* to them, it is conceived *cannot be extinguished but* by a *treaty* holden under the *authority of the [U.S.], and in the manner prescribed by the laws of Congress.*" *Id.* (emphasis added).

On May 22, 1795, approximately two months prior to the execution of the Cayuga Ferry Treaty, federal official Chapin wrote U.S. Secretary of War Pickering concerning the State's impending treaties with the Oneida, the Onondaga and the Cayuga. *See* Tr. at 2980; *see also* Gov. exh. 277 at 1. At that time, Indian affairs were within the province of the Department of War. The exact nature of Chapin's concern is unknown because that letter has not survived. Nor is it known if that letter of Chapin's contained any enclosures, such as a copy of the 1795 State Act under which the State was proceeding with those treaties.

Regardless of the exact nature of Chapin's concern, as the record shows, Pickering's response could not have been more emphatic or more clear. In a June 29, 1795 letter, Pickering wrote that New York's proposed treaties were "repugnant" to the Nonintercourse Act. *See* Gov. exh. 277 at 1. Not only that, Pickering advised Chapin that according to Attorney General Bradford, New York tribes such as the Cayuga were *not* exempt from the Nonintercourse Act. *See id.* And, in no uncertain terms Pickering, informed Chapin that when purchasing Indian lands, "the bargain *must be made* at a *treaty held under* the *authority of the [U.S.]*." *Id.*

(emphasis added). To reinforce this view, Pickering enclosed a copy of the Attorney General's opinion letter and indicated that a copy of same had also been provided to Clinton. *See id.* at 1–2.

Characterizing the State's proposed treaties as an "unlawful designation of the New York Commissioner[,]" Pickering then commanded Chapin "as the guardian of [the Indians'] rights[,]" to "advise them not to listen to the invitation of any [State] Commissioners *unless* they have *authority from the [U.S.]* to call a treaty." *Id.* (emphasis added). In a telling postscript Pickering added: "All difficulties on this subject I expect will cease as soon as Mr. Jay's administration commences." *Id.* at 2. Former U.S. Supreme Court Chief Justice John Jay, *see* Nat. exh. 61 at 24, was Clinton's successor and "assumed office on July 1st, 1795." *See* Tr. at 3893 and 3917. Clinton "ended his term of governor in late June of 1795." *See id.*

Pickering reiterated his position several days later in a July 3, 1795 letter to Chapin, wherein he states that "[i]n a [previous] letter I informed you that such a treaty [with the Cayuga or Onondaga] could not be held without the authority of the [U.S.]." *See* Gov. exh. 278 at 1. Pickering also told Chapin that Pickering had been advised that the 1795 State Act "appointing the Commissioners directed them to apply to the [federal] Government to appoint a treaty & a commissioner to hold it[,] but that Governor Clinton would not do it." *See id.* Pickering was convinced, however, that Jay would follow the strictures of the Nonintercourse Act. *See id.* Pickering admonished Chapin, as he had in his letter a few days earlier, "that unless a [U.S.] commissioner ... holds the treaty[,]" neither Chapin or any one from the Federal Government "are to give any countenance to it; but on the contrary to tell the Indians that it will be improper & unsafe." *Id.*

On July 27, 1795, the same date as the signing of the Cayuga Ferry Treaty, President Washington wrote to Pickering regarding several matters. Particularly significant is the following observation by Washington:

If the meeting of the Commissioners, appointed to treat with ..., Cayuga ... Indians, took place at Albany the 15th. [of July], as was expected by the extract of Genl. Schuylers [sic] letter to the Governor of New York; any further sentiment *now* on the unconstitutionality of the measure would be recd, too late.

Gov. exh. 388 at 250–51 (emphasis in original). Dr. Whiteley testified to the clear import of this language: If the negotiations for the Cayuga Ferry Treaty, occurred when Washington anticipated, *i.e.,* July 15, 1795, it would be "[t]oo late to prevent the treaty taking place." *See* Tr. at 3477. By the same token, Washington proceeded to write that if that Treaty had "not take[n] place, ... [i]t is my desire that you would obtain the best advice you can on the case and do what prudence, with a due regard to the Constitution and laws, shall dictate." *See* Gov. exh. 388 at 251.

Shortly after the signing of the Treaty at Cayuga Ferry, Chapin wrote Pickering outlining what had transpired there. Chapin apologetically explained that "unfortunately" only on that day, July 31, 1795, *four* days *after* the execution of this Treaty, did he receive Pickering's earlier letters of June 29th and July 3rd which emphatically stated, based upon the Nonintercourse Act, that a state could not enter into a Treaty to purchase Indian lands without the approbation of the U.S. *See* Gov. Exh. 269 at 1. Chapin told Pickering that the four Commissioners named in the 1795 State Act "purchase[d] the

Cayuga reservation" for $1,800.00 to be paid annually, reserving six square miles to the Cayuga and "their children forever." *Id.* Chapin admits being aware of the Nonintercourse Act, but because he did not have "any directions" from Pickering, Chapin "endeavored to not interfere" because he presumed that the State Commissioners "were fully authorized by the Government of the [U.S.][,]" as well as by the State, and that they had "full power to transact the business." *Id.*

Chapin further wrote that the State Commissioners had ignored his request to see the 1795 State statute. *See id.* at 1–2. At the Indians' "request[,]" Chapin went with them to the Treaty, but he asserts that he did "not use[ ][his] influence with them, as [he] very soon s[aw] [that] they were determined to manage the business as a separate interest from the [U.S.]" *Id.* at 2. According to Chapin, when he inquired of Schuyler as to how the Nonintercourse Act should be construed, Schuyler "made very little reply[,]" except to [say] that that Act was "very well where it … correspond[ed] with that of an individual State." *Id.* Chapin then assured Pickering that if he had received Pickering's earlier letters, he would have conducted "the business more to [Pickering's] mind[,]" but he presumed that the State "had applied to the [federal] Government and had obtained sufficient power to call the Indians to the treaty[.]" *Id.* at 2. Chapin was quick to note, however, that he had been "cautious" so that it would not appear that he was attending the 1795 Treaty on behalf of the U.S., because he had "no special directions" from the federal government, and so he attended solely as a "private individual[.]" *Id.* at 203.

During this same time period, State officials were also corresponding about the State's treaty making under the 1795 State Act. In a letter dated June 9, 1795, one of the Commissioners appointed under the Act, Philip Schuyler, wrote to newly-elected Governor John Jay, who had not yet taken office. *See* St. exh. 738. Among other things, in that letter Schuyler advised Jay, in very basic terms, of the 1795 Act. On the basis of the authority invested in the Commissioners appointed under that Act, Schuyler goes on to explain that "[i]t was agreed to meet [the Oneida, Onondaga and Cayuga tribes]" on July 15, 1795, and they had been so notified. *Id.* at 2. The plan was that the Commissioners, except Clinton, would meet in Albany on July 1, 1795, and proceed to Onondaga where they would convene their Treaty negotiations with the Onondaga and the Cayuga. *See id.* Schuyler invited Jay to join he and the other Commissioners at this "conference[.]" *See id.*

On June 13, 1795, prior to taking office, Jay received a congratulatory letter from State Supreme Court Justice Benson (former State Attorney General and member of the Council which vetoed the 1795 State Act), wherein Benson expressed interest in being appointed as a Commissioner with respect to the State's proposed treaty with the St. Regis Mohawk Indians. *See* Gov. exh. 376; *see also* Tr. at 2966. Benson also reminded Jay of the existence of the 1793 Nonintercourse Act, candidly concluding: "There is the *Rub* with your Predecessor [sic] [Clinton], and I would not trust him to make a full and seasonable Communication of this Business to You." *See* Gov. exh. 376 at 2 (emphasis in original).

In addition to receiving correspondence from State officials regarding the State's treaty making, Jay exchanged letters with Secretary of War Pickering. On July 6, 1795, newly-elected Governor Jay received a letter dated three days earlier from Pickering, *see* Gov. exh. 238, which included a copy of Attorney General Bradford's

opinion letter. *See* Gov. exh. 289 at 1. Even in the face of Bradford's unequivocal opinion letter, in a letter dated July 13, 1795, Governor Jay told Pickering that his "information relative to the Indian Affairs of [New York] [was] imperfect" and that is why Jay did not respond sooner to Pickering. *See* Gov. exh. 238 at 1. Furthermore, in that letter which Jay wrote less than two weeks after assuming office, in a circumspect fashion he stated that "on *this* occasion I think I should forbear officially to consider and decide" the issues of "[w]hether the Constitution of the [U.S.] warrants the ... 1793 [Nonintercourse Act] and whether the [1795] act of this State ..., is consistent with both or either of them[.]" *Id.* (emphasis in original). Jay did observe though that the 1795 State Act was "silent" regarding "any intervention or concurrence of the [U.S.] ... and I do not observe any thing in it which by implication directs or authorizes the Governor to apply for such intervention or which implies that the Legislature conceived it to be either necessary or expedient." *Id.* at 1–2. Apparently in an effort to distance himself from the State's treaty negotiations, Jay reminded Pickering that "[t]he arrangement of this business was finished, *before* I came into office[.]" *See id.* at 2 (emphasis added).

Governor Jay wrote another letter to Pickering, on July 18, 1795, this time to alert him of the St. Regis' claims to lands in the northern part of the State, and the State's intent to treat with those Indians in mid-September, 1795. *See* St. exh. 740 at 1 and 2. After briefly recounting the State's prior dealings with the St. Regis, Jay set forth his understanding of the procedure to be followed with respect to that planned Treaty. Jay observed the need for the U.S. to appoint at least one commissioner to treat with the Indians so that the State's negotiations with the St. Regis would "be conducted conformably to the [Nonintercourse Act.]" *See* St. exh. 740 at 2; *see also* Tr. at 3921. Jay provided this accurate, albeit simplified description of the procedure to be followed under the Nonintercourse Act despite the fact that just five days earlier he claimed an "imperfect" understanding of New York's Indian affairs. *See* Gov. exh. 238 at 1.

In March 1796, the State ratified the 1795 Cayuga Ferry Treaty, *see* Tr. at 2997; but to this day the U.S. has *never* ratified it. *See* Tr. at 3479. Approximately eight months after the State's ratification, in November 1796, the State surveyed and divided the land which it had purchased under the 1795 Treaty, and sold it at a public auction.

The Cayuga maintain that the foregoing events, as described through this correspondence, show that the State knew about the requirements of the Nonintercourse Act, but "*wilfull* [*y* ] *defi* [*ed* ]" the same when it "entered into the [1795] Cayuga Ferry Treaty." *See* Tr. at 3916–17 (emphasis added). Likewise, the U.S. asserts that the foregoing shows "that the State demonstrably was aware of the existence and proper interpretation of the Non–Intercourse Act[,]" but despite that knowledge it entered into the 1795 Treaty in violation of that Act. *See* U.S. Resp. at 5. (citation omitted). The State's response is two-fold: (1) it was unaware of the Nonintercourse Act until after-the-fact; and (2) in the eight months lapse between the treaty's signing and its ratification by the State legislature, "[n]othing was done by any federal official ... to advise the State that the 1795 treaty was deemed by them to be invalid." *See* St. Post–Tr. Memo. at 36. For these reasons, the State contends that even though it violated the Nonintercourse Act with respect to the 1795 Treaty, nonetheless, it acted in good faith.

Addressing the State's opposition arguments in reverse order, the court agrees that in the interim between the execution of the 1795 Cayuga Ferry Treaty and its ratification by the State legislature eight months later, the U.S. did not take any action to notify the State that it deemed that Treaty to be invalid under the Nonintercourse Act. Even if, as the U.S. urges, it did take "affirmative steps to stop the 1795 treaty from happening[,]" *see* Tr. at 2981, that is not directly responsive to the State's argument. The State is not challenging the U.S.' conduct *prior* to the 1795 Treaty, rather it is questioning the U.S.' conduct *after* execution, but before ratification of that Treaty.

For several reasons the court finds particularly troublesome the U.S.' failure to notify the State before ratification of the 1795 Treaty that that Treaty was not carried out in accordance with the Nonintercourse Act. Correspondence outlined above from various federal officials shows that well before the State's execution of this treaty, the U.S. was aware of a possible Nonintercourse Act violation if the State did not comply therewith, *i.e.* act under the authority of the U.S. Likewise, that correspondence further shows that in 1795 the U.S. was acutely aware of the State's intent to enter into a treaty.

Furthermore, even if the State officials did not have a strong grasp on the Nonintercourse Act and its implications for state treaties, such as the 1795 Cayuga Ferry Treaty, there is ample proof showing that the federal officials had a keen understanding of that Act and states' obligations thereunder. Despite that, as the State is quick to point out, before ratification of that Treaty, the U.S. had eight months in which it could have informed the State of the necessity of conforming the same to the Nonintercourse Act. The U.S.' inaction during that interim period is all the more

striking because it *did* act promptly to invalidate the Richardson Lease, declaring it "entirely null and void" less than a month after its ratification by the State. *See* Nat. exh. 9 at 1. Nothing suggests that any federal official took any such similar action here. In fact, in his July 27, 1795 letter, President Washington essentially concedes that if this Cayuga Ferry Treaty had already been executed, it should be allowed to stand. And, on that exact date the 1795 Treaty was executed.

The State's assertion that despite its failure to comply with the Nonintercourse Act, it acted in good faith because it was unaware of that Act until *after* that Treaty's execution is less convincing. Perhaps more than any other issue in this case, the court's ability to determine exactly when the State became aware of the necessity of complying with the Nonintercourse Act is hampered by the passage of time. Those with first-hand knowledge of this in some ways critical issue, the State and federal officials involved, obviously have long since passed away. And even though their correspondence is part of this record, its value is limited because much of it is open to differing interpretations.

These differing interpretations are attributable to several factors, including, naturally, the authors' use of the language of the day. It is not always easy for a modern day reader, even the three expert historians who testified during Phase II, to ascertain the precise meaning of these words which were quite literally written in a time and place far removed from the present. Adding to the difficulty in trying to figure out the extent of the State officials' knowledge of the Nonintercourse Act was their tendency to write rather obliquely. Thus, although this correspondence does shed some light on the issue of the State's awareness of the Nonintercourse Act, it is not enough.

The record does not support the U.S.' assertion that the State was *"demonstrably* aware of the existence" of the Nonintercourse Act prior to July 27, 1795—the Cayuga Ferry Treaty's execution date. *See* U.S. Resp. at 5 (emphasis added). An inference can be drawn from the record, however, of the State's awareness generally, prior to July 27, 1795, of the existence of that. Support for this inference can be found in the two letters which Jay received in June, 1795, prior to assuming office as governor. In those letters, as previously discussed, the Nonintercourse Act was at least referenced, although not specifically in terms of the relationship between that Act and the State's then pending Treaty negotiations with the Cayuga. The fact that less than a week after assuming office, Governor Jay received a copy of Bradford's opinion letter, where the State's necessity of complying with the Nonintercourse Act could not have been stated more plainly, lends further support to the inference that Jay was aware of that Act. Just one day prior to the beginning of the Cayuga Ferry Treaty negotiations, *see* Tr. at 3922, on July 18, 1795, Jay demonstrated a passable, working knowledge of the Nonintercourse Act and its impact upon the State's planned treaty with the St. Regis. *See* St. exh. 740. Jay's prior governmental experience, as set forth above, lends further credence to the view that the State, through Jay, was at least aware of the Nonintercourse Act's existence before July 27, 1795.

The inference that Clinton was aware of the existence of the Nonintercourse Act prior to the State entering into the 1795 Treaty is more tenuous. Examining the record as a whole, however, Clinton's awareness of the fact that there was a federal statute such as the Nonintercourse Act seems likely. For example, there is inferential evidence that Clinton would not comply with the Nonintercourse Act. *See*

Gov. exh. 278 at 1. To decide not to follow that Act, it is safe to assume that Clinton would have had to have been aware of it in the first place. Unlike Jay, who, the record shows did receive Attorney General Bradford's forceful opinion letter, the record is silent as to whether Clinton ever received it.

Even if the State was generally aware of the existence of the Nonintercourse Act, that is far different than being "demonstrably aware;" and, more significantly, it does not necessarily follow from that general awareness, as the U.S. maintains, that the State was aware of the "proper interpretation" to be accorded that Act. *See* U.S. Resp. at 5. If anything, the record shows some confusion on the State's part in terms of the relationship between that federal Act and the State's own 1795 Act authorizing State Commissioners to treat with the Indians.

Contributing to the confusion over whether the State was aware of the "proper interpretation" of the Nonintercourse Act is the fact that the 1795 Cayuga Ferry Treaty had been set in motion by Governor Clinton, a staunch advocate of states' rights who, as the record shows, resented the Federal Government's attempts to assert its power over Indian affairs within New York State. By the time that Treaty was actually signed, however, Jay, a federalist, *see* Nat. exh. 61 at 22, was New York's governor. Presumably, as a federalist, Jay would have been far more likely to defer to federal law and federal policies regarding Indian affairs, than would a supporter of states rights, such as Clinton.

In any event, the 1795 Treaty seems to have fallen between the cracks in that it was initiated by a states rights supporter, Clinton, who from the evidence, appears to have been more than willing to proceed without any involvement by the Federal

Government. In the meantime, Jay, a federal rights' advocate, became governor and even though he was more likely to comply with the Nonintercourse Act and did so shortly after the Cayuga Ferry Treaty, he felt powerless to intervene in that particular Treaty, as is evidenced by his reminder to Pickering that "[t]he arrangement of this business [the Cayuga Ferry Treaty] was finished, before I came into office[.]" *See* Gov. exh. 238 at 2. Consequently, the court cannot find, that the State willfully defied the Nonintercourse Act with respect to the 1795 Treaty. Nor can the court find, as the U.S. urges, that the State was "demonstrably" aware of that Act and its "proper interpretation," and yet still proceeded with this 1795 Treaty contrary thereto. To be sure, the State did have a general awareness of the Nonintercourse Act, but the scope of that awareness, especially as to this particular Treaty is vague.

Despite several ambiguities regarding the scope and timing of the State's awareness of the Nonintercourse Act, there is no ambiguity in the fact that Pickering's letters to Chapin, wherein he explicitly instructed Chapin how to proceed with the Cayuga Ferry Treaty so that it would conform to the strictures of the Nonintercourse Act, arrived too late for Chapin to prevent execution of that Treaty. This makes it harder to lay the blame entirely at the State's feet especially when the U.S. itself did not come forward in the months immediately following the Treaty's execution and insist that it be brought into compliance with the Nonintercourse Act prior to its ratification by the State. Moreover, both President Washington and Secretary of War Pickering seemed content to let the matter rest given that, in a manner of speaking, "the damage had already been done." *See* Gov. exh. 388 at 250–51; and St. exh. 729.

### 2. *Negotiation Process*

In the 1789 Treaty between the State and the Cayuga Lake minority, the State "assured" the minority that it would keep them in "peaceable possession" of the lands which they retained under that Treaty. *See* Gov. exh. 298 at 2; *see also* Tr. at 5073. In fact, just four days prior to the signing of the 1795 Cayuga Ferry Treaty, Captain Key, the Cayuga Lake faction's spokesperson at the time, reminded the State Commissioners of that 1789 pledge. *See* Gov. exh. 298 at 1 and 2. Despite that earlier pledge to the Cayuga Lake minority, the State's 1795 Treaty was with the Buffalo Creek majority, and it was for the sale of nearly the entire claim area, including those lands which the State had previously assured the Cayuga Lake minority that it would not sell without that faction's approval. *See* Tr. at 2995; *see also* Gov. exh. 427.

Tracing the 1795 Treaty negotiation history reveals a process which was complicated by the fact that the two Cayuga factions were frequently at odds with each other pressing differing objectives. In the days leading up to the signing of that Treaty, before the arrival of the State Commissioners, the two Cayuga factions met to attempt to reach a compromise regarding the position they were going to take with the State regarding the Cayuga lands. Because of the internal divisions, the Cayuga Nation as a whole was unable to present a united front to the State in terms of how it wanted to proceed. *See* Tr. at 4721.

The Cayuga Lake faction wanted to sell the western side of the Reservation, which had been set aside for it in the 1789 Treaty, *see* Gov. exh. 298 at 2, while at the same time it wanted to retain approximately 50 square miles of that Reservation so it could continue living there. *See* Tr. at 4721. Captain Key, on behalf of the

Cayuga minority, made that proposal to the Commissioners. *See* Gov. exh. 298 at 2. The Buffalo Creek majority, however, wanted to retain only *one square mile* for the minority, *see* St. exh. 103 at 3, because it was still hopeful that the two factions would be reunited at Buffalo Creek. *See* St. exh. 106 at 6 ("We have lands at Buff[alo] Creek and we love our Bro[thers] & wish them to come & live with us."); *see also* Tr. at 4727. In fact, so interested was the Buffalo Creek faction in having the Cayuga Lake faction join it at Buffalo Creek, that as incentive for the two factions to reunite, the majority "insist[ed]" that the annuities payable under the 1795 Treaty be paid at Buffalo Creek rather than at Canandaigua. *See* St. exh. 106 at 5; *see also* Tr. at 4727.

In a July 22, 1795 speech, Hanging Face, the Buffalo Creek majority's spokesperson,[22] advised the State Commissioners of the internal division:

We arrived here some days before you came, and we have been endeavouring [sic] to unite in sentiment with our Brethren who live on the Reservation [the Cayuga Lake faction], but they have declined giving an answer until the Commissioners should arrive.

St. exhs. 102 and 103 at 2. That speech was not the first time the State had become aware of the divergent interests of the two Cayuga factions. The Buffalo Creek majority wanted to dispose of practically the entire Reservation created by the 1789 Treaty, but the Cayuga Lake minority, who were still living on that Reservation, wanted to retain a fair sized land base there. Recognizing the possibility that the two factions would continue to reside in different areas, as they had in the previous years, in his July 19, 1795, opening speech

(prior to Hanging Face's speech), General Schuyler counseled:

If any part of your nation continues to reside on the land apportionated [sic] to your use and occupancy, *and another part* continues to reside at Buffalo Creek or elsewhere, you ought to stipulate what portion of the money to be annually paid you should be paid to each party, as *this will present controversy amongst yourselves* and prevent the effects of partiality in the agent, who may be entrusted with the distribution.

But, Brothers, *it would afford us much more pleasure if your whole Nation would collect and settle on such part of your reservation as you may not incline now to dispose* of.

St. exh. 80 at 2 and 5 (emphasis added). What is more, when the Buffalo Creek majority proposed reserving one square mile for the use of the minority, the State responded that that was "insufficient" because thirteen families were living there. *See* St. exh. 104 at 1–2. Therefore, the State made a counter proposal that two square miles should be reserved to the minority; and that was done. *See* St. exh. 104 at 1–2; Gov. exh. 427 at 2, ¶ 4; and Tr. at 3004.

The Cayuga urge the court to imply bad faith on the State's part because during the 1795 Treaty negotiations it disregarded the concerns of the Cayuga Lake minority by "refus[ing]" the minority's proposal to sell a portion of the Reservation, and then "proceed[ed] only to deal with the [Buffalo Creek] majority." *See* U.S. Post–Tr. Memo. at 26 (citations omitted). This argument carries little weight with the court. It is premised upon the Cayuga's belief that the State had changing allegiances in terms of which Cayuga faction it was dealing with at any given time;

---

**22.** Hanging Face was Fish Carrier's deputy, and as the latter aged, Hanging Face became the principal spokesperson for the Buffalo Creek majority. *See* St. exh. 623 at 48.

or, in the words of the U.S.' historian, the State had a "divide-and-rule approach[,]" intentionally playing one Cayuga faction off against the other to advance the State's own interests. *See* Gov. exh. 362 at 57. Referring to the Buffalo Creek majority as the "authorized leadership of the Cayuga Nation," the State asserts that the majority were "willing sellers." St. Post–Tr. Memo. at 28.

Admittedly, by entering into the 1795 Treaty with the Cayuga majority, the State did not strictly abide by the terms of the 1789 Treaty with the Cayuga Lake minority because it sold the lands reserved under that latter Treaty without the minority's approval. Nevertheless, the court is reluctant to find that such conduct, standing alone, demonstrates that the State acted in bad faith. The State should not be held responsible for division and internal strife within the Cayuga Nation. Indeed, given the majority's interest in disposing of as much of the Cayuga lands as possible in exchange for annual payments, without the State's intervention on the minority's behalf, doubtless that faction would have received even less than it did under the 1795 Treaty. If the Buffalo Creek majority had its way, the minority would only have had one square mile, but at the State's insistence the minority retained two square miles. Given that in 1795 the Cayuga Lake minority represented only about 12–13% of the entire Cayuga population, a reserve of two square miles does not seem unreasonable. *See* Tr. at 4942. Rather than evincing an intent by the State to "divide and conquer," as the U.S. posits, the State's conduct at the 1795 Treaty negotiations, especially when viewed in the context of the preceding history between the State and the Cayuga factions, shows the difficulty the State had in dealing with the Cayuga Nation, which was sharply divided as to what should be done with its lands.

The availability of alcohol is yet another reason the Cayuga offer to support a finding of bad faith during negotiations of the State at the 1795 Cayuga Ferry Treaty. Several references to alcohol and Indians are in the record. *See, e.g.,* Gov. exh. 324 at 175 ("[T]he Six Nations wanted traders to be licensed, in order that unscrupulous whiskey-sellers and other undesirables could be excluded from ... Indian country[.]"); and Gov. exh. 218 at 692–93 (noting that on November 3, 1794, with respect to the Treaty of Canandaigua, "no business was done because the chiefs avoided the issue and got drunk[ ]"). Specific references to alcohol at the 1795 Treaty session in particular are scant, however. On direct examination, the Cayuga's historian asserted that Schuyler "brought alcohol or alcohol was used to ply the Indians at the treaty grounds." *see* Tr. at 3950–51. Hauptman was forced to admit on cross-examination though that his only source for this bald assertion did not actually support it. *See* Tr. at 4221–22.

Moreover, in a July 19, 1795 speech General Schuyler reminded the Six Nations that:

> [I]n transacting business of importance, it is necessary that both parties should act with candor and moderation. Neither should insist on terms that are improper or immoderate. *Each party shall be sober and discreet, and possessed of their reason. We shall therefore moderate ourselves in the use of spiritous liquors and as far as it depends on us, we shall prevent excess in you.* To this end, we shall not give any rum to any of your people, except what is given to be drunk around this Council fire and what may be necessary to take to your encampment.

St. exh. 80 at 5–6 (emphasis added). As this speech reveals, the State did provide

alcohol at the 1795 Treaty sessions, but There is nothing in the record establishing that the alcohol in any way effected the Cayuga and their ability to carry on with treaty negotiations. The absence of such evidence, and considering the record as a whole, convinces the court that the availability of alcohol was nothing out of the ordinary for treaty making at that time, and it is certainly not indicative of bad faith on the part of the State, especially given Schuyler's emphasis on moderation.

The Cayuga contend that the State engaged in "bribery" in connection with the 1795 Treaty, and supposedly this too demonstrates bad faith on the part of the State "by currying favor with the Cayugas, overcoming their distrust, and influencing their agreement through the payment of gratuities." *See* Cay. Reply at 21. Of the three historians who testified, only Dr. Hauptman raised this notion of bribery by the State. To support this contention Hauptman relied upon a ledger, which was not made a part of his report, "list[ing] four Cayugas who received four payments of $10." Tr. at 4140–41; *see also* Tr. at 3951; and St. exh. 742. Using Hauptman's own definition of a bribe, as "an illegal payment to an official or individual to seek some favor," *see* Tr. at 4142, the record fails to support a finding of bribery by the State. The mere fact that that ledger did not include entries listing the reasons for certain payments does not, as Hauptman urges, show that the State engaged in bribery. By attributing to the State the worst possible motive to actions, which if not wholly innocent, were in keeping with the mores of that time and place is nothing more than a far flung attempt by the Cayuga to show bad faith where none exists,. *See* Tr. at 4713 ("[I]t [is] unfortunate that a term like bribery has been used to describe what were, in essence, cultural norms of the day and were so transparent that they were blatantly recorded in ledgers and other forms.").

Based upon Hanging Face's speech to the State Commissioners on July 25, 1795, wherein the Cayuga "agree" to the State's "propos[al] to take a lease *for ever* [sic][,]" the Cayuga further assert that they were not aware that they were transferring their lands at the 1795 Treaty. St. exh. 106 at 4 (emphasis added). According to the Cayuga this alleged confusion arises in part because their concept of land ownership differs from that of "European legalities." *See* Cay. Pre–Tr. Memo. at 53. The U.S., relying in part upon Hanging Face's July 22, 1795 Speech to the Commissioners, wherein he proposed a 22 year lease, asserts that the Cayuga *did* have an "understanding of the principle of ownership[.]" *See* Gov. exh. 362 at 57. Regardless of whether the Cayuga had an understanding of the consequences of their actions in terms of principles of land ownership, this is irrelevant to the bad faith issue because there has been no showing that the State was aware of or fully understood these claimed cultural differences. Furthermore, there has been no showing that the State improperly used the knowledge of these alleged differences to its advantage.

### 3. Commissioners' Conflicts of Interests

As an additional basis for establishing the State's bad faith vis-a-vis the 1795 Treaty, the Cayuga allege that the four Commissioners appointed as agents of the State under the 1795 Act had conflicts of interest because they "stood to gain personally from a land treaty with the Cayuga[ ]." *See* Cay. Post–Tr. Memo. at 47. Looking at events retrospectively, the U.S. similarly asserts that the New York Commissioners "benefit[ted] from the 1795 transaction[,]" which is indicative of bad

faith on the part of the State. *See* U.S. Post–Tr. Memo. at 26. The State challenges these assertions from a factual standpoint, as well as by arguing that whether a conflict exists should not be determined with the advantage of hindsight.

Philip Schuyler, a prominent, well-to-do New Yorker of some stature and influence was the negotiator for the State during the Cayuga Ferry 1795 Treaty negotiations, *see* Tr. at 5163, although all four Commissioners signed that Treaty. *See* Gov. exh. 427 at 3. Prior to 1795, Schuyler had held various positions in both the Federal and State Governments, where presumably he gained some knowledge of Indian affairs, although the record is unclear as to the depth and scope of that knowledge. During the American Revolution, Schuyler had been a Federal Commissioner dealing with the Iroquois Confederacy as well as "one of the leading generals of the [U.S.]" *See id.* at 2979 and 4078. In addition, during the 1790s he had periodically served as a U.S. Senator. *See id.* at 4078. Schuyler's list of accomplishments does not end with his federal service. Prior to his appointment as State Commissioner, he had also served as a New York State Senator and Surveyor General of that State. *See id.* Finally, not surprisingly, Schuyler was "one of the largest, [if not] the largest land holders and wealthiest people in the [S]tate." *Id.*

In stark contrast to Schuyler, of the four State appointed Commissioners, John Richardson probably was the least qualified to serve in that capacity. Richardson was described as a "yeoman" in his indenture for his 1791 private lease with the Cayuga, which the State later declared illegal. *See* Tr. at 2979. The U.S.' historian testified that Richardson had "no special qualifications" to serve as a State Commissioner, and that his appointment

was based upon "nothing more than the fact that he ha[d] a great deal of interest" in the Cayuga lands in that, among other things, he resided there off and on for several years preceding the 1795 Treaty. *See id.* at 2978 and 2979. The other view of Richardson's appointment is that "precisely" because he did own an interest in the Cayuga land, as a settler who had periodically resided there with the Cayuga's consent, he was appointed to represent the views of other settlers such as himself, and to present preemption petitions to the Commissioners on behalf of those settlers. *See* Tr. at 5158; and 5139. Regardless of the underlying motivation for Richardson's appointment, the record shows that he and Schuyler were each fairly high profile individuals of the time, although for very different reasons. The other two State appointed Commissioners, Cantine and Brooks, were not so high profile. John Cantine had been a State surveyor and an ally of Schuyler's in 1789. *See id.* Brooks' stature most likely came from his status as a State judge. *See id.* at 2979.

In November, 1796, the State auctioned the Cayuga lands which it had acquired pursuant to the 1795 Cayuga Ferry Treaty. Article ten of the State's 1795 Act contemplated that settlers who had been residing on Cayuga land for a certain amount of time prior thereto, such as John Richardson, could claim preemption rights which normally belonged to the State. *See* St. exh. 48 at 617. Implicit in Article ten is the recognition that each settler would be allowed only one preemption lot, not to exceed 250 acres. *See id.* Of the approximately 200 available lots, roughly 20 to 30 were preemption lots. *See* Tr. at 3003; *see also* St. exh. 115. Three of the four State Commissioners appointed under the 1795 Act personally acquired land, but only one, Richardson, did so by exercising his right to preemption. The other two Com-

missioners who acquired land at the auction, Brooks and Cantine, did so by successfully bidding on that property, not by exercising any preemption rights. Cantine obtained ten lots and Brooks six. *See* St. exh. 115.

In ascertaining whether the four Commissioners appointed under the 1795 Act had a conflict of interest, the State maintains that any potential conflicts of interest must be examined in light of the "facts known and knowable at the time of the 1795 treaty, not on unforeseen subsequent events." *See* St. Reply at 22. Furthermore, according to the State, whether or not a conflict existed should not be judged by 20th or 21st century standards, where there has been a heightened sensitivity to such conflicts. The Cayuga remark that "the concept of a conflict of interest did not originate in modern times." ·Cay. Reply at 17 (citation omitted). Although the concept of a conflict of interest is not new, undoubtedly the standards which are used to determine the existence of same may well differ depending upon the time and place of the conduct being judged. The court declines to apply current and arguably stricter standards regarding potential conflicts of interest to this centuries' old conduct.

It is especially important for the court to keep in mind that the acts of which the Cayuga now complain took place over 200 years ago, in a world far different than today's. In 1795 New York State was unpopulated compared to today, making it more difficult to find qualified but completely unbiased individuals to serve the State. Therefore, it is not surprising that the four Commissioners appointed under the 1795 Act were all involved in various aspects of State life at the time, not only with the State's dealings with Indians. As Dr. von Gernet, the State's historian; so aptly put it, "[I]n those days it was far

more common, given the intimacy of the people involved, to have overlapping interests." Tr. at 5160. Thus, to the extent possible the court will view the conflicts alleged here in historical context, keeping in mind the foregoing.

Insofar as Brooks and Cantine are concerned, the only basis for the Cayuga's claimed conflict here seems to be that these two Commissioners successfully bid on several lots at the 1796 auction. Several factors significantly undermine this argument. First, as specified in the 1795 Act, the auction was public and nothing in that Act or elsewhere precluded Commissioners appointed thereunder from participating in that auction. *See* St. exh. 48 at 617. Second, to find a conflict it must be presumed that when carrying out their statutory duties, these two Commissioners subordinated the Cayuga's interests to the Commissioners' own desire to later purchase parcels of Cayuga lands for their own use. The record does not support such a presumption. Cantine and Brooks were both eligible to participate in the 1796 public auction and they did. There has been no suggestion that there was any impropriety in the bid process itself. Consequently, the court fails to see how Cantine and Brooks can be deemed to have had a conflict of interest.

Whether Schuyler or Richardson, or both, had a conflict of interest is more debatable. For example, even the State's own historian admitted on cross-examination that "Schuyler may or may not have had some conflict of interest." Tr. at 5159. The primary argument for finding that Schuyler had a conflict comes from the Cayuga's historian, Dr. Hauptman. In keeping with the theme of his research in recent years, Dr. Hauptman testified at some length that Schuyler supposedly had a conflict of interest because, in Hauptman's view, Schuyler was trying to obtain

the Cayuga Reservation to further his own interests in promoting a canal system throughout New York State. Substantially for the reasons set forth by the State at page 21 of its Reply Memorandum, this argument does not carry much weight with the court.

Particularly compelling among those State arguments is arguments that there is no basis for this particular alleged conflict because Schuyler easily could have pursued his transportation interests without obtaining any Cayuga land. In fact he did. Furthermore, absent from this record is any indication that Schuyler purchased Cayuga lands at the 1796 auction. *See* Tr. at 5432; *see also* St. exh. 115. Given Schuyler's stature in the community at the time, in combination with his extensive Federal and State service, including prior involvement with the Iroquois Confederacy, his appointment as Commissioner under the 1795 Act was not out of the ordinary and not necessarily indicative of bad faith on the State's part. In fact, had Schuyler not been appointed, the court can envision the Cayuga now arguing that the State acted in bad faith by *not* appointing this individual who seems to have been so well-suited to carrying out the duties set forth in the 1795 Act.

Richardson's situation was more tenuous given his relative lack of qualifications. There is ample proof in the record that he did not have the stature, politically, militarily, or socially that Schuyler did. Richardson was a yeoman who had a "major interest" in the Cayuga lands at the same time he "was appointed a commissioner to treat for the state's purchase of the reservation." *See* Tr. at 2979. The State's historian openly admitted that the extent of Richardson's involvement is "disturb[ing] . . . from a modern vantage," because earlier Richardson had been expelled from Cayuga lands by order of Governor Clinton, and his earlier private lease with the Cayuga had been declared illegal by the State, still he is appointed an agent of the State. *See id.* at 5138. Still, the court does not believe that judging Richardson's conduct in historical context, his appointment amounted to a conflict of interest reflective of the State's bad faith. There is nothing in the record showing that Richardson actually participated in the 1795 Treaty negotiations, but he did sign that Treaty. His subsequent purchases at the 1796 auction do not evince bad faith because that auction was public; and as with Brooks and Cantine, there has been no showing that Richardson actually participated in the 1795 Treaty negotiations. Schuyler's role was to negotiate with the Cayuga, which is understandable given his prior relevant experience. There is no basis for finding that Richardson somehow subordinated the Cayuga's interests to his own. Last, but not least, again keeping in mind the historical context, the Commissioners' mandate under the 1795 Act was to promote the interests of the Indian Nations enumerated therein. As Dr. von Gernet persuasively testified, in 1795 "purchasing the lands that the [Cayuga] ha[d] been trying to dispose of for many years[ ]" could even be viewed as tending to promote the Cayuga's interests, even in if retrospect it might not be viewed that way. *See* Tr. at 5161–62; *see also* Tr. at 5141–42.

#### 4. Sale of Former Cayuga Lands

The issue of whether the State failed to act in good faith in connection with its sale of Cayuga Reservation lands at the 1796 public auction need not detain the court for long. It is undisputed that by its express terms the 1795 State Act provided that the State would purchase the Indian lands for what was the equivalent of only 50 cents per acre, whereas such lands were to be

sold by the State for no less than the equivalent of $2.00 per acre. *See* St. exh. 48 at 616. Consequently, inherent in that statutory scheme was a profit for the State. Given the prices mandated under the 1795 Act, the *State's minimum profit* was to be *four times* that of its *original* purchase *price.* Based upon that statutorily anticipated minimum profit, the State's lack of good faith is virtually self-evident, even if it never actually realized a profit.

This is not the first time the State has been condemned for this 1795 Act which was *anything but* what it professed to be—an Act "for the better support" of the Cayuga and the other two Indian Nations named therein. Not only did the 1795 Act contain a built-in profit for the State, but when the Cayuga Reservation lands were auctioned by the State in November 1796, it realized an even greater profit. Perhaps the most damaging evidence of the State's lack of good faith in this regard comes from the State itself. The Council of Revision vetoed or "disapproved," the 1795 legislation on the basis, *inter alia,* that "three-quarters of the land ceded would go for the benefit of the State and not over one-quarter for the benefit of the Indians." *See* Gov. exh. 375 at 141 and 142. In some respects the Council of Revision was prescient when it vetoed that Act because, among other reasons, essentially that Act was a revenue generating mechanism for a new State anxious to establish and extend itself in the new Republic. *See* Gov. exh. 375 at 142. Indeed, in a proceeding 114 years after the fact, that is what the State Board of Land Commissioners found; that the State had realized a profit of $247,609.33, or an average price of $4.50 per acre, or $2.50 per acre *more* than the statutory minimum. *See* Gov. exh. 374 at 74–77. The fact that the 1795 Act authorized the State to purchase the Cayuga lands at a profit, coupled with the fact that the State realized even a greater profit

than anticipated under that Act, readily convinces this court that the State did not act in a manner even approaching good faith. Not only did the State pass this improvident Act in the first place (and in so doing overrode the Council of Revision's soundly reasoned veto), but it then proceeded to enter into the 1795 Cayuga Ferry Treaty under the authority of that same Act.

#### 5. Adequacy of Consideration

Closely related to the issue of the State's subsequent sale of the Cayuga lands, is the issue of whether the Cayuga received adequate consideration for their lands under the payment provisions of the 1795 Treaty. From the U.S.' perspective, the consideration which the State paid for the Cayuga Reservation was "unconscionable" and "grossly unfair[,]" and hence supports a finding of bad faith on the part of the State. *See* U.S. Pre–Tr. Memo. at 23; U.S. Post–Tr. Memo. at 30; and U.S. Resp. at 23. The State offers three reasons as to why the court should not impute bad faith to it on the basis of this allegedly inadequate consideration. None of these reasons are valid, however, especially considering the abundance of proof demonstrating that the Cayuga were *not* adequately compensated for the land which they ceded to the State under the 1795 Cayuga Ferry Treaty. This proof includes the State's recognition, in later years of the inadequacy of the 1795 consideration which it paid the Cayuga. *See, e.g.,* Gov. exh. 464 at 2; Gov. exh. 375 at 141–43.

The State first urges the court to use "contemporary history" of the U.S.' acquisition and resale of Indian lands "as the measuring stick for the reasonableness of New York's dealings with the Cayuga[.]" St. Reply at 19. Under that standard, the State asserts that its 50 cents per acre payment to the Cayuga "was far from

unconscionable." *Id.* There is a basic flaw with this argument. It is difficult to see how the U.S.' sale of western Indian lands made in accordance with federal law in "contemporary" times is relevant to this 1795 transaction.

The State fares no better with its second argument. The State is urging the court to assess the adequacy of the consideration paid the Cayuga by applying real estate valuation principles, many of which were developed during Phase I of this litigation. Relying upon such principles, the State vigorously disputes that it ever made a profit from the sale of the former Cayuga lands. There is no need for the court to engage in such an analysis, however. The terms of the 1795 Act itself, coupled with the profit realized by the State a year later, are sufficient to show that while perhaps not "unconscionable," the consideration paid by the State in 1795 was *not* adequate. Indeed, regardless of what transpired at the 1795 Treaty negotiations, the State had the "upper hand" entering those negotiations in at least one very important respect: The 1795 Act only authorized the Commissioners to pay 50 cents per acre for the purchase of the Cayuga lands. Therefore, whether or not the State actually realized a profit, the terms of the 1795 Act and the fact that private landowners were willing to bid nine times the price which the State paid to the Cayuga, support a finding that the Cayuga received inadequate consideration in 1795. *See* Gov. exh. 362 at 59.

Third, the State argues that the U.S.' silence following the 1795 Treaty, not even "hint[ing] that the transaction was deemed to be unconscionable," undermines the U.S.' argument today that the consideration was unconscionable. *See* St. Reply at 19. The court disagrees. The U.S.' silence in the aftermath of the 1795 Treaty is troubling in more ways than one, but it does not provide a basis for finding that the Cayuga were adequately compensated for their land in 1795, especially when all of the evidence points to the contrary.

The weakness of the State's arguments is exacerbated by the State's own acknowledgment in later years as to the inadequacy of the consideration which it paid to the Cayuga in 1795. After the Cayuga presented several memorials to the State between the mid-1800s and the early 1900s, in 1907 the Legislature authorized the Cayuga to present their claim that they had not been sufficiently compensated to the State Land Board. The Board, in turn, appointed a Special Investigator, Joseph Lawson, Esq., who reported to the Board, among other things, "that the annuity now received by ... [the] Cayuga nation...is *not* an *equitable, just* and *fair annuity,* in view of the *large profits made* by the *State* ... on the purchase and sale of lands formerly belonging to [the] Cayuga Nation[.]" *See* Gov. exh. 374 at 77 (emphasis added). The Board adopted Lawson's report in full, including the just quoted finding. *See id.* at 79. Particularly in light of the State's own acknowledgment, albeit after-the-fact, of the inadequacy of the 1795 consideration which it paid to the Cayuga, the court finds no basis for holding that the State acted in good faith with respect to the amount of that consideration.

■■■ After examining the vast and comprehensive historical record pertaining to the 1795 Cayuga Ferry Treaty, which included an abundance of evidence providing the backdrop for that Treaty, the court finds as follows with respect to the State's purported good faith in that regard.

There were a number of historical events upon which the parties heavily focused in an effort to show the State's good faith or lack thereof. Not all of those events are directly relevant to the funda-

mental issue of the State's good faith though. For instance, the Sullivan–Clinton Campaign did not advance the State's assertion that it acted in good faith, particularly as to the Cayuga, because that battle was essentially retaliation for the events at Wyoming Valley; such battles are an unfortunate but predictable byproduct of any war; but events such as those did assist in providing a historical context for the 1795 Treaty. Thus those events outlined herein to stress the importance, indeed the necessity, of looking at the "big picture" when examining events which occurred hundreds of years ago, and where there are no witnesses with firsthand knowledge of these events.

An examination of *all* of the circumstances surrounding the 1795 Treaty, including the proof which was thoroughly developed as to the Cayuga's and the State's roles in historical events such as the American Revolution, persuades the court that the State was *not* motivated by a deliberate intent to cheat or defraud the Cayuga in relation to those two Treaties. Nor does the record support a finding that the State at that time *wilfully* violated the Nonintercourse Act. In fact, in sharp contrast to *Wickham*, 955 F.2d 831, there "is [*not* ] every indication ... that the [State] knew it was *clearly violating a specific statutory duty* created by the [Nonintercourse Act]." *See id.* at 839 (emphasis added). As previously discussed, at a minimum the State had a general awareness of the Nonintercourse Act prior to executing the 1795 Treaty. But the present record does not establish that Jay, Clinton, or any other high-ranking State official was aware of a *specific* statutory duty imposed upon the State by the Nonintercourse Act, especially with respect to this 1795 land cession. Likewise, there is insufficient evidence to support a finding that the State engaged in a "blatant scheme to defraud" the Cayuga when it entered into the 1795

Treaty. *Cf. Drexel Burnham,* 837 F.Supp. at 609 (ordering two repeat offenders in a securities law action to pay prejudgment interest where they had engaged in such a scheme, and where they had repeatedly refused to acknowledge the wrongfulness of their actions).

There is more than enough proof in the record, however, to support a finding that in several critical ways the State of New York did exhibit a lack of good faith in its dealings with the Cayuga during the relevant time frame. The first such instance occurred in 1789. In July, 1788, the State ratified the U.S. Constitution which explicitly provides: "*No State* shall enter into any Treaty[.]" U.S. CONST. art. 1, § 10 (West 1987) (emphasis added). The Constitution also explicitly grants treaty making power to the U.S. President, "with the Advice and Consent of the Senate[.]" *Id.* art. 2, § 2, cl. 2. Given the State's ratification of the U.S. Constitution in 1788, presumptively it should have been aware of those two provisions when it entered into the Treaty of Albany with the Cayuga Lake minority less than a year later, in February 1789. Yet, disregarding that unequivocal constitutional language, the State, not the Federal Government, and not the U.S. President, entered into the 1789 Treaty without the "Advice and Consent of the Senate[.]" *See id.* The State's brazen disregard of the U.S. Constitution significantly undermines its assertion that it acted in good faith as to this 1789 Treaty.

Turning to the 1795 Cayuga Ferry Treaty, the plaintiffs offer a host of different reasons which they argue are indicative of the State's lack of good faith in relation thereto, and which have already been discussed at some length. To quickly summarize, the record does not support a finding that the State displayed a lack of good faith during the 1795 negotiation process

itself. For the reasons set forth herein, neither the availability of alcohol, the purported "bribes," nor the alleged cultural misunderstandings support a finding that the State failed to act in good faith with respect to those negotiations. Likewise, there is no merit to plaintiffs' claim that the State did not exercise good faith in the 1795 negotiations because it negotiated with the Cayuga majority faction, as opposed to the Cayuga Lake faction. This is just another example of the Cayuga's continuing inability to present a united front to the State insofar as their lands were concerned.

That said, one of the most flagrant examples of the State's failure to act in good faith arises in connection with the 1795 Treaty itself; that was the State's passage in the first place of the 1795 Act, which authorized it to proceed with treaty making to obtain lands from three member Nations of the Iroquois Confederacy, including the Cayuga. As should be readily apparent by now, in this court's opinion, that Act was nothing more than a transparent attempt on the State's part to generate revenue at the expense, both economically and otherwise, of the Cayuga. The State's passage of this Act is all the more disconcerting given that the Council of Revision, of which Governor Clinton was a member, vetoed this Act because, among other reasons, "it was improper to become a law since it was *not in the best interest of the Indians* [.]" *See* Gov. exh. 363 at 464 (internal quotation marks and footnote omitted) (emphasis added). The Council further reasoned that the 1795 Act "did not live up to the promises made by both houses of the legislature in concurrent resolution" the preceding year. *See id.* That Resolution stated:

> His Excellency the Governor, was requested to confer with the Indians then in the city of Albany, and to give them the fullest assurances of the continued friendship of the State towards their brethren the Six–Nations, and that the legislature would protect and secure them in the possession and enjoyment of their reservation, according to the agreements made with their several nations, and were ready to make any further disposition thereof for their *sole* benefit, when the wishes of their respective nations shall be made thereon for that purpose.

*Id.* at 464–65 (internal quotation marks and footnote omitted).

Even in the face of that 1794 Resolution and the Council of Revision's veto of the 1795 Act, first the State Senate and then the State Assembly overruled that veto. They did so despite the fact that it is difficult to imagine legislation which was more contrary to that earlier Resolution by the State than the 1795 Act. That 1795 Act was not for the *benefit* of the Cayuga, as it purported to be, but rather it was an Act to the *detriment* of the Cayuga.

As to the 1795 Cayuga Ferry Treaty itself, the State also did not act in good faith either as to its sale of the former Cayuga lands thereunder, or as to the consideration which it paid for those lands. Because the 1795 Act provided for a sizeable profit to the State, the profit scheme inherent in that legislation manifests the State's lack of good faith regarding its subsequent sale of the Cayuga's land. In addition, the record is replete with references in several forms, such as the Council's reasons for vetoing the 1795 Act, and in later proceedings before the Land Office Board, as to the State's self-serving profit motive in passing this legislation, and the profit which it realized.

There is one other facet of the 1795 Treaty which bolsters the court's conclusion that the State did not act in good faith with respect thereto, and that is the scope

of the State's knowledge of the requirements of the Nonintercourse Act prior to its execution of that Treaty. In its earlier discussion of this factor, the court found that the State had a general awareness of the Nonintercourse Act, but that the record is unclear as to the extent of that awareness, especially as it relates to the 1795 Cayuga Ferry Treaty. The court emphasizes, however, that when it made this finding it did so in isolation. Stepping back and viewing the totality of the evidence in historical context, however, reveals that the State's failure to comply with the Nonintercourse Act, despite its *general* awareness of the same at the time, was an act which was not wholly innocent, especially given the State's overt profit motive. To conclude, although the court cannot find that the State willfully violated the Nonintercourse Act, there is sufficient evidence in the record to show that it acted in calculated disregard of that federal statute; and such calculated disregard is not indicative of good faith.

### N. 1807 Treaty

The State's treaty making did not end in 1795. Prior to the 1807 Treaty, in addition to the treaty with the St. Regis, the State entered into several other treaties with other member Nations of the Iroquois Confederacy. In 1798 and again in 1802, the State entered into two separate treaties with the Oneida, both of which satisfied the Nonintercourse Act. At the time of this first Oneida Treaty, in 1798, John Jay was still governor of New York State. And, as already discussed, at least as late as September 1, 1795, he demonstrated an understanding both of the requirements of the Nonintercourse Act and of the fact that the State could not proceed alone in that regard. *See* St. exh. 740 (Jay letter to Pickering regarding impending St. Regis Treaty wherein Jay advised Pickering that the State had made all the necessary arrangements, but wanted an immediate response from the U.S. as to appointment of its commissioners because the State's proceedings were "necessarily ... suspended until [Jay] receive[d] [the U.S.'] answer[ ]").

In addition to that St. Regis Treaty in 1789, while Jay was still governor, the State entered into a treaty with the Oneida. Plainly that treaty was in compliance with the Nonintercourse Act, as it states thereon that "Joseph Hopkinson Commissioner appointed under the authority of the [U.S.]" was "PRESENT[.]" Nat. exh. 16 at 249. He also executed that treaty, *see id.* at 251, which was subsequently ratified by Congress. *See* Nat. exh. 61 at 24. And although Clinton had resumed the governorship by 1802 when the State entered into the second Oneida Treaty which is part of this record, *see* Tr. at 3923, that treaty, too, was entered into in compliance with the Nonintercourse Act. There was a federal presence at that 1802 Treaty: "John Tayler Agent appointed under the authority of the [U.S.] to hold the Treaty[.]" *See* Nat. exh. 17 at 256. Tayler also executed that Treaty and it too was subsequently ratified by Congress. *See id.* at 257; and Nat. exh. 61 at 24. Thus, the record firmly establishes that the State entered into at least two, perhaps three, separate treaties for cessions of Indian lands prior to its 1807 Treaty with the Cayuga; and at least two of those treaties fully complied with the Nonintercourse Act. The foregoing demonstrates the State's awareness, not just generally but specifically, as to the proper procedures to be followed under the Nonintercourse Act, yet, the State again, in 1807, failed to follow that procedure with respect to the Cayuga.

After the 1795 Treaty, the Cayuga Nation began to disperse even more. Some continued to live at Cayuga Lake, but oth-

ers went to Buffalo Creek or across the Canadian border to Grand River, places to which other Cayuga had previously moved. *See* Gov. exh. 362 at 63. Although the proof is not definitive, it shows that in all likelihood at least by 1800, if not before, there were no Cayuga remaining in the Cayuga Lake area. *See* Tr. at 3008–09; and St. exh. 623 at 59.

Because so many of the Cayuga had left their former homeland, and because they were in dire financial straits, it is no surprise that in 1799 and again in 1807 some of them approached the Governor regarding the sale of what remained of their once relatively sizable homeland. In the summer of 1799, Governor Jay informed U.S. Superintendent of Indian Affairs Israel Chapin that "a considerable part of the Cayuga Tribe wished to sell their reserved Land[.]" St. exh. 65; and Tr. at 3494. Because "a number" of Cayuga opposed that sale, Jay was hesitant to pursue this request. *Id.* Jay was amenable though if "reasonable [t]erms" could be reached, and if a stipulation could be agreed upon whereby "a specified portion of the purchase money should be paid to the one party, and the residue to the other party." *Id.;* and Tr. at 3494–95. In that way, Jay desired to appease both "the mass of the Tribe [who][we]re anxious to sell, and . . . [the] small party who [we]re jealous lest Injustice . . . be done them." *Id.;* and Tr. at 3495. Accordingly, Jay instructed Chapin to determine if the Cayuga could agree amongst themselves on this sale, and to see what "would be the lowest Terms on which they would sell." *Id.* Evidently based upon prior experience, Jay frankly informed Chapin that if the Cayuga could not agree, then he "doubt[ed] the Expediency of buying the Land of the Majority,

and being afterwards troubled with the Remonstrances & Discontents of the minority." *Id.*

Apparently nothing came of the Cayuga's 1799 request. But the next year, in the early summer of 1800, Chapin reported to Jay that "the whole Cayuga Tribe" had moved westward, and Chapin was planning to meet with "a number of their Chiefs[,]" who were still interested in selling the remaining portion of their Reservation. *See* St. exh. 66. Jay wrote Chapin that if the Cayuga would "*all unite* in the sale" of that land, the State would buy it, provided the price was fair and in the best interest of the public. *Id.* (emphasis added). Jay observed that the price the State would be willing to buy would be affected by the relatively small size of the remaining land, and the State's expenses, such as the cost of a "national Commissioner[.]" *Id.* Jay again instructed Chapin to ascertain what would be the lowest price for which the Cayuga would agree to sell. *See id.*

Record proof as to what transpired between that second request by the Cayuga in 1800, and the State's 1807 agreement in principle to purchase those remaining Cayuga lands is practically non-existent. *See* St. exh. 623 at 60; *see also* Tr. at 3496. The proof does show, however, that on February 26, 1807, Governor Morgan Lewis, two members of the "Cayuga Tribe," and "their interpretor [sic] Josfe [sic] Parish Esquire[ ] . . ., the Superintendant [sic] of Indian affairs in this State[,]" executed an agreement wherein the State agreed to purchase nearly all of the remaining Cayuga lands,[23] roughly three square miles, totaling 3,200 acres. *See* St. exh. 50 at 1 and 3. The payment terms for one lump sum payment of $4,800.00 or $1.50 per acre, *id.* at 2, thus leaving the Cayuga "without a

---

**23.** Approximately 34 years later, the State completed its purchase of all Cayuga lands when it purchased the one square mile lot

which had been reserved for Fish Carrier in the 1789 Treaty of Albany. *See* Gov. exh. 362 at 66.

home in New York State[.]" *See* Tr. at 3009; and 4145; Gov. exh. 374 at 19. That principle in agreement did not take the form of a treaty, however, until May 30, 1807. *See* St. exh. 52 at 229. Even though the Cayuga received only $4,800.00 for that land, later in that same year those former Cayuga lands were appraised "at approximately $14,899.41[.]" *See* Gov. exh. 374 at 19; and Tr. at 3009.

Like the 1795 Treaty, this court has previously held that this 1807 Treaty was not "ratified by the federal government in accordance with Article II, Section 2 of the U.S. Constitution," and hence plaintiffs established a *prima facie* case of a Nonintercourse Act violation. *See Cayuga IV,* 730 F.Supp. at 489. And also as with the 1795 Treaty, the court's earlier holding remains the law of the case. *See Aramony,* 254 F.3d at 411. Therefore, the court need not revisit the issue of the validity of the 1807 Treaty under the Nonintercourse Act, despite the Cayuga's contention, through Dr. Hauptman, that the State's bad faith here is due, *inter alia,* to the absence of a federal commissioner. *See* Tr. at 4146. There is evidence in the record, though, which easily supports a finding that the State acted in bad faith regardless of whether or not a federal commissioner was present.

 The State contends that it did act in good faith in negotiating this 1807 Treaty because, as improbable as it might seem, the State depicts that Treaty as "keeping with [its] longstanding policy of protecting the interests of the Cayuga minority ..., at the hands of the Cayuga majority who had been intent on selling the [R]eservation ever since it[s] ...creat[ion] in 1789[.]" *See* St. Ph. II Memo. at 12. As has been its strategy throughout this litigation, the State attempts to divert attention away from its own actions by pointing the finger at the

Federal Government, declaring: "The [U.S.,] through its duly appointed Indian agent, transmitted the Cayuga's request to make the sale to the State, was fully aware of all details of the transaction, participated in its fruition, and signed the [1807 Treaty.]" *Id.* at 12–13.

The court's attention cannot be so easily diverted. The State is conveniently ignoring the record evidence showing that it was fully aware of the Nonintercourse Act requirements by 1807, but it still did not abide by that Act with respect to this 1807 Cayuga Treaty, which Congress has never ratified. The State is also overlooking the fact that as with the 1795 Cayuga Ferry Treaty, the consideration which it paid the Cayuga in 1807 for nearly all the rest of their homeland was inadequate, as is evidenced by the fact that the State bought that land for $1.50 an acre, and shortly thereafter it was appraised at approximately $4.50 an acre. Given the State's knowledge of the Nonintercourse Act by 1807, the State certainly cannot be said to have acted innocently when it failed to comply therewith. In fact, an inference can be drawn from the proof that the State knew, or should have known of the necessity of complying with the Nonintercourse Act when entering into land cessions with Indians.

### O. 1807 Onward

So far, in ascertaining the State's good faith or lack thereof the court's analysis has been dominated, as was Phase II, by events which happened mostly in the late 18th and early 19th centuries. Plaintiffs' claims of bad faith do not end with the 1807 Treaty, however. They argue that the State continued to act with bad faith in the immediate aftermath of the 1795 and 1807 Treaties, and has continued to do so well into the 20th century. Primarily this argument is based upon the Cayuga's re-

peated efforts, beginning in 1853, to attempt to get additional recompense from the State for the cession of its homelands to the State in 1795. Although not stated in exactly these terms, the thrust of this argument is that the State acted in bad faith by rebuffing these efforts nearly every step of the way. A related argument by the plaintiffs is that the court should not reduce or limit the amount of prejudgment interest based upon laches or the delay in commencing this lawsuit because any such delay is not attributable to the Cayuga—they commenced this lawsuit at the first available opportunity.

The State counters that it has made a "substantial showing" of its good faith in its dealings with the Cayuga from 1807 onward, and plaintiffs have failed to rebut that showing. *See* St. Reply at 30. Further argues the State, "plaintiffs have failed adequately to explain or justify their long and unreasonable delay in bringing the present action[.]" St. Reply at 41.

The record contains considerable proof as to the Cayuga's efforts, beginning in 1853, and continuing right up until the filing of this lawsuit in 1980, to "make their voice heard" with respect to the sales to the State of their homelands in 1795 and 1807. It is not necessary for the court to go into the minutia of the Cayuga's efforts and the State's responses thereto (although the parties did, both in terms of the evidence proffered and in their briefing of the related legal issues), to resolve the bad faith and delay issues which are being raised at this juncture. The necessity of such an in-depth examination of this proof is further obviated by the fact that the record facts which form the basis for both of these arguments are nearly identical, and largely undisputed. *See* U.S. Resp. at 8. Thus what follows are highlights of both the Cayuga's attempts to receive compensation from the State for

the past approximately 150 years, and the State's responses thereto.

The Cayuga's efforts began in 1853 when Dr. Peter Wilson, "a well-educated Grand Sachem of the Six Nations," *see* Gov. exh. 600, at 6, ¶ 5(h) (internal quotation marks and citation omitted), first petitioned the State Legislature on their behalf, by presenting a Memorial seeking the difference between the amount for which the State subsequently sold their land and the amount which the State originally paid to the Cayuga. *See* St. exh. 631. Dr. Wilson resubmitted that Memorial to the State Legislature in 1861. *See* Gov. exh. 460. The State refused to appropriate funds, *see* Gov. exh. 445, exh. 5 thereto at 2, in spite of the fact that the State Senate's Committee on Indian Affairs found that the Cayuga should be further compensated for the sale of their lands. *See* Gov. exh. 464. The Committee offered a number of reasons for this recommendation, including the Legislature's previous "appropriat[ion][of] large sums in liquidation of the claims of other Indian tribes, resting upon precisely similar grounds." *See id.* at 3.

Undeterred, in the early 1900s the Cayuga retained an attorney to "investigate the possibility of legal action in connection with the 1795 land sale." *See* Gov. exh. 600, at 11, ¶ 5(y). Eventually with the assistance of counsel who prepared another Memorial, three New York Cayuga Chiefs submitted it to the State Legislature in early 1906. *See id.* (citation omitted); *see also* St. exh. 633. Shortly thereafter, the State's Attorney General issued an opinion concluding that the Cayuga's claim, as set forth in that 1906 Memorial, "surviv[ed] any lapse of time," but was a claim over "which no court had jurisdiction[.]" St. exh. 635 at 2. As authorized by an act of the State Legislature, the State Land Board appointed attorney Joseph

Lawson to investigate that same Memorial. *See id.* In Lawson's 1908 "Opinion," he made a number of findings, including that "there rests a moral obligation" upon the State "to make further provision for the support and maintenance" of the Cayuga "based upon a consideration of, ... [the] sum of $247,609.33 as the profits realized by the State ... from the sale" of the Cayuga's former homelands in 1795, but that amount was "in no sense a measure of damage sustained by [the] Cayuga by reason of [the State's] purchase." *See* Gov. exh. 374 at 77. Based upon these findings, Lawson recommended that an act be prepared to submit to the State Legislature "empowering" the State Land Board to enter into negotiations with the Cayuga for "a just and equitable disposition of" the 1906 Memorial. *See id.* at 78. Eventually the State Legislature passed an act authorizing settlement, *see* Gov. exh. 375 at 29–32; and the State Land Board and the New York Cayuga agreed upon a "proposed settlement of $297, 131.20[.]" *See* Gov. exh. 600 at 13, ¶ 5(hh). That settlement was never finalized however.

The Cayuga persisted. When the State Land Board refused to cooperate in further settlement attempts, in January 1913, they sought a writ of mandamus compelling it to negotiate, *see* Gov. exh. 445, exh. 35 thereto, and that relief was granted. After the issuance of that writ, the State agreed to payment of additional annuities, but those payments were discontinued in 1918. From 1913 onward the Cayuga persevered through various avenues within the State bureaucracy. Some of the disputes during that time regarded annuity distribution among the Cayuga, which had been a subject of contention even in the late 1700s. It was not until 1958, however, that the State finally passed into law an act authorizing settlement with the Cayuga. *See* Gov. exh. 600 at 22, ¶¶ 5(mmm) (citing Chapter 918 of the Laws of 1958).

Throughout this time period, for all intents and purposes, basically the Cayuga were foreclosed from pursuing relief in state courts. Moreover, it was not until the Supreme Court's landmark decision in *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), that the federal courts became available to Indian Nations making Nonintercourse Act claims of the type which the Cayuga are asserting in this lawsuit. Reversing the lower courts, in 1974, for the first time, the Supreme Court recognized that Nonintercourse Act claims such as the Cayuga's claims herein do present a federal question "[g]iven the nature and source of the possessory rights of Indian tribes to their aboriginal lands, particularly when confirmed by treaty[.]" *Id.* at 667, 94 S.Ct. 772.

### 1. "Bad Faith"

Keeping in mind that the State has the burden of proving its good faith, the court finds that it has not satisfied that burden here. The record does support a finding, as the State urges, that ultimately the Cayuga did succeed, through legal and political means, in gaining additional compensation in the form of increased annuity payments, which the State has continued to pay through the years. It does not necessarily follow from such a finding, however, that the State acted in good faith in its dealings with the Cayuga in the post-Treaty years.

In arguing that it acted in good faith because eventually the Cayuga received additional compensation from it, the State is ignoring two important points. Assuming *arguendo* the adequacy of those increased annuity payments, the State is ignoring the length of time it took the Cayuga to finally receive those payments. It did not take the State a few years, or even a few decades to make those pay-

ments; it took over 100 years. And while some of that time is understandable given the delay inherent in most political processes, there is evidence in the record that a substantial portion of that delay is attributable to the State, which often times refused to acknowledge its obligations to the Cayuga. *See, e.g.* Gov. exh. 445, exh. 35 thereto at 4 (Supreme Court State Land Office "wholly neglected failed and refused" to negotiate with the Cayuga as required by a State law). The State is also ignoring the fact that the court must, as it has done throughout Phase II of this litigation, view the State's treatment of the Cayuga post–1807, not in isolation, but in the larger context. When that is done, there is simply no basis for finding that the State's actions in those later years were taken in good faith.

By the mid–19th century, as the evidence makes abundantly clear, the State was aware or should have been aware of its previous Nonintercourse Act violations, at least as to the 1807 Treaty. More important is the fact that practically since the Cayuga presented their first Memorial in 1853, various State officials and State entities recognized, time and again, that the Cayuga had not, to put it bluntly, been treated fairly by the State, and hence the State at least had a moral obligation to rectify that wrong. The record from this time period is also filled with acknowledgments by the State that essentially it took advantage of the Cayuga in 1795. *See, e.g.,* Gov. exh. 464 at 2 (1861 State Committee of Indian Affairs reporting that "[w]hile the State was ..., encouraging the Indians to emigrate to the then far west, extinguishing their titles to their lands, and then disposing of those lands for much larger sums than they had cost, the Cayugas, in common with other tribes, experienced all the evils, without any of the benefits of that civilization before whose majestic stride they are forced to recede.") And although the State was not obligated to treat all Indians within its borders the same, the State's willingness to recognize its "moral obligation" with respect to others, such as the Stockbridge Tribe of Indians, *see* Gov. exh. 374 at 76, renders the State's refusal to promptly do the same with the Cayuga all the more questionable.

In an effort to show its good faith, the State challenges both the type of relief which the Cayuga sought in the various State proceedings, as well as the nature of the claims asserted therein. The fact that the Cayuga are now seeking greater and/or different relief than they previously sought from the State does not change the court's opinion that the State did not act in good faith in its handling of the Cayuga's various claims in the post-Treaty years. Equally specious is the State's attack on Dr. Wilson for his failure to challenge the validity of the underlying Treaties, and instead only seeking additional compensation for the Cayuga. The nature of the claims being made does not excuse the State's conduct. Finally, when viewing the State's entire course of dealing with the Cayuga, its treatment of the Cayuga since 1807 is simply a continuation of its poor treatment of the Cayuga in the preceding years. Even if the court were to find that the State acted in good faith in the post-Treaty years, given the current state of the record in terms of its lack of good faith prior thereto, a subsequent finding of good faith would not change the court's analysis of the prejudgment issues herein.

### 2. *Delay*

The Cayuga argue that the court should "give little, if any, weight to any such evidence [of laches]" as a "possible basis for reducing the amount of prejudgment interest to which [they] may be entitled." Cay. Pre–Tr. Memo. at 8. In mak-

ing this argument, the Cayuga contend that "laches cannot be imputed to a party who lacks the authority to seek legal redress[,]" and because "until the mid–20th century no federal or state court could have asserted jurisdiction over the type of tribal claim brought by the plaintiffs [here-]in[,]" it would have been "futile" for them to have pursued a lawsuit of this type. *See id.* at 8; 9; and 14. Put somewhat differently, the Cayuga are arguing that if there was a delay in bringing this lawsuit, it was not unreasonable due to the foregoing, and likewise not attributable to them because they commenced this action at the first available opportunity. Conversely, the State argues that the Cayuga "were fully capable of pressing their claims, but simply chose to pursue types of relief other than those sought in this lawsuit[,]" St. Reply at 41, and thus the court should deny or reduce prejudgment interest on the basis of this delay.

 "[A]n equitable consideration such as laches can[ ] bar an otherwise valid claim for [prejudgment] interest[.]" *West Virginia v. U.S.*, 479 U.S. at 311 n. 3, 107 S.Ct. 702 (citation omitted). As this court recognized earlier in this litigation, in the context of the availability of ejectment as a remedy, there are two essential elements to laches, "unreasonable delay committed by the plaintiff and prejudicial consequences suffered by the defendant." *Cayuga X*, 1999 WL 509442, at *25 (internal quotation marks and citation omitted). The parties did not address this second factor, perhaps because the prejudice to the State is so patently obvious. If laches or delay does not serve to bar, limit or reduce the Cayuga's prejudgment interest claim, then, based upon the conclusion of the Cayuga's economist that they are entitled to $1.7 billion in such interest, the prejudice to the State is clear.

The parties do dispute the issue of whether the delay of roughly 200 years between the time of the first "injury" arising from the 1795 treaty and the filing of this lawsuit in 1980 is reasonable. The court cannot find that the Cayuga are responsible for any delay in bringing this action. The Cayuga's efforts to seek redress from the State for the loss of their homeland in 1795, as recounted above, attest to their perseverance and fortitude. Those efforts do not support a finding that the Cayuga should be denied prejudgment interest simply because they took advantage of the legal and political mechanisms available to them through the years. Furthermore, as this court has previously recognized, "protests, complaints and negotiations looking toward a settlement of the controversy go far to explain the reasonableness of the delay." *Cayuga X*, 1999 WL 509442, at *25. In short, the court finds that this delay was not unreasonable, insofar as the actions of the Cayuga are concerned. As will be seen, that does no mean, however, that the court will not take into account the passage of more than 200 years between the time of the 1795 treaty and the date upon which judgment will be entered. At this point in the litigation, and given the extraordinarily unique facts of this case, in the court's view, it is not significant which party, if any, bears the responsibility of this more than 200 year delay. What *is* significant is the passage of so much time. Irrespective of why, there has been a lapse here of more than 200 years between the time the Cayuga's rights were first violated under the Nonintercourse Act and the time of judgment, which has not yet been entered due to the procedural posture of this case. Suffice it to say for now that the passage of over two centuries is unprecedented in the context of prejudgment interest, and the court will take that into account in calculating prejudgment interest here.

In making a final determination as to whether the Cayuga are entitled to an award of prejudgment interest and the amount thereof, it is appropriate to briefly summarize the court's findings thus far. Prejudgment interest is necessary to fully compensate the Cayuga because not only did they sustain the loss of their homeland, for which the jury found they were entitled to compensation totaling $37 million, but they have sustained the additional loss of not having that compensation available to them over the years for investment or other purposes. At the same time, the court does not agree with the Cayuga that the purpose of such award is to augment or increase the jury's award because supposedly the jury verdict did not adequately compensate them. The fact that the Non-intercourse Act is essentially remedial in nature also augurs in favor of a prejudgment interest award herein as do considerations of fairness and the relative equities. The historical record before the court demonstrates all too vividly that the State did not act in good faith toward the Cayuga at the time of the 1795 and 1807 Treaties, but also on subsequent occasions throughout the 200 years under consideration herein. In sum, the *Wickham* factors undoubtedly warrant a grant of prejudgment interest in favor of the Cayuga.

Since the issue of prejudgment interest first arose, the amount of such an award has been the more challenging issue, primarily because of the extremely long interval between the time of injury and the entry of judgment here. Therefore, even though the economic evidence was not nearly as extensive or comprehensive as the historical evidence, calculating prejudgment interest in this case raises its own complicated issues.

The prejudgment interest issues herein are novel because this lawsuit is novel, indeed practically unprecedented (at least in terms of the remedy phase), in that the wrongs complained of occurred over two centuries ago.

Prejudgment interest is commonly awarded in a variety of contexts, such as on back pay awards in Title VII actions, *see, e.g., Gierlinger v. Gleason,* 160 F.3d 858, 874 (2d Cir.1998); in Securities and Exchange Commission proceedings, *see, e.g., S.E.C. v. Warde,* 151 F.3d 42 (2d Cir.1998); and on claims for unpaid benefits for violations of Employee Retirement Income Security Act, *McDonald v. Pension Plan of NYSA–ILA Pension,* 153 F.Supp.2d 268, 297 (S.D.N.Y.2001), to name a few. Despite the frequency with which such awards are made, analysis as to how those awards are determined has received relatively little attention from the courts. Consequently, in analyzing the unique prejudgment issues before it, not only has the court been confronted with an extremely difficult and unusual set of facts, but case law has not been particularly instructive.

### Economic Evidence

During Phase II, in addition to the three historian experts, the court heard the testimony of three expert economists: Peter Temin, Ph.D., currently the Elisha Gray II Professor of Economics at the Massachusetts Institute of Technology ("MIT"), on behalf of the Cayuga; Mark P. Berkman, Ph.D., Vice President, National Economic Research Associates, Inc., on behalf of the U.S.; and Dr. Grossman, identified earlier, on behalf of the State.

The three economists arrived at different conclusions as to the amount of interest to which the Cayuga may, or in the case of Dr. Grossman, the amount to which they may *not* be entitled. Dr. Grossman, the State's economist, came to the conclusion that it is actually the Cayuga who owe the State money. "[T]here is a huge gulf"

between the economists insofar as these amounts are concerned. *See Cayuga XIV,* 2000 WL 654963, at *3. During Phase II it became apparent that although there is still a "huge gulf" as to the economists' conclusions, they have several significant areas of agreement regarding how to analyze the issue of prejudgment interest.

The economists agree, first of all, that in general an award of prejudgment interest is necessary to wholly compensate a plaintiff because such an award takes into account a plaintiff's lost opportunity cost, or the time value of money. And, as discussed earlier, this economic principle has been widely adopted by courts in calculating prejudgment interest.

In the present case, the necessity of compensating the Cayuga for lost opportunity cost is based on the proposition that if they had not been injured at the time in the amount the jury determined for each of the 204 years for which it awarded damage, they could have used or invested those funds. Without that money or property, they incurred lost opportunity costs with respect thereto. Accordingly, the Cayuga must be compensated for the lost opportunity cost of the money to which they did not have access through the years.

To calculate lost opportunity cost in this case, for example, it is necessary to find a measure of damages available to a person in 1795 (or other past year) who had the resources to invest. Depending upon the type of investment, however, the value of the money invested may increase or decrease. Generally bonds are deemed to be relatively low risk, and thus yield lower interest rates. *See* Nat. exh. 64 at 9, ¶ 25. Stocks, on the other hand, ordinarily involve greater risk and thus have a higher rate of return. *See id.* Because there is no way to know what the Cayuga would have done with the property or money absent

the Treaties in question there is no way to know the investment risk they would have taken in relation thereto.

■ The three economists also agreed that ordinarily compound as opposed to simple interest is preferred. Dr. Berkman emphatically stated, "from an economist's perspective, compound interest is *always* correct." *See* Gov. exh. 2 at 7, ¶ IV(E) (emphasis added); *see also* St. exh. 721 at 4, ¶ 10 ("[T]ypically economists ... use compound interest in their calculations" because they "assume that any interest paid could be reinvested and, ..., interest can be earned upon interest."). In a similar vein, Dr. Temin declared that compounding "is the *only way* to calculate the opportunity cost that makes any sense." *See* Nat. exh. 64 at 13, ¶ 36 (emphasis added). Again, this comports with basic principles of prejudgment interest jurisprudence.

The economists also agreed that the "risk-free" rate is the proper rate to be used here, *assuming* access to financial markets. As to this factor, Dr. Grossman challenged the opportunity cost analysis of both Temin and Berkman because, for one thing, in Grossman's view it is difficult to ascertain opportunity costs at the time in that access to financial markets was extremely limited in the last 18th and early 19th centuries. Thus, insofar as Temin and Berkman are assuming that financial markets were available, and that the Cayuga had access to them, Dr. Grossman questions that assumption.

As discussed earlier in the context of whether or not the jury verdict was inconsistent, a substantial portion of Dr. Grossman's testimony was devoted to his theory that the jury improperly compared "constant" and "current" dollars, using the definition of "current" dollars which evidently is generally accepted among economists,

but is *not* the definition which the jury was instructed to use in Phase I. For the reasons previously set forth herein, because the court disagrees with Grossman's interpretation of the jury verdict, it also disagrees with his prejudgment interest calculations based upon his "adjustment" to the jury verdict. Even if the court agreed with Grossman's methodology, it would not apply that methodology in this case because to do so would render a truly untenable result. When Dr. Grossman did his own independent analysis of the jury's verdict, he concluded that instead of the State owing the Cayuga money for lost rent, it would be the other way around. That is so because Grossman's analysis "suggest[s] that the credits to the State exceeded the amount that damaged the plaintiffs in virtually every year." St. exh. 721 at 10, ¶ 26 (citation omitted). Furthermore, "[t]he implication" of assuming, as Grossman does, "that the jury expressed their verdict in constant 2000 dollars[,] . . . is that the State does *not* owe any damages for loss of past use and possession." *See id.* at ¶ 27 (emphasis added). In other words, strictly applying Grossman's economic based theory as to how the verdict, particularly with respect to lost rent damages, should be calculated would result in the Cayuga *owing* the State approximately $7.6 million dollars.[24] *See* Tr. at 6450–51; *see also* St. exh. 721, exh. 4 thereto at 25.

The court cannot countenance such a result, which in the context of the present case would be fundamentally *un*fair and *in*equitable. Requiring the Cayuga, the prevailing party, to pay the State, the defendant who has been found liable for $37 million, would erode the whole concept of prejudgment interest. The Cayuga would not receive full compensating because

without any prejudgment interest whatsoever, they would not be compensated for the lost time value of their money. Furthermore, under this scenario potentially the State would be *re*warded in that it would effectively have had an interest-free loan for over 200 years.

Because the court is unwilling to follow Grossman's approach for calculating prejudgment interest, and given that he has recognized the validity of Berkman's and Temin's analyses, if the court does not accept his reading of the verdict, it will not consider Grossman's alternative calculation methods. In addition to Dr. Grossman, the State also relied upon its real estate appraisal expert, John D. Dorchester, Jr., who also testified during Phase I. Upon the U.S.' motion in Phase II to strike his testimony, the court limited Dorchester's testimony to possible prejudgment interest calculations, subject to a later determination of relevancy. *See* Tr. at 6128–29. After hearing Dorchester's testimony, and carefully reviewing his April 25, 2000 report ( St. exh. 698), the court finds his prejudgment interest calculations irrelevant in that his underlying assumption is that the Cayuga received adequate compensation from the State in 1795, which the court has found is not so. Accordingly, Dorchester's opinion that the Cayuga sustained no lost opportunity cost, and hence "the State would still owe the Cayuga[ ] a perpetual annuity, as originally agreed[,]" but nothing more is not valid. *See* St. exh. 698 at 4.

Anticipating that the court would disagree with his first assumption, Dorchester also presented a number of tables setting forth a variety of methods for calculating prejudgment interest, based upon several different possible accrual

---

**24.** The State's assurances that it will not actually collect from the Cayuga does not change the court's opinion that Grossman's analysis, using an "adjusted" jury verdict, is inappropriate.

dates, interest rates, and calculations using both simple and compound interest. None of those calculations are applicable to the present case, however, and this court declines to consider them. Having decided that it will not use either Dr. Grossman's or Mr. Dorchester's calculation theories, next the court must consider the analyses of Drs. Temin and Berkman, which while similar are not identical.

Temin and Berkman calculated prejudgment interest taking into account inflation. *See* Gov. exh. 2 at 4, § IV, ¶ 4; and Nat. exh. 64 at 3, § III, ¶ 7. Both compounded the interest beginning in 1795; and both used a "risk-free" interest rate. A "risk-free" interest rate "measures" the "pure time effect [of money] precisely," and accounts for inflation since compounding interest alone will not. *See* Nat. exh. 64 at 9, ¶ 25. According to Dr. Berkman, "[m]any argue that a risk-free interest rate is appropriate because damages estimated at the time of loss should be neutral with respect to the risk faced by the plaintiff following the loss." *See* Gov. exh. 2 at 5, § IV, ¶ (C). As Dr. Berkman noted, the concept of risk-free interest is articulately expressed by Franklin Fisher of MIT:

> At first glance, it may seem that the plaintiff is entitled to interest at its opportunity cost of capital...After all, had the plaintiff received [the funds related to the lost asset], it would have invested the funds, receiving presumably its average rate of return...The fallacy here...has to do with risk. The plaintiff's opportunity cost of capital includes a return that compensates the plaintiff for the average risk it bears. But, in depriving plaintiff of an asset...the defendant has also relieved it of the risks associated with investment in that asset. The plaintiff is thus entitled to interest compensating it for the time value of money, but is not also entitled to interest compensating it for the risks it did not bear.

*Id.* (citing Franklin M. Fisher and R. Craig Romaine, "Janis Joplin's Yearbook and the Theory of Damages" in John Monz, Editor, *Industrial Organization, Economics and the Law, Collected Papers of Franklin M. Fisher,* Cambridge, MA: The MIT Press, p. 393). Relying upon Fisher's reasoning, Dr. Berkman opined that "a risk-free rate is appropriate here[.]" *Id.* at 6, § IV, ¶ (C). "Use of such a rate will result in a prejudgment interest award which properly accounts for the time value of money and inflation[,][but] not for any risk faced by the plaintiff." *Id.* Moreover, "[b]ecause the risk-free market asset is ... the one offering the *lowest* interest rate, ... it will result in the *most conservative estimate* for [prejudgment interest] in this case." *Id.* (emphasis added).

Even though Berkman and Temin agreed on the use of a "risk-free" interest rate, they used different rates which accounts for their different results. In his analysis, Dr. Berkman used U.S. Treasury Bill rates or their equivalents, depending upon the time frame. From 1919 forward, he used the U.S. Treasury–Bill rate; but because prior to that year there is no "detailed history of Treasury Bill and Bonds with specific terms[,]" he "used the lowest interest rate available in each year, whether that rate was issued by a municipal, state or federal government." *Id.* at 6, § IV, ¶ (D). This resulted in interest rates ranging from a low in 1940 of 0/01% to a high of 14.03% in 1981. *See id.,* exh. 2 thereto at 4.

Dr. Temin used the same methodology as Dr. Berkman; the only difference is in the rates used. Berkman explained this difference by the fact that Dr. Temin examined the overall market, while Berkman

looked to the lowest rate. Dr. Temin expressed the interest rates he applied in terms of the "historical nominal risk-free rate[,]" which takes into account "the real rate of interest" [*i.e.,* the "rate after the adjustment for expected inflation] and the expected inflation rate." *See* Nat. exh. 64 at 16–17, ¶ 46.

Despite the similarities in methodologies, given the different interest rates, Dr. Temin, the Cayuga's economist, concluded that they are entitled to prejudgment interest totaling $1,749,963.279.00. *See id.,* exh. S3 thereto. Applying the annualized interest rates mentioned above, and compounding annually, Berkman concluded that as of June 30, 2000, the Cayuga were entitled to $527,500,817.00 in prejudgment interest. *Id.,* exh. 3 thereto.

Adopting Temin's methodology, which includes an accrual date of July 27, 1795, compounds interest and employs the historical interest rates mentioned above, yields a result which can only be described as exorbitant. The court does not fault Dr. Temin's methodology, but there is no justification for such an immense prejudgment interest award—$1.7 billion. When numbers become so large, at a point it is difficult to grasp what a certain amount means in day-to-day life. To place Dr. Temin's prejudgment interest figure in perspective, "Lloyd's of London, the world's biggest insurance market, said ... that it expected to face ... $1.92 billion in claims ... related to the [recent] terrorist attacks on the [U.S.], making it the most costly single calamity in Lloyd's 320–year history." Alan Cowell, *Lloyd's Expects Claims From Attacks to Top $1.9 Billion,* N.Y. TIMES, Sept. 27, 2001. The court stresses that it is making this observation *strictly* for illustrative purposes.

As has been repeatedly stated herein, one of the purposes of prejudgment interest is to fully compensate the injured party. Common sense dictates that such an award should not penalize the party causing the injury, however. Arguably at some point when a prejudgment interest award becomes so large, such as $1.7 billion, whether due to compounding, the interest rate, or simply the passage of time, it crosses the line from being full compensation and becomes an improper penalty. *Cf. Raybestos Products Co. v. Younger,* 54 F.3d 1234, 1247 (7th Cir.1995) (under the Lanham Act courts have discretion to enter prejudgment interest which is "just," but is not a "penalty"); *but see S.E.C. v. Antar,* 97 F.Supp.2d 576, 591 (D.N.J.2000) (a prejudgment interest award "no matter how large," cannot be called 'punitive[ ]' because defendants can invest the funds "during litigation and use the interest thereon to satisfy their prejudgment interest obligation"). An additional reason for not adopting Dr. Temin's calculations wholesale, with no adjustments, is that there would be a very real possibility of overcompensation. Given the equitable nature of prejudgment interest, courts "must be careful that [such] an award does not overcompensate a plaintiff." *See Commercial Union Assur. Co.,* 17 F.3d at 613 (citation omitted); *see also Clarke v. Frank,* No. 88 CV 1900(JLC), 1991 WL 99211 (E.D.N.Y. May 17, 1991) (plaintiff not entitled to prejudgment interest award which results in "windfall"). Last but not least, as the parties agree, plaintiffs have the burden of proving the scope and extent of such relief. *See* U.S. Resp. at 22; and St. Post–Tr. Memo. at 62. They have not met that burden in terms of showing their entitlement to the approximately $1.7 billion figure which the Cayuga's expert recommends.

Having eliminated the analyses of Drs. Temin and Grossman, and Mr. Dorchester, the court is left with Dr. Berkman's analysis. As did Dr. Berkman (and Temin), the

court will use compound interest. Compounding furthers the primary goal of prejudgment interest, which is to make the plaintiff whole again; and the economists uniformly testified, compounding is the norm from a strictly economic perspective. As previously alluded to, application of simple interest here would result in an award which would be too low, and thus would not comport with notions of fairness given the fact that the Cayuga have been deprived of the use and enjoyment of their former homelands for over 200 years.

■ "In a fluctuating economy, a fixed interest rate cannot respond to changes in conditions, frequently resulting in inadequate compensation." *Survey*, 77 Nw. U.L.Rev. at 194. "The rate of prejudgment interest should be a flexible one which is responsive to changing economic conditions." *Id.* at 222. The rates provided by Dr. Berkman easily meet that criteria. "[F]or most of this century," he used "the 3–month Treasury Bill" rate; "[d]uring the 1800's," he used "various municipal, state, and federal bonds[;]" and between 1795 and 1797, he used the rate "associated with a loan from Holland to the American Revolutionary government." *See* Gov. exh. 2, at § IV, ¶ (D). Close examination of these rates reveals that Dr. Berkman did take into account changing economic conditions through the use of those fluctuating rates. Use of these historic, changing interest rates also properly takes into account the fact that "[a]s recent developments in the national economy so readily reveal, the earning power on investments varies a great deal over time." *Survey,* 77 N.W. U.L.Rev. at *220 (footnote omitted). Taking into account what is equitable and necessary to compensate the Cayuga in this unique case, the court finds that the rates used by Dr. Berkman best comport with the full compensation purpose of a prejudgment interest award.

*See Jones v. UNUM Life Ins. Co. of America,* 223 F.3d 130, 139 (2d Cir.2000) (citations omitted) ("[T]he same considerations that inform the court's decision whether or not to award interest at all should inform the court's choice of interest rate[.]").

■ In *Cayuga VIII,* 1999 WL 224615, the court identified the accrual date, the interest rate and the methodology as three issues which it must "carefully ... consider[ ]" in awarding prejudgment interest. *See id.* at *21. As should be readily apparent by now, the only remaining prejudgment interest issue is probably the most heavily disputed—the accrual date. Because of the time span involved, what might seem like a rather mundane issue has taken on much greater significance. A number of different possible dates have been suggested both by the court, *see Cayuga VIII,* 1999 WL 224615, at *23, and the parties. *See* St. exh. 698 at 6, ¶ 4(a); and St. exh. 721 at 12, ¶ 34. The first and most obvious accrual date is the "date of injury or deprivation," or July 27, 1795, the date of the first transaction. *See id.* (citations omitted). As several of the experts' calculations of prejudgment interest show, however, especially those of Dr. Temin, using that 1795 accrual date and compounding interest has the potential for rendering an enormous amount of prejudgment interest in this case.

Nonetheless, the court adopts July 27, 1795, as the accrual date. Even a cursory review of the experts' calculations using accrual dates from more recent years, such as 1980 when this action was first commenced, or 1992 when the U.S. intervened, reveals that an award based on those dates would be relatively insignificant and could in no way fully compensate the Cayuga. It would be fundamentally unfair to rely upon such accrual dates in the context of this unique litigation.

From the time it first became evident that a second phase of this litigation would be required, it has always been known that equities would dominate, and so they have. When confronted with the fact that the Cayuga were seeking ejectment as a remedy, this court stated that "the time ha[d] finally come to invoke ... equitable principles[.]" *See Cayuga X,* 1999 WL 509442, at *22. The court further remarked that such principles "were no longer an abstract concept, but a reality which the Cayuga[ ], as well as the defendants must face[.]" *Id.* The same is true again today. Using July 27, 1795, as the accrual date and compounding, even with the most conservative interest rates, still results in an immense sum, as is evidenced by Dr. Berkman's conclusion that the Cayuga are entitled to $529,377,082.00 in prejudgment interest. Therefore, in balancing all of the equities and "adopting a flexible and commonsense approach," *see Cayuga VIII,* 1999 WL 224615, at *22 (internal quotation marks omitted), the court has determined that it is necessary to adjust that amount. There are a host of reasons compelling such an adjustment.

Even though the court is not relying upon Dr. Grossman's calculations of prejudgment interest, it does give some credence to a few other points which he made. In disputing the methodology applied by Drs. Temin and Berkman, Grossman challenges several aspects of same. Grossman challenges their failure to take into account what the Cayuga would have done with the money if they had actually received adequate consideration in 1795. He also asserts that there are too many unknowns, such as whether the Cayuga would have had access to financial markets and whether or not they had the ability, knowledge, or skills to take advantage of such markets, especially in the early years. Grossman also points out that Temin and Berkman did not take into account expenses which would have been necessarily incurred if the Cayuga had remained in possession of the subject property for the past 204 years, such as their ability to collect rents, overhead costs, taxation, etc.

According to Grossman, another weakness in the methodology used by Temin and Berkman is that they did not consider the fact that the claim area, as unimproved, had no rental value until the twentieth century. Grossman also takes Temin and Berkman to task for compounding interest over 204 years, which Grossman deemed a theoretical exercise because it ignores such factors as times when this country's banks were in crisis and many investors lost significant sums of money. Grossman also noted that compounding interest over a long period of time is unlikely to occur in a real world market. Although the court is not persuaded to alter its view that overall Dr. Berkman's basic approach is the one which it will adopt in determining the amount of prejudgment interest to be awarded in this case, Dr. Grossman made some valid points which the court will consider in evaluating the relative equities herein.

■ In addition to what the court will loosely refer to as these "economic" reasons which factor into its decision to adjust Dr. Berkman's prejudgment interest determination, there are other reasons as well. A recent Supreme Court decision supports this court's view that the amount of prejudgment interest awarded herein should be adjusted due to the long passage of time. In *Kansas v. Colorado,* —— U.S. ——, 121 S.Ct. 2023, 150 L.Ed.2d 72, a case between two states involving violations of a water rights compact, the Supreme Court recently held that a Special Master properly balanced the equities in making a prejudgment interest award, and concluded that the accrual date should be

1985, the filing date of the complaint, rather than 1969 when Colorado knew or first should have known it was violating that compact. *See id.* at 2030–32. Adopting the Special Master's reasoning, the Supreme Court affirmed because, a "long interval [had] passed between the original injuries and th[o]se proceedings[,]" and during the early years of the compact, "no one had any thought that [it] [had been] violated." *Id.* at 2031. "[T]he dramatic impact of compounding interest over many years[ ]" was also deemed adequate justification for choosing a later accrual date. *Id.* at 2031 (citation omitted).

That reasoning applies with equal if not more force here. In *Kansas,* the "long interval" was "at least 50 years." *Kansas v. Colorado,* Third Report of Special Master (August 200) at 99. Here, the "long interval" is four times that—over 200 years. Likewise, in the present case, even assuming *arguendo* that the State had notice of a Nonintercourse Act violation on July 27, 1795, surely it did not have notice that its liability for that violation could include compounded prejudgment interest, much less in the amounts suggested by the expert economists today. This court too cannot ignore the "dramatic impact" of compounding interest in this case. Allowing recovery for 200 years of compounded prejudgment interest would offend this court's sense of fundamental fairness. All these factors militate in favor of reducing Dr. Berkman's suggested prejudgment interest amount of $527,500,817.00.

The court would be remiss if, in its discussion of fairness and relative equities, it did not mention the conduct of the U.S. toward the Cayuga. The U.S. has actively and effectively represented the Cayuga's interest in this litigation since 1992 when it was granted intervener status. The court cannot turn a blind eye, however, to the U.S.' behavior toward the Cayuga in the years, indeed, centuries prior to its intervention. Despite its fiduciary role under the Nonintercourse Act, *see Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 379 (1st Cir.1975), before it intervened in this action the U.S. had not been as solicitous and supportive, nor so active in protecting the Cayuga's interests, as it has been in the 11 years since its intervention.

The record in this case touches upon the U.S.' inaction. Suffice it to say that the U.S., like the State, has at times advanced certain policies and legislation strictly for its own benefit without taking into account competing interests of Indians such as the Cayuga. In fact there is evidence in the record that prior to this litigation the U.S. had taken positions which are contrary to those of the Cayuga's interests herein by in essence in aligning itself with the State and the positions it has taken in the current litigation. During the course of the American and British Claims Arbitration, for example, the U.S. took the position that the State did not need federal approval in entering into treaties with the Cayuga, and the positions it has taken in the current litigation; thus, by implication the 1795 and 1807 Treaties were valid. Of course, the U.S. has taken the exact opposite position throughout this litigation. In this court's more than 20 years of experience in land claim litigation such as this, it has too often been the case that the Indians have been pawns between the State and federal government. Unfortunately, this case is no different.

The court further observes that the sole basis for its earlier holding that neither the 1795 nor the 1807 Treaties were carried out in conformity with the Nonintercourse Act is the fact that the federal government never expressly ratified either of those Treaties. *See Cayuga IV,* 730 F.Supp. at 489. In the eight months be-

tween the execution and ratification of that Treaty, the federal government failed to inform the State that that Treaty did not comply with the Nonintercourse Act. Nor has the U.S. ever ratified this Treaty, which obviously has the very real potential for rendering this litigation moot. It is patently obvious that had the U.S. carried out its fiduciary responsibilities to act on behalf of its ward, the Cayuga Native Americans, this court would not have been faced with the herculean task of righting the wrong which was perpetrated on the Cayuga centuries ago. In that regard, the State should not have to shoulder the blame for the U.S.' wrongful conduct in addition to its own, and the court will take that equitable fact into consideration in arriving at its ultimate award to the Cayuga.

### *Conclusion*

■ In conclusion, the court has determined that although acceptance of plaintiffs' experts' analysis and conclusions cannot be faulted on purely economic principles and might well be justified in providing for prejudgment interest in the usual case when ascertaining damage over a limited period of years, the unique and unprecedented circumstances of this case, *i.e.,* a period of over two centuries between loss and final judgment, cry out for consideration of other factors here and a common sense view to modify the rigid economic text book approach. Thus, the court will adopt the analysis of Dr. Berkman and his computations as to the ultimate prejudgment interest loss to the Cayuga. The court will, however, discount Dr. Berkman's total to take into account: (1) the passage of 204 years; (2) the failure of the U.S. to intervene or to seek to protect the Cayuga's interests prior to 1992; (3) the lack of fraudulent or calculated purposeful intent on the part of the State to deprive the Cayuga of fair compensation for the lands ceded by them in the 1795 and 1807 Treaties; and (4) the financial factors enumerated by Dr. Grossman.

After having given careful consideration to the evidence presented to the court in the form of historical, economic, financial, and real estate proof, the court, in its discretion, finds it just and equitable to award 40% of the $527,500,817.00 computed damages arrived at by Dr. Berkman, in the amount of $211,000,326.80. When that sum is added to the jury award of $1,911,672.62 for the fair rental value of the claim area less credits to the State, and the jury award of $35,000,000.00 for the future loss of use and possession of the claim area, both of which concerned the Cayuga land as unimproved but with infrastructure in place, the Cayuga will at last receive just and fair compensation for the loss of use of that land, past and future.

Accordingly, the court finds that the Cayuga are entitled to an award here of $1,911,672.62 for the fair rental value of the claim area from July 27, 1795 to February 17, 2000, and $35,000,000.00 for the future loss of use and possession of the claim area, as found by the jury on February 17, 2000, and to a further award of $211,000,326.80 for prejudgment interest in connection with the reasonable rental award against the State making a total award of $247,911,999.42, and the Clerk of the Court shall forthwith enter judgment in accordance herewith.

IT IS SO ORDERED.